## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO:** _____ |
| **v.** | : | **DATE FILED:** _____ |
| **TROY WRAGG** | : | **VIOLATIONS:** |
| **AMANDA KNORR** | | **18 U.S.C. § 371 (conspiracy to commit** |
| **WAYDE MCKELVY** | : | **wire fraud – 1 count)** |
| | | **18 U.S.C. § 1343 (wire fraud – 7** |
| | : | **counts)** |
| | | **18 U.S.C. § 371 (conspiracy to commit** |
| | : | **securities fraud - 1 count)** |
| | | **15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R.** |
| | : | **§ 240.10b-5 (securities fraud - 1 count)** |
| | | **18 U.S.C. § 2 (aiding and abetting)** |
| | : | **Notice of Forfeiture** |

## INDICTMENT

## COUNT ONE

**THE GRAND JURY CHARGES THAT:**

### BACKGROUND

At all times material to this indictment:

1.      Mantria Corporation ("Mantria") was a Delaware corporation with its principal place of business in Bala Cynwyd, Pennsylvania.   Mantria claimed to earn millions of dollars in earnings from selling real estate and "green energy" products.   Mantria purported to contain 11 operating divisions, 32 wholly-owned or affiliated companies, and other related entities including Mantria Place, Mantria Financial, Mantria Real Estate, Carbon Diversion, Inc., EternaGreen Global Corporation, Clean Energy Components, Earthmate Technologies, Mantria Industries, Mantria Renewable Energy Fund, and Mantria Communities.   Defendant TROY WRAGG was the co-founder, chairman of the board of directors, and chief executive officer of

Mantria.    Defendant AMANDA KNORR was the co-founder, president, vice-chairman of the board of directors, and chief operating officer of Mantria.    Neither defendant WRAGG nor defendant KNORR possessed a license to sell securities.

2.    Speed of Wealth, LLC, and Retirement TRACS LLC, were Colorado limited liability companies operated by defendant WAYDE MCKELVY which pooled investor funds for joint investments.    Speed of Wealth advertised on the internet, television, radio, and print media to draw prospective investors from the general public to seminars in Colorado, Las Vegas, and elsewhere.    During Speed of Wealth seminars, defendant MCKELVY advised prospective investors to liquidate other investments, including retirement accounts, and to obtain the maximum amount of funds in loans from financial institutions in the form of credit cards, insurance policies, home equity, and other loans, and invest all these funds in Mantria and its related entities.    Despite the fact that he routinely sold securities during the duration of the conspiracy, defendant MCKELVY has never been licensed to sell securities.

3.    Securities investments in Mantria and its related entities mainly were performed through Private Placement Memorandums ("PPMs") which were supposed to be sold to accredited investors who could afford a loss in a high risk investment.    Many of the investors in Mantria were not accredited and were otherwise not suitable to high risk investments. Defendant WAYDE MCKELVY advised and assisted investors to pool investment funds in an attempt to evade SEC regulations.

4.    During the duration of the conspiracy, Mantria raised approximately $54.5 million in new investor funds in their unregistered securities offerings.    Most of the investors resided in Colorado and attended seminars or conferences during which defendants TROY

2

WRAGG, AMANDA KNORR, or WAYDE MCKELVY sold unregistered securities in Mantria or its subsidiaries.    Most of the new investor funds were sent by wire transfer from Colorado to Mantria controlled bank accounts in Pennsylvania.

5.      Mantria Financial was a financial institution and mortgage lending business which engaged in interstate commerce.    Mantria Financial was licensed in Tennessee to finance real estate mortgages.    Mantria Financial was controlled by Mantria based in Bala Cynwyd, Pennsylvania and defendants TROY WRAGG, AMANDA KNORR, and WAYDE MCKELVY.    Mantria Financial issued unregistered securities which defendants WRAGG, KNORR, and MCKELVY sold to investors in Colorado and elsewhere.    Defendants WRAGG, KNORR, and MCKELVY used the funds raised by Mantria Financial to purchase or finance mortgages for undeveloped real estate in Tennessee owned by the Mantria or its subsidiaries in order to generate paper profits for Mantria and inflate the value of the undeveloped land. Defendants WRAGG, KNORR, and MCKELVY then used the proceeds from the land "sales" for other Mantria-related business and for their own personal enrichment.

6.      Mantria performed a small amount of improvements to the Tennessee real estate to give the appearance of development to investors.    Mantria built some roads, one model home, and an entrance gateway.    Mantria had some of the real estate surveyed.    However, the development was never completed, no residences were built, and most of the real estate lacked a supply of potable water.    By the end of 2008, Mantria curtailed the modest improvements of the real estate to focus on "green energy" projects.    Mantria acquired an interest in Carbon Diversion, Inc., a company which initially held a license to manufacture "biochar," a charcoal-like product.    Mantria began construction on a "biochar" facility in Dunlap,

3

Tennessee.   While investors were told that the Dunlap facility was a full production facility, the Dunlap facility was merely a facility which Mantria used to test and refine the machines, called carbon diversion systems, Mantria was developing to make the biochar.   Mantria used the Dunlap facility as a showpiece for investors and potential customers.   The machines did not consistently produce biochar of a sufficient quality to sell on the market.   Moreover, the Dunlap facility was built in a remote location and lacked the logistical infrastructure to transport the tons of biochar necessary for the facility to be profitable.   Consequently, Mantria planned to build a second biochar facility in Hohenwald, Tennessee which had better logistical access.   The Hohenwald biochar facility, however, was never built.   Mantria also solicited investments for a factory in Carlsbad, New Mexico, which would manufacture the machines to make biochar. The Carlsbad facility was also never built.

7.     The United States Securities and Exchange Commission ("SEC") was an independent agency of the United States which was charged by law with protecting investors by regulating and monitoring, among other things, the purchase and sale of securities, including securities sold through PPMs.   None of the securities sold by Mantria were registered with the SEC.   Federal securities laws prohibited fraud in connection with the purchase and sale of securities, including making an untrue statement of material fact or omitting to state a material fact from the information provided to investors.   Federal securities law also generally required those selling securities to the general public to be licensed.

## THE CONSPIRACY

8.     From on or about March 1, 2005, through on or about April 30, 2010, in the Eastern District of Pennsylvania, the District of Colorado, and elsewhere, defendants

4

**TROY WRAGG,**
**AMANDA KNORR, and**
**WAYDE MCKELVY**

conspired and agreed together to commit offenses against the United States, that is, wire fraud

affecting a financial institution, in violation of Title 18, United States Code, Sections 1343.

**MANNER AND MEANS**

It was a part of the conspiracy that:

9.      Defendants TROY WRAGG, AMANDA KNORR, and WAYDE

MCKELVY raised approximately $54 million from more than 300 investors nationwide in

twelve fraudulent and unregistered securities offerings for Mantria and its related entities.

10.      In order to induce prospective investors to invest in Mantria, defendants

TROY WRAGG, AMANDA KNORR, and WAYDE MCKELVY made materially false

statements and omitted material facts to mislead investors as to the true financial status of

Mantria, including grossly overstating the financial success of Mantria and promising excessive

returns.

11.      While defendants TROY WRAGG, AMANDA KNORR, and WAYDE

MCKELVY claimed that Mantria made millions of dollars selling real estate and "green energy"

products, they knew that Mantria had virtually no earnings, no profits, and was merely using new

investor money to repay earlier investors.

12.      Most of the investors were introduced to Mantria through defendant

WAYDE MCKELVY and his company, Speed of Wealth.      Defendant MCKELVY caused

Speed of Wealth to advertise on the radio, internet, and other media outlets to lure the general

public to seminars he offered.   During these seminars, defendants WAYDE MCKELVY,

TROY WRAGG, and AMANDA KNORR made materially false statements and omitted material facts to mislead prospective investors and induce them to invest in Mantria securities. Early investors who received extravagant returns in Mantria securities were used to provide "testimonials" to induce additional investors to invest in Mantria securities.

        13.     Defendants TROY WRAGG, AMANDA KNORR, and WAYDE MCKELVY made the following materially false statements to prospective investors:

        a.     That Mantria earned between 17% and 484% annually, although they knew that Mantria in fact had virtually no earnings and no profits.

        b.     That Mantria investments were secured by real estate in Tennessee which was worth twice as much as the investments, although they knew that the value of the real estate in Tennessee was substantially less and Mantria's interest in this property was contingent.

        c.     That Mantria was currently producing large quantities of biochar, although they knew that Mantria was not producing large amounts of biochar.

        d.     That Mantria had large amounts of "pre-orders" or imminent sales of biochar, although they knew that Mantria had no such imminent sales.

        e.     That Mantria built a carbon diversion systems factory in Carlsbad, New Mexico which had a substantial number of sales contracts to sell the finished systems, although they knew that no such factory was built and no such sales contracts were signed.

        f.     That Mantria intended to turn consumer waste from the Tennessee real estate developments into biochar, well knowing that consumer waste lacked sufficient amounts of carbon to be turned into biochar.

g.       That Mantria was "not a Ponzi scheme," although they knew that Mantria was just such a scheme paying investors' "earnings" with money raised from misled new investors.

14.       Defendants TROY WRAGG, AMANDA KNORR, and WAYDE MCKELVY omitted the following material facts in their representations to investors.

a.       That Mantria used a substantial portion of the new investor funds to make payments to old investors, all the while making the claim that these new investments were "earnings" of Mantria.

b.       That Mantria used a substantial portion of the new investor funds to pay "marketing" commissions to defendants WRAGG, KNORR, MCKELVY, and others. Most of these "marketing" commissions were sent via wire transfer.

c.       That there were significant undisclosed problems with the real estate in Tennessee, which served as the most significant asset of Mantria and was represented to investors as collateral for their investments.   These problems included a lack of potable water, the possibility that some of the land contained unexploded artillery shells, the fact that their valuations were based upon a projection of the value of the land after it had been developed which had not occurred, that Mantria would incur substantial expenses to develop the land, and the fact that Mantria's interest in the land was contingent upon selling the land to third parties.

d.       That Mantria did not have a patent for the technology for the biochar process or for the systems sales.   In fact, the license which they had used was revoked in December 2008.

e.       That Mantria was under SEC investigation.

7

15.     By their false statements, defendants TROY WRAGG, AMANDA KNORR, WAYDE MCKELVY raised approximately $54.5 million from investors and paid investors approximately $17.5 million in "earnings," resulting in a net loss of approximately $37 million.   Defendants WRAGG and KNORR paid Defendant MCKELVY approximately $6.2 million in commissions for raising investor funds for Mantria.

16.     After the SEC commenced civil litigation against Mantria in November 2009, defendants TROY WRAGG, AMANDA KNORR, and WAYDE MCKELVY continued to make false statements to investors regarding the economic status of Mantria in order to lull investors into believing that their investments were secure and to encourage new investments in Mantria and related entities.

## OVERT ACTS

1.     In or about March 2005, defendant TROY WRAGG traveled to Tennessee to view prospective real estate development opportunities.

2.     On or about March 8, 2007, defendants TROY WRAGG and AMANDA KNORR opened a bank account at Citizens Bank for Mantria Corporation.

3.     On or about March 19, 2007, defendants TROY WRAGG and AMANDA KNORR opened a bank account at Citizens Bank for Mantria Investments, LLC.

4.     On or about May 3, 2007, defendants TROY WRAGG and AMANDA KNORR opened a bank account at Citizens Bank for Mantria Realty, LLC.

5.     On or about October 15, 2007, defendants TROY WRAGG and AMANDA KNORR opened a bank account at Citizens Bank for Mantria Financial, LLC.

6.      On or about November 6, 2007, defendants TROY WRAGG and AMANDA KNORR sent a wire transfer in the amount of $240,000 in new investor funds to Alden View Funding.

7.      In or about January 2008, defendants TROY WRAGG and AMANDA KNORR obtained approval from the State of Tennessee to form a bank and to start financing mortgages on Mantria real estate.

8.      On or about April 17, 2008, defendants TROY WRAGG and AMANDA KNORR established Mantria Capital Advisors, LLC to handle all investor relations.

9.      On or about May 15, 2008, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $71,999.20 of investor funds to a title company to pay closing costs on real estate sold in Tennessee.

10.     On or about May 15, 2008, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $58,399.20 of investor funds to a title company to pay closing costs on real estate sold in Tennessee.

11.     On or about May 15, 2008, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $51,999.20 of investor funds to a title company to pay closing costs on real estate sold in Tennessee.

12.     On or about May 15, 2008, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $47,999.20 of investor funds to a title company to pay closing costs on real estate sold in Tennessee.

13.     On or about May 15, 2008, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $46,399.20 of investor funds to a title company to pay closing costs on real estate sold in Tennessee.

14.     In or about July 2008, defendants TROY WRAGG, AMANDA KNORR, and WAYDE MCKELVY attempted to raise $70 million through a Private Placement Memorandum (PPM) to finance purchases of Mantria real estate in Tennessee and used false representations and material omissions to raise millions of dollars which they used to pay "earnings" to other investors.

15.     On or about September 4, 2008, defendants TROY WRAGG and AMANDA KNORR established the Mantria Renewable Energy Fund, LLP to solicit funds from investors purportedly to invest in "green energy".

16.     On or about September 18, 2008, defendants TROY WRAGG and AMANDA KNORR established the Mantria Place Renewable Energy Site Development Fund to solicit investments in the Dunlap, Tennessee biochar facility.

17.     On or about December 1, 2008, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $60,000 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

18.     On or about December 1, 2008, defendants TROY WRAGG and AMANDA KNORR authorized the wire transfer of $171,500 in investor funds to purchase 50 memberships in the Investors Registry.

19.     On or about December 1, 2008, defendants TROY WRAGG and AMANDA KNORR authorized the wire transfer of $60,000 of investor funds to an entity controlled by defendant WAYDE MCKELVY for the purchase of a show horse.

20.     On or about January 26, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer of $600,000 of investor funds to a company selling weight loss products.

21.     On or about February 27, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $434,000 to a third party to purchase land for Mantria Place.

22.     On or about March 15, 2009, defendants TROY WRAGG, AMANDA KNORR, and WAYDE MCKELVY attempted to raise funds to build a carbon diversion plant in Carlsbad, New Mexico by falsely stating that the investment funds were to be used exclusively to build the Carlsbad plant.

23.     On or about April 1, 2009, defendant TROY WRAGG authorized a wire transfer in the amount of $35,000 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

24.     On or about April 16, 2009, defendants TROY WRAGG and AMANDA KNORR established the Mantria Industries Hohenwald Tennessee Eco-industrial Center Site Development, LP to solicit investments in the Hohenwald biochar plant.

25.     On or about April 21, 2009, AMANDA KNORR appeared on the Speed of Wealth internet radio show to promote Mantria securities to potential investors and made the following false statements:

(a)     Mantria was able to "produce about 20% more product than other competitors."

(b)     Mantria was currently selling the biochar being produced at the Dunlap facility in Tennessee and that "We actually have orders going out."

(c)     Mantria intended to convert consumer waste in biochar at the Dunlap facility.

26.     On or about April 21, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $50,000 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

27.     On or about April 30, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $112,584.77 of investor funds to a title company to pay for real estate transactions in Tennessee.

28.     On or about May 1, 2009, defendants TROY WRAGG, AMANDA KNORR, and WAYDE MCKELVY attempted to raise $12.2 million to build a waste-to-energy plant in Hohenwald, Tennessee by falsely promising investors that:

(a)     their investment was "backed by high quality real estate at a 2 to 1 ratio" of the amount invested.

(b)     the estimated return on this investment at 233.28%.

(c)     "Your investment is secured with collateral, so if we fail to provide the projected ROI [Return on Investment] at the end of each year, you could then enact your collateral."

29.     On or about May 4, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $40,000 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

30.     On or about May 5, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $60,000 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

31.     On or about May 7, 2009, defendant WAYDE MCKELVY made the following false statements to prospective Mantria investors at a conference in Centennial, Colorado:

(a)     They could earn 17% annualized returns in Mantria investments.

(b)     The Mantria investments were secured with real estate and "guaranteed."

(c)     Mantria was not a "Ponzi scheme" even though the returns sounded "too good to be true."

(d)     "I'm deeply involved in Mantria.   A lot of the things he's [WRAGG] talking about, I'm a partner with.   I look at the books.   I know where all the money is going."

32.     On or about May 7, 2009, defendant TROY WRAGG made the following false statements to prospective Mantria investors at a conference in Centennial, Colorado:

(a)     Mantria made $10.6 million in pre-tax profits for Speed of Wealth investors over the past 18 months.

(b)     Mantria had over $100 million in assets.

13

(c)     All Mantria investments were secured by real estate in Tennessee at a "2 to 1 ratio."

(d)     Mantria had a "very light and passive debt load."

(e)     Mantria was "developing" 4500 home sites on the real estate in Tennessee.

(f)     Mantria Place was "Tennessee's largest master plan community."

(g)     The average return on Mantria's investments for the past nine months had been over 248%.

(h)     Mantria had already "built the world's first biorefinery manufacturing plant in Carlsbad, New Mexico."

(i)     The "estimated net profit" for Mantria in 2009 was $5.5 million.

(j)     Mantria's estimated rate of return for investors over three years was 134.50%.

(k)     Mantria was "something that's cash-flowing, something that has assets of over $104 million supporting it."

(l)     Mantria was "setting aside money to make sure that we can buy you back."

(m)     If Mantria went bankrupt, the investors would not lose any money because they had the collateral of the real estate investments.

33.     On or about May 12, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $60,000 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

14

34.     On or about May 15, 2009, defendants TROY WRAGG, AMANDA KNORR, and WAYDE MCKELVY sought to raise $5 million in common stock for Mantria by falsely stating that:

(a)     The real estate in Tennessee owned by Mantria was worth $70 million.

(b)     Mantria expected to earn a 134.50% profit.

(c)     The investment would be guaranteed with real estate with a "2 to 1 Ratio on your original investment, which means if you invest $50,000 you will receive $100,000 worth of collateral."

35.     On or about May 21, 2009, at a conference in Centennial, Colorado, defendant WAYDE MCKELVY made the following false statements to prospective investors in Mantria:

(a)     Mantria was the next Microsoft and that the investors in the room would get "stinkin, filthy rich" if they invested with Mantria.

(b)     Mantria was "on the cusp of a revolutionary technology that's going to change the world, and you guys can benefit from it by putting money in and getting stinkin' wealthy."

(c)     "This is the biggest wealth-building opportunity that I believe has ever come across in your lifetime."

(d)     The State of New York had "already ordered and signed a letter of intent" to purchase 62 waste disposal units from Mantria.

(e)     The investors "can get paid by just owning land and spreading this stuff [biochar] all over your field, because this stuff pulls the toxins out of the atmosphere."

(f)     Mantria was the only biochar producer which would "burn all waste" and "could turn trash into biochar in 40 minutes."

(g)     The competition's biochar units cost $13 million to build, while Mantria's biochar units only cost $3.5 million and were "portable."

(h)     Mantria had "a backlog of machines already ordered" and that Mantria could not manufacture the biochar machines fast enough to keep up with sales.

(i)     The Carlsbad, New Mexico plant was currently under construction to build more biochar machines.

36.     On or about May 21, 2009, at a conference in Centennial, Colorado, defendant TROY WRAGG made the following false statements to prospective investors in Mantria:

(a)     Mantria was in a "full commercial state" of production.

(b)     Mantria had received "6,000 tons of preorders for our bioproducts."

(c)     Mantria owned over 10,000 acres of land in Tennessee that they were "developing" into Tennessee's largest master-plan community.

(d)     Mantria had made "well over 100-percent return" in 2008.

(e)     Mantria "returned to Speed of Wealth students over $9.5 million in pretax profits."

(f)     Mantria investments would be collateralized "by real estate at a 2 to 1 ratio" and explained "Now, every dollar that's invested into this deal is at a 2 to 1 ration, which

means if you invest $50,000 or $25,000, - let's say $25,000, you're getting $50,000 of collateral, which is backed by high quality real estate."

        (g)     If Mantria went bankrupt, the investment would still be secured by the real estate.

        (h)     Mantria's biochar production had experienced "tremendous growth" which "more than doubled in just this past month."

        (i)     EternaGreen was "rapidly becoming the industry-leading brand."

        (j)     The Dunlap biochar plant was producing "$6.2 million annually" with a single shift of production.

        (k)     With triple shifts, the Dunlap biochar plant could produce profits to pay earnings of 293% to investors.

        37.     On or about June 3, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $59,375 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

        38.     On or about June 4, 2009, defendants TROY WRAGG and AMANDA KNORR and others formed Earth Mate Technologies, LLC, to solicit investments in the carbon diversion systems.

        39.     On or about June 8, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $121,875 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

40.     On or about June 9, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $200,000 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

41.     On or about June 11, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $46,078.43 of investor funds to a title company to pay for real estate transactions in Tennessee.

42.     On or about June 17, 2009, defendants TROY WRAGG and AMANDA KNORR and others formed Clean Energy Components LLC, to solicit investments in the carbon diversion systems.

43.     On or about July 1, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $87,500 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

44.     On or about July 1, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $43,750 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

45.     On or about July 9, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $68,750 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

46.     On or about July 13, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer of $134,000 in investor funds to pay interest on the loan to purchase real estate in Tennessee.

47.     On or about July 14, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $54,633.60 of investor funds to Infinite Cash Entertainment, LLC, to support an aspiring rap artist.

48.     On or about July 31, 2009, defendants TROY WRAGG, AMANDA KNORR, and WAYDE MCKELVY attempted to raise $3.75 million for 25% of the profits interest on Mantria Place Eternagreen Center by falsely promising investors that:

      (a)     The Dunlap facility was operational.

      (b)     The investment was "secured by real estate with an appraised value of at least 100% of an Investor's initial investment."

      (c)     The new investors' funds would be used for development and working capital and not to pay off earlier investors.

49.     On or about July 31, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $200,000 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

50.     On or about August 26, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $57,000 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

51.     On or about August 31, 2009, defendants TROY WRAGG, AMANDA KNORR, and WAYDE MCKELVY attempted to raise another $20 million for the construction of the Hohenwald Site which falsely stated that:

     (a)     The estimated profits for the Hohenwald plant was 38.97% for 2010 and 78.56% for 2011.

     (b)     The estimated return if the company went public was 550.87%,

     (c)     The investment was secured by real estate "at a 1 to 1 Ratio on your amount invested."

     (d)     "Your investment is secured with collateral, so if we fail to provide the projected ROI at the end of each year, you could then enact your collateral."

     (e)     Mantria was currently working with "the following Fortune 500 companies: Kraft, Republic Waste, Smuckers, Wal-Mart."

52.     On or about September 3, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $34,375 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

53.     On or about September 10, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $37,458.57 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

54.     On or about September 18, 2009, defendants TROY WRAGG and AMANDA KNORR authorized a wire transfer in the amount of $40,625 to an entity controlled by defendant WAYDE MCKELVY to pay his undisclosed fees for raising new investor funds for Mantria.

55.     On or about November 20, 2009, defendants TROY WRAGG, AMANDA KNORR, and WAYDE MCKELVY sent, or caused to be sent, a form to investors which provided the false information regarding the SEC litigation:

(a)     Mantria was "working on fulfilling the pending orders" for biochar.

(b)     Regarding the sale of waste conversion systems, "none of the parties we are in negotiations with have stepped away."

(c)     The Dunlap facility "is producing bio-char."

(d)     "We are continuing system sales and biochar orders."

(e)     Mantria's "revenue [has] come from the sale of land and limited sales of bio-char."

(f)     "We believe we used the investor funds for the purposes stated in the use of proceeds."

(g)     "We believe that we will be able to make all the investors whole."

(h)     Mantria had "significant assets in Real Estate and at the Mantria Place facility."

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO THROUGH EIGHT

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.      Paragraphs 1 through 7 of Count One are incorporated here.

### THE SCHEME

      2.      From on or about March 1, 2005 to on or about April 30, 2010, defendants

**TROY WRAGG,**
**AMANDA KNORR, and**
**WAYDE MCKELVY**

in circumstances affecting a financial institution, devised and intended to devise a scheme to

defraud and to obtain money and property by means of false and fraudulent pretenses,

representations and promises.

### MANNER AND MEANS

      3.      Paragraphs 9 through 16 of Count One are incorporated here.

      4.      On or about each of the dates set forth below, in the Eastern District of

Pennsylvania and elsewhere, defendants

**TROY WRAGG,**
**AMANDA KNORR, and**
**WAYDE MCKELVY**

for the purpose of executing the scheme described above, and aiding and abetting its execution,

caused to be transmitted by means of wire communication in interstate commerce the signals and

22

sounds described below for each count, each transmission constituting a separate count:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| Two | September 18, 2009 | Wire transferred $40,625 in new investor funds to pay for "marketing" |
| Three | September 10, 2009 | Wire transferred $37,458.57 in new investor funds to pay for "marketing" |
| Four | September 3, 2009 | Wire transferred $34,375 in new investor funds to pay for "marketing" |
| Five | July 31, 2009 | Wire transferred $200,000 in new investor funds to pay for "marketing" |
| Six | July 9, 2009 | Wire transferred $68,750 in new investor funds to pay for "management fees" |
| Seven | July 1, 2009 | Wire transferred $87,500 in new investor funds to pay for "management fees" |
| Eight | June 11, 2009 | Wire transferred $46,078.43 to pay closing costs on real estate in Tennessee |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT NINE

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.      Paragraphs 1 through 7 of Count One are incorporated here.

### THE CONSPIRACY

      2.      From on or about March 1, 2005 through on or about April 30, 2010, in

the Eastern District of Pennsylvania, the District of Colorado, and elsewhere, defendants

**TROY WRAGG,**
**AMANDA KNORR, and**
**WAYDE MCKELVY**

conspired and agreed together, to commit offenses against the United States, that is, securities

fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17,

Code of Federal Regulations, Section 240.10b-5.

### MANNER AND MEANS

      3.      Paragraphs 9 through 16 of Count One are incorporated here.

### OVERT ACTS

      4.      Overt Acts 1 through 55 of Count One are incorporated here.

      All in violation of Title 18, United States Code, Section 371.

## COUNT TEN

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.     Paragraphs 1 through 7 and 9 through 16 of Count One and Overt Acts 1 through 55 of Count Two are incorporated here.

      2.     From on or about March 1, 2005 through on or about April 30, 2010, in the Eastern District of Pennsylvania, the District of Colorado, and elsewhere, defendants

**TROY WRAGG,**
**AMANDA KNORR, and**
**WAYDE MCKELVY**

willfully and knowingly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, used and employed manipulative and deceptive devices and contrivances, and aided and abetted such use and employment, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons in connection with sales of securities in Mantria and related entities.

      In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5 and Title 18, Section 2.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     As a result of the violations of Title 18, United States Code, Section 371 and Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, Section 2 as set forth in this indictment, defendants

**TROY WRAGG,**
**AMANDA KNORR, and**
**WAYDE MCKELVY**

shall forfeit to the United States of America any property that constitutes, or is derived from, proceeds traceable to the commission of such offenses.

2.     If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    (a)     cannot be located upon the exercise of due diligence;

    (b)     has been transferred or sold to, or deposited with, a third party;

    (c)     has been placed beyond the jurisdiction of the Court;

    (d)     has been substantially diminished in value; or

    (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and 28

U.S.C. § 2451, both incorporating Title 21, United States Code, Section 853(p), to seek forfeiture

of any other property of the defendant(s) up to the value of the property subject to forfeiture.

　　　　　　　All pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(A)

and Title 28, United States Code, Section 2461.

**A TRUE BILL:**

_____

**GRAND JURY FOREPERSON**

_____

**ZANE DAVID MEMEGER**
**UNITED STATES ATTORNEY**