IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL No. 15-398-3 |
| WAYDE MCKELVY, | : | |
| Defendant | : | |

## AMENDED MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS COUNTS 1-8 OF THE INDICTMENT, BASED ON THE STATUTE OF LIMITATIONS

I.   SUMMARY OF ARGUMENT.................................................................1

A.  Counts 1-8................................................................................1

B.  McKelvy's argument as to the government's "first rationale" and its "second rationale.".................................2

C. [NEW §] The reasons for this Amended Limitations Memorandum...................................................................3

II.  BACKGROUND....................................................................4

A.  The general statute of limitations...............................4

B.  Section 3293(2) is the government's basis for an extended statute of limitations...................................4

C.  The government's two rationales to support the applicability of sections 3293(2) and 20(10) to Counts 1-8...........5

D.  The statutory definitions of a "financial institution" and of "mortgage lending business.".........................7

III.  PROCEDURAL ASPECTS OF THE DEFENDANT'S MOTION...................8

A.  Rule 12(b)(3)(A) authorizes a pre-trial motion to dismiss based on the statute of limitations.................8

B.  Carollo supports McKelvy's position that his
Limitations Motion is ripe and that his proffers are
pertinent.................................................................................11

C.  Likewise, Ghavami supports McKelvy's position that his
Limitations Motion is ripe and that his proffers are
pertinent.................................................................................13

D.  By his proffers, adopted from the government's case,
McKelvy meets the five requirements for litigating a
Rule 12(b) motion pre-trial.............................................15

IV.  FACTUAL BACKGROUND – THE DEFENDANT'S PROFFERS................17

A.  The defendant's proffers are based on the grand jury and
SEC testimony, FBI 302s, and other undisputed documents...............17

B.  The defendant's proffers.........................................................18

C. [NEW §] The defendant's supplemental proffers...........................26

V.  THE GOVERNMENT'S FIRST RATIONALE – THE "FINANCIAL
INSTITUTION" REQUIREMENT.........................................................33

A.  The factual and legal allegations in the indictment which
are relevant to the government's first rationale.......................33

B.  Mantria Financial was not a "financial institution"
within the meaning of sections 3293(2) and 20(10)...................33

C. The term "mortgage lending business" has not been
developed by the courts in the context of section 3293(2)............34

D. [AMD ¶] While the literal meaning of a "mortgage lending
business" seems clear, legislative intent might be relevant.......34

E.  Dictionary definitions should provide the meanings of
the pertinent words in sections 3293(2) and 20(10).................35

F. [AMD §] The facts of the government's case refute its
allegation that Mantria Financial was a "mortgage lending"
institution.............................................................................36

VI.  THE GOVERNMENT'S FIRST RATIONALE – THE "AFFECTED" REQUIREMENT......................................................................................37

A.  McKelvy cannot move to dismiss for insufficient allegations on how the fraud "affected" a financial institution........................................................................................37

B.  In Carollo, the government did not make sufficient allegations for section 3293(2), but in Ghavami it did......................38

C.  An "institution" which was an "active participant in the fraud" can be "affected" under section 3293(2)........................41

D. [AMD §] Even if Mantria Financial were an "active participant in the fraud," the government has not shown that this company was "affected."................................................41

E. To make a colorable case that Mantria Financial was "affected" by the fraud, the government must make three showings...........................................................................................42

F. [AMD §].  The government's allegations have not met the three requirements set out in section VI (E)...........................45

VII.  THE GOVERNMENT'S SECOND RATIONALE FOR APPLYING SECTION 3592(2) TO THIS CASE IS LIKEWISE UNSUPPORTABLE....................50

A.  The government's second rationale is also unsupportable, based on the discovery which McKelvy has reviewed.......................50

B.  The government's second rationale regarding the applicability of sections 3293(2) and 20(10) to Counts 1-8.........50

C.  McKelvy's proffer on the second rationale...........................51

D.  The reasons why the second rationale fails.........................51

E.  For the government to adequately support the second rationale, it must supply the following information..........................53

Certificate of Service.........................................................56

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA         :

                v.               :          CRIMINAL No. 15-398-3

WAYDE MCKELVY,                   :

        Defendant                :

AMENDED MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS COUNTS 1-8 OF THE INDICTMENT,
BASED ON THE STATUTE OF LIMITATIONS

Defendant Wayde McKelvy, by his attorneys, Walter S. Batty, Jr. and William J. Murray, Jr., submits this "Amended Limitations Memo"[1] in Support of his Amended Motion to Dismiss Counts 1-8 of the Indictment, Based on the Statute of Limitations ("Amended Limitations Motion").

I.   SUMMARY OF ARGUMENT.

A.   Counts 1-8.

The parts of Counts 1-8 which are relevant to this motion are as follows:

Count 1 of the indictment charges Wayde McKelvy and co-defendants Troy Wragg and Amanda Knorr with conspiracy to commit wire fraud "affecting a financial institution," in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 371. See Count 1, ¶ 8 ("The Conspiracy" section).

Counts 2-8 charge McKelvy and his two co-defendants with committing wire fraud, "in circumstances affecting a financial institution," in violation of 18 U.S.C. §§ 1343, 2. See Counts 2-8, ¶ 2 ("The Scheme" section).

---

[1]  Other than several new headings, McKelvy will signify any changes in the text by either [NEW §], for a new section, and [NEW ¶], for a new paragraph.  McKelvy will use the same format for amended language, [AMD §] or [AMD ¶].

[AMD ¶] As described more fully below, the indictment charges that defendants Wragg, Knorr, and McKelvy participated in a Ponzi scheme to defraud over 300 investors in Mantria Corporation ("Mantria"), which was then based in Bala Cynwyd, Pennsylvania.  The indictment also charges that the gross amount of the loss by the investors was $54.5 million and that net amount of the loss was approximately $37.5 million.

The indictment also charges that McKelvy advised the investors to extend existing credit lines, whether in the form of credit cards, second mortgages, and/or loans against life insurance, and to use proceeds of these credit lines to invest in Mantria. (The evidence in the case will show that McKelvy referred to this technique as "arbitrage," and that, prior to becoming involved with Wragg and Mantria, he used this technique in his small investment club in Colorado.)

B.  McKelvy's argument as to the government's "first rationale" and its "second rationale."

In this memorandum, McKelvy argues that the traditional five-year statute of limitations is applicable in this case and that, accordingly, Counts 1-8 should be dismissed.  The government's position is that the applicable statute of limitations is 18 U.S.C. § 3293(2), which states that a ten-year statute will apply in wire fraud prosecutions where the government can prove that a defendant willfully participated in an offense which "affect[ed] a financial institution."

The government has informally offered a first and second rationale as to why section 3293(2) is applicable here.  The first rationale is that Mantria Financial, which was initially set up to issue mortgages on land sold by Mantria in Tennessee, later went bankrupt as a result of the fraud scheme.  McKelvy responds that, under any common sense definition of "financial institution," Mantria Financial does not qualify as such. McKelvy further responds that, even if Mantria Financial were a "financial institution," it was not "affected" – as that term is used in the case law – by the alleged fraud.

In its second rationale, the government argues that (unnamed) "financial institutions" – presumably federally-insured banks - were "affected" because they lost money when Mantria investors

defaulted on their credit or loan obligations, which they had extended based on McKelvy's urging them to utilize his "arbitrage" technique.  McKelvy responds that the government has not yet identified any evidence to support this claim.  McKelvy recognizes, however, that the statute of limitations is an affirmative defense and that the government has not yet had an opportunity to rebut the defendant's arguments on this point.

C.   [NEW §] <u>The reasons for this Amended Limitations Memorandum.</u>

There are three reasons for McKelvy's having asked this Court, with the government's authorization to say that it had no objection, for leave to submit an Amended Limitations Memorandum.

First, in the Government's Response to McKelvy's Motion to Dismiss Counts One through Eight of the Indictment Based on the Statute of Limitations ("Response"), the government argued, in terms almost identical to its informal first rationale, that

> Under 18 U.S.C. § 27, a mortgage lending business is defined as any "organization which finances or refinances any debt secured by an interest in real estate . . . and whose activities affect interstate or foreign commerce."

Response at 5.  McKelvy recognized, when reviewing the Response, that the logic of the government's informal first rationale was broader than he had thought.  At that point, McKelvy asked this Court for leave to amend his Limitations Memorandum and will expand here his argument as to the proper application of section 3293(2).  As indicated below by the references to new or amended sections and paragraphs, as noted in footnote 1, there are additional reasons why, under the government's evidence, Mantria Financial cannot be considered to be a "financial institution" which was "affected" by the fraud.

Second, in its Response, the government argued that McKelvy's selection of evidence for his proffers, while sometimes "helpful" to his position, also "ignored or discounted unhelpful statements." Response at 8.  The cited example of this allegedly unfair presentation of evidence was the defendant's failure to mention that when "Wragg created Mantria Financial" he did so with "[Christopher] Flannery's legal assistance." Id.  While

McKelvy anticipates later making, in a Reply Memo, a fuller analysis of this point, he acknowledges here that there was a period, at the beginning of Wragg's and Knorr's operation of the Tennessee land sales from 2005 to August 2007, as to which the evidence is unclear regarding whether or not they operated with criminal intent.  As such, McKelvy agrees with the government's implicit assertion that the Ponzi scheme had not started before the time when Wragg asked Flannery to give him (Wragg) legal advice in or about September or October 2007, cf. McKelvy's proffer ("Pr.") 10, 47, which advice Wragg largely disregarded.

Third, McKelvy realized that he had made a mistake in his Limitations Memorandum by arguing that the buyer's discounts, Pr. 17, were direct evidence that the scheme did not "affect" Mantria Financial.  Instead, the defendant will argue here that there is comprehensive evidence, independent of the scheme to defraud, which shows that even if Mantria Financial were a "financial institution," it would have become insolvent regardless of the fraud scheme and, accordingly, that the scheme did not affect Mantria Financial.  As a result of McKelvy's revised analysis, he has also added proffers and arguments that Mantria Financial was so infected by the fraud that it was not a "financial institution" under the statute.

II.  BACKGROUND.

A.  <u>The general statute of limitations</u>.

For most federal crimes, the applicable statute of limitations, as stated in 18 U.S.C. § 3282, is five years. See, <u>United States v. Leadbeater</u>, 2015 WL 567025 (D.N.J. 2015).

McKelvy argues that Count 1, the wire fraud conspiracy count, and Counts 2-8, the wire fraud substantive counts, should be dismissed for violating the pertinent five-year statute of limitations.

B.  <u>Section 3293(2) is the government's basis for an extended statute of limitations</u>.

Section 3293(2) provides a ten-year statute of limitations for the crimes charged in Count 1, the wire fraud conspiracy count, and Counts 2-8, the wire fraud substantive counts, "if [each]

offense affects a financial institution." Cf. United States v. Anthony Allen, 160 F.Supp.3d 698, 705 (S.D.N.Y. 2016).

As to Count 1, absent a statutory extension under section 3293(2), "[f]or a conspiracy indictment to fall within the statute of limitations, it is 'incumbent on the Government to prove that … at least one overt act in furtherance of the conspiracy was performed' within five years of the date the Indictment was returned." United States v. Bornman, 559 F.3d 150, 153 (3d Cir. 2009)(citation omitted).  As to Counts 2-8, they are traditional substantive counts, as to which the statute of limitations focuses on the dates of the substantive crimes alleged there.

Accordingly, unless section 3293(2) applies here, the statute of limitations on Count 1 would have run five years after November 20, 2009, the date of the last overt act (no. 55) alleged in Count 1; under this scenario, the statute would have run on November 20, 2014.  The indictment here was returned on September 2, 2015, more than nine months after the statute would have run, absent grounds for an extension.

Likewise, unless section 3293(2) applies here, the statute of limitations on Counts 2-8 would have run five years after the dates of the substantive crimes of wire fraud alleged in those seven counts, the latest of which (Count 2) was on September 18, 2009; under this scenario, the statute would have run on September 18, 2014, and earlier for the other six counts.  The indictment here was returned more than 11 months after the statute for Count 2 would have run.

C.  The government's two rationales to support the applicability of sections 3293(2) and 20(10) to Counts 1-8.

-- The indictment.  The government's attorney has informed counsel that there are two rationales for its argument that it is entitled to the extended statute of limitations.  We refer to these as the "first rationale" and the "second rationale."  We will discuss here the parts of the indictment which pertain to each rationale.

As to the first rationale, the indictment alleges that "Mantria Financial was a financial institution and mortgage lending

business which engaged in interstate commerce." Count 1, ¶ 5.
McKelvy argues, for a number of reasons, that Mantria Financial
was not a "financial institution."

Paragraph 5 in Count 1 also alleged (in the Background section)
that:

> Defendants Wragg, Knorr, and McKelvy used the funds raised
> by Mantria Financial to purchase or finance mortgages for
> undeveloped real estate in Tennessee owned by the Mantria
> or its subsidiaries in order to generate paper profits for
> Mantria and inflate the value of the undeveloped land.

There is no allegation in paragraph 5 of any way in which
Mantria Financial was "affected" by the fraud scheme.  Rather,
as noted above, paragraph 8 charged, in only the very broadest
terminology, all three defendants with conspiracy to commit wire
fraud "affecting a financial institution."

As to the second rationale, although the indictment does not
identify any financial institutions other than Mantria Financial
which were purportedly "affected" by the fraud charged, it does
allege that McKelvy advised potential investors "to obtain the
maximum amount of funds in loans from [non-Mantria] financial
institutions in the form of credit cards, insurance policies,
home equity, and other loans, and invest all these funds in
Mantria and its related entities." Count 1 at ¶ 2.  This passage
is apparently the basis for the second rationale.

-- The government's "first rationale."  In the government's
first informal rationale, the government states:

> Mantria set up Mantria Financial as a financial institution
> as defined by 18 U.S.C. §§ 20(10) and 27.  Under 18 U.S.C.
> § 20, all "mortgage lending businesses" qualify as
> financial institutions.  [The government then quotes
> language from 18 U.S.C. § 27, which defines "a mortgage
> lending business" as is set out below by McKelvy.] ….
> [T]here is no question that Mantria Financial engaged in
> interstate commerce, qualified as a financial institution,
> and that the wire fraud affected Mantria Financial (i.e.,
> it went bankrupt).

-- <u>The government's "second rationale."</u>  The government has also described a second way in which one or more financial institutions were allegedly "affected" by the alleged fraud:

> [T]he wire fraud affected numerous other financial institutions, [in that] the defendants coached investors to take out the maximum possible mortgage on their homes and to withdraw the maximum amount of funds from credit cards to invest in Mantria.  When the Mantria Ponzi scheme collapsed, those financial institutions which lent money to investors were affected because many of the investors could not repay those loans or at least were delinquent on those loans….  Thus, the Mantria fraud affected these financial institutions as well.

D.  <u>The statutory definitions of a "financial institution" and of "mortgage lending business."</u>

As used in section 3293(2), the term "financial institution" is defined in 18 U.S.C. § 20(10)[2] as follows:

> As used in this title, the term "financial institution" means --
>
> (1) an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act);
>
> … or
>
> (10) a mortgage lending business (as defined in section 27 of this title) ….

As stated in <u>United States v. Cardillo</u>, 2015 WL 3409324 (D.N.J. 2015), "In 2009, Congress amended the definition of 'financial institution,'" as set out above in section 20(10), to include "a mortgage lending business (as defined in section 27)."  Section 27, in turn, states, "In this title, the term 'mortgage lending business' means an organization which finances or refinances any debt secured by an interest in real estate, including private mortgage companies …, and whose activities affect interstate or foreign commerce."

---

[2]  Section 20(10) was added, by an amendment to section 20, on May 20, 2009.

Before the amendment in 2009 to the definition of "financial institution" in section 3293(2), that section had been codified part of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). Cf. Anthony Allen, 160 F.Supp.3d at 705.  Section 3293(2), as initially enacted, was described in a Seventh Circuit opinion, United States v. Serpico, 320 F.3d 691, 694-95 (7th Cir. 2003), in this manner:

> [T]he whole purpose of § 3293(2) is to protect financial institutions, a goal it tries to accomplish in large part by deterring would-be criminals from including financial institutions in their schemes.

320 F.3d at 694-95.

As for section 20(10), which was a 2009 amendment to section 20, this change was "prompted" by "the subprime mortgage crisis, [which] threatened the financial stability of many federally insured financial institutions." United States v. Bouchard, 828 F.3d 116, 124 (2d Cir. 2016), referring to the Fraud Enforcement and Recovery Act ("FERA") of 2009.

III.  PROCEDURAL ASPECTS OF THE DEFENDANT'S MOTION.

A.  Rule 12(b)(3)(A) authorizes a pre-trial motion to dismiss based on the statute of limitations.

McKelvy's motion to dismiss Counts 1-8 is filed pursuant to Fed.R.Crim.P.12(b)(3)(A), which rule states that a motion to dismiss for a "defect in instituting the prosecution" must be filed pre-trial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."  "Generally, Rule 12(b) motions are appropriate to consider 'such matters as … statute of limitations, [etc.], [and] lack of jurisdiction.'" United States v. Nukida, 8 F.3d 665, 669 (9th Cir. 1993) (citation omitted).

While a challenge to the court's jurisdiction "may be made at any time while the case is pending," under Rule 12(b)(3)(A), an alleged violation of the applicable statute of limitations is a claim of a "defect in instituting the prosecution," under Rule 12(b)(3)(A), which means that unless a limitations defense is raised pre-trial, it will be considered as having been waived.

As the Third Circuit said in United States v. Karlin, 785 F.2d
90 (3d Cir. 1986), cert. denied, 480 U.S. 907 (1987), "in
criminal cases the statute of limitations does not go to the
jurisdiction of the court but is an affirmative defense that
will be considered waived if not raised in the district court
before or at trial." Id. at 92-93 (citing opinions in five
circuit court and two Supreme Court decisions). See also, United
States v. Smith, 600 Fed.Appx. 991, 994-95 (6th Cir. 2015).

McKelvy argues that it is appropriate to litigate his statute of
limitations defense pre-trial because the (factual) basis for
the within motion to dismiss is "reasonably available," under
Rule 12(b)(3)(A), and because there is no "good cause to defer a
ruling," under Rule 12(d).  McKelvy is filing today his proposed
Findings of Fact and Conclusions of Law ("Proposed Findings and
Conclusions"), because Rule 12(d) requires a court to "state its
essential findings on the record."

The decisions in the securities fraud cases discussed below,
where the defendant(s) raised a statute of limitations defense
and the government argued that section 3293(2) applied, are all
consistent with these provisions in Rule 12.

The Third Circuit briefly analyzed the issue of the ripeness of
a pre-trial motion to dismiss in United States v. DeLaurentis,
230 F.3d 659, 660-61 (3d Cir. 2000).  In that case, the court
ruled that a district court could grant a motion to dismiss on
"a stipulated record." Id.  The court noted that "evidentiary
questions should not be determined at that stage," citing United
States v. Knox, 396 U.S. 77, 90 (1969).

The Sixth Circuit has provided a more extensive analysis of the
issue of the ripeness of a pre-trial motion under Rule 12
in United States v. Levin, 973 F.2d 463, 470 (6th Cir. 1992);
see also United States v. Ali, 557 F.3d 715, 719-20 (6th Cir.
2009)(adopting reasoning in Levin).  A succinct summary of the
holding in Levin is found in a district court case: "Under Rule
12(b)(3), a motion to dismiss an indictment is appropriate if
the undisputed facts establish that the offense charged cannot
be proven as a matter of law." United States v. Fitzgerald, 2017
WL 74074, *2 (W.D.Mich. 2017); accord, United States v. Joyce
Allen, 2014 WL 3368605, *12 (E.D.Tenn. 2014).

As the court in <u>Levin</u> said, in an extended excerpt:

> Rule 12 … encourage[s] district courts to entertain and
> dispose of pretrial criminal motions before trial if they
> are capable of determination without trial of the general
> issues.  Moreover, district courts may make preliminary
> findings of fact necessary to decide questions of law  … so
> long as the trial court's conclusions do not invade the
> province of the ultimate finder of fact.
>
> In the instant case the operative facts … were undisputed.

973 F.2d at 467 (citations omitted).

Moreover, the court in <u>Levin</u> also stated:

> [A] trial of the substantive criminal charges would not
> have assisted the district court or this court in deciding
> the legal issues joined by the defendant's pretrial motion
> to dismiss the controversial counts of the indictment.

Id. (citations omitted). See, <u>United States v. Covington</u>, 395
U.S. 57, 60 (1969); see also, <u>United States v. Stewart</u>, 2015 WL
5012645, *1 (W.D.Pa. 2015)(adopting reasoning of Sixth Circuit
opinions in <u>Levin</u> and <u>Ali</u>).

Finally, "[i]n evaluating a Rule 12 motion to dismiss, a
district court must accept as true the factual allegations … in
the indictment." <u>United States v. Stock</u>, 728 F.3d 287, 299(3d
Cir. 2013) (citation and quotation marks omitted).  Moreover,
"[t]he indictment must be read as a whole, accepting the factual
allegations as true, and construing those allegations in a
practical sense with all the necessary
implications." <u>Fitzgerald</u>, 2017 WL 74074 at *2 (citation and
quotation marks omitted).

[AMD ¶] Accordingly, there are five requirements which a
defendant, who requests a court to rule pre-trial on a motion to
dismiss, must meet regarding "the basis for the motion." Rule
12(b)(3).  First, any facts must be undisputed, <u>Levin</u>, supra;
second, the issue must be able to be decided as a matter of law,
without invading the province of the jury on the facts, <u>Levin</u>,
supra; third, a trial of the disputed factual issues would not
have "assisted the … court in deciding the legal issues," <u>Levin</u>,

supra; fourth, the (factual) basis for the within motion to dismiss must be "reasonably available," under Rule 12(b)(3)(A), and there must be no "good cause to defer a ruling," under Rule 12(d); and fifth, the defendant "must accept as true the factual allegations … in the indictment." Stock, supra. See also, Sewell v. United States, 406 F.2d 1289, 1292 (8th Cir. 1969) (Rule 12(b) serves the "purpose of preventing unnecessary trials and deterring the interruption of a trial … for any objection relating to the institution … of the charge").

McKelvy has found no relevant contrary authority on these points. As United States v. Weaver, 659 F.3d 353, 355 n. (4th Cir. 2011), summarized various decisions in other circuits,

> [A] district court may consider a pretrial motion to dismiss … where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts.

Id. (citations to the Third Circuit's DeLaurentis and eight other circuit court opinions omitted).

B.   Carollo supports McKelvy's position that his Limitations Motion is ripe and that his proffers are pertinent.

The Carollo case consists of two decisions - United States v. Carollo ("Carollo I"), 2011 WL 3875322 (S.D.N.Y. Aug. 25, 2011) (defendants' motion to dismiss counts 4, 5, and 7 granted pre-trial), and United States v. Carollo ("Carollo II"), 2011 WL 5023241 (S.D.N.Y. Oct. 20, 2011)(government's motion for reconsideration as to counts 4 and 5 denied).[3]

The Carollo case is relevant here on two aspects of McKelvy's case: (1) the ripeness of his Limitations Motion to dismiss and (2) the role of proffers in deciding whether a party, here the government, has made out a colorable case that the scheme "affected" a financial institution, such as Mantria Financial.

---

[3]   The defendants' convictions were affirmed on their appeals, at United States v. Grimm, 738 F.3d 498 (2d Cir. 2013), the correctness of the dismissals was not reached on appeal.

In Carollo I, the defendants argued that the indictment should
be dismissed due to a violation of the traditional five-year
status of limitations. Carollo I, 2011 WL 3875322 at *1-*2.  The
district court granted the defendants' motion to dismiss on
counts 4, 5, and 7.  The government argued that these counts
were within the extended statute of limitations provided by
section 3293(2).  The court ruled that section 3293(2) was
inapplicable because "the government has not alleged that the
financial institutions suffered any actual loss or at most the
risk of loss is de minimis." Carollo I, at *2.

-- Ripeness.  In Carollo II, the district court considered the
government's motion for reconsideration.  In that motion, the
government "argued that it is not required to prove its case in
advance of trial." 2011 WL 5023241 at *1.  Specifically, the
government contended that the court "ought not to have ruled on
the Defendants' statute of limitations defense at the motion to
dismiss stage." Id. at *2.  The court first looked to the part
of the 2002 version of Rule 12, which, as referred to in Levin,
provided that: "A party may raise by pretrial motion any defense
… that the court can determine without a trial of the general
issue." Rule 12(b)(2).[4]  The court rejected the government's
argument that the defendants' motion to dismiss based on the
statute of limitations could not be decided pre-trial.

In denying the government's motion for reconsideration, the
district court provided its reasoning on the ripeness issue:

> As the Second Circuit has explained, "[t]he general issue
> in a criminal trial is, of course, whether the defendant is
> guilty of the offense charged."  [citation omitted]…
> [R]esolution of a statute of limitations issue pretrial
> does not go to the general issue of liability and "protects
> the defendant from having to defend against stale charges."

Carollo II at *2, quoting United States v. Kerik, 615 F.Supp.2d
256, 268 (S.D.N.Y.), aff'd, 585 F.3d 726 (2d Cir. 2009).

---

[4]  The 2014 version substituted the (more modern) phrase "on the
merits" for the (archaic) "general issue" language; "[n]o change
in meaning [was] intended." 2014 Advisory Committee Notes.

In ruling that a district court can grant pre-trial a motion to dismiss on statute of limitations grounds, the court in <u>Carollo II</u> stated, "Courts have also denied pre-trial motions based on statutes of limitations grounds, not as premature, but on their merits." <u>Carollo II</u> at n. 1 (citations omitted).

-- <u>Proffers</u>.  <u>Carollo II</u> also relied on the district court's decision in <u>Kerik</u>, for the proposition that a dismissal is appropriate where the government did not proffer sufficient evidence "to overcome a statute of limitations defense." <u>Carollo II</u>, at *3.  McKelvy will more fully discuss the significance of this ruling below, at section VI (B, E, F), pages 38-40, 42-49.

C.  <u>Likewise, Ghavami supports McKelvy's position that his Limitations Motion is ripe and that his proffers are pertinent.</u>

<u>Ghavami</u> is the other leading case on the two points discussed above regarding the <u>Carollo</u> case. There are three decisions in <u>Ghavami</u>: <u>United States v. Ghavami</u>, 2012 WL 2878126, *7-*10 (S.D.N.Y. 2012) (denying, on the merits, the pre-trial motion to dismiss Counts 1-5), 23 F.Supp.3d 148 (S.D.N.Y. 2014) (denying post-trial motions), <u>aff'd</u> <u>sub</u> <u>nom</u>., <u>United States v. Heinz</u>, 790 F.3d 365 (2d Cir. 2015), <u>cert</u>. <u>denied</u>, 136 S.Ct. 801 (2016).[5]

-- <u>Ripeness</u>.  While the district court in <u>Ghavami</u> noted the question of "[w]hether an offense affected a financial institution is [ultimately] a question of fact for a jury to decide," it also ruled that "the Court <u>must</u> determine [pre-trial] whether the evidence the Government intends to submit [at trial] would be sufficient to permit a jury to find that the conduct alleged in the Indictment affected a financial institution within the meaning of § 3293(2)." Id. at *7 (emphasis added, citation omitted).  As did <u>Carollo II</u>, the court in <u>Ghavami</u> rejected the government's argument that it was premature to consider the defendants' motion. 2012 WL 2878126 at

---

[5]  We will refer to the two district court opinions as <u>Ghavami</u> and the court of appeals opinion as <u>Heinz</u>.

*6; see also <u>Ghavami</u>, Gov't Reply Memo, Dkt. #484, 10-CR-1217, at 9-10.[6]

McKelvy asserts that the standard in <u>Ghavami</u> – "whether the evidence the Government intends to submit [at trial] would be sufficient to permit a jury to find that the conduct alleged in the Indictment affected a financial institution within the meaning of § 3293(2)" - is analogous, for example, to the standard for determining whether a defendant is entitled to a jury instruction on an affirmative defense. <u>Cf</u>. <u>Government of Virgin Islands v. Fonseca</u>, 274 F.3d 760, 766 (3d Cir. 2001)(generally, "a defendant is entitled to an instruction as to any recognized defense [in this case, self-defense] for which there exists evidence sufficient for a reasonable jury to find in his favor" (citation and internal quotation marks omitted)). Although <u>Ghavami</u> used the term "sufficient to permit a jury to find," other cases in analogous situations use interchangeable terms, such as "prima facie" and "colorable;" McKelvy will use the term "colorable" in the interest of clarity.

The district court's ruling in <u>Ghavami</u> that it would consider pre-trial the defendants' motion to dismiss, 2012 WL 2878126 at *6, is consistent with the provision in Rule 12(d) noted above that "[t]he court <u>must</u> decide every pretrial motion before trial unless it finds good cause to defer a ruling" (emphasis added).

The government in <u>Ghavami</u> appeared to recognize the strength of the argument by the defendants that the motions were ripe for decision pre-trial.  Even though the government there made a 12-word argument that the pre-trial motion to dismiss was "premature," citing <u>United States v. Martinez</u>, 1995 WL 10849 (S.D.N.Y. 1995), it proceeded to emphasize instead that <u>Carollo I</u> was distinguishable, by stating that in this case (<u>Ghavami</u>) it

---

[6]  [NEW] It was appropriate for the <u>Ghavami</u> court to rule that it "must" decide the motion to dismiss pre-trial is that the government has to be able to make a colorable showing that, at trial, it will be able to meet the reasonable doubt standard on the applicability of section 3293(2). Cf. <u>United States v. Pelullo</u>, 964 F.2d 193, 208 (3d Cir. 2012); <u>Anthony Allen</u>, 160 F.Supp.3d at 705. Cf. also <u>United States v. Hall</u>, 20 F.3d 1084, 1087 (10th Cir. 1994) (defendant's motion to dismiss counts properly granted pre-trial where underlying facts undisputed).

"provided a [five-page summary of its] proffer of evidence of actual loss, … infra." Dkt. #484, 10-CR-1217 (S.D.N.Y), at 9-14.

-- Proffers. The court in Ghavami ruled that, to support its response to the motion to dismiss, the government could proceed by way of proffers, as long as the substance of the proffers was supported by "agree[ments] to stipulate." Ghavami, 2012 WL 2878126, at *7-*10, n.9. The court engaged in a detailed discussion of the merits of the government's proffers on actual loss and substantial risk of loss. McKelvy will more fully discuss the significance of this ruling below, at section V(G).

-- Summary. Based on the Carollo and Ghavami decisions, McKelvy argues that there is no distinction between the ripeness of his motion under Rule 12(b) and the ripeness of the defense motions in those cases, as long as his proffers are undisputed.

D.  By his proffers, adopted from the government's case, McKelvy meets the five requirements for litigating a Rule 12(b) motion pre-trial.

In the following section, McKelvy will set out his factual basis for the motion, in the form of proffers ("Pr."), to comply with the "five requirements," supra at 9-11, for requesting a pre-trial ruling on his motion to dismiss Counts 1-8.

First, because his factual basis for this motion must be "undisputed," McKelvy proffers only evidence adopted directly from the government's case – the grand jury testimony; the deposition testimony taken by the SEC in its civil case against Mantria, et al.; statements in FBI 302s; the documents furnished by the government in discovery; any stipulations between the parties; and clear inferences which can be drawn from the testimony, statements, and documents. McKelvy assumes that this evidence will be "undisputed," unless the government advises that it is disavowing a representation in the testimony, statements, and/or documents. (Such a disavowal could, of course, be a noteworthy event.) If the government, in response to this memo, suggests modifications in the proffers, or submits one or more proffers of its own, the defendant will make every effort to reach agreement with the government on the suggested changes and/or additions.

Second, because the issue must be decided as a matter of law, McKelvy represents that he has made his best efforts to distill the government's case, which he submits is overwhelming on the factual issues related to this motion.

Third, as of this stage, McKelvy knows of no disputed factual issues which are relevant to this motion and which would be clarified at a trial.

[NEW ¶] Fourth, as noted above, Rule 12(b)(3)(A) requires, in effect, that a motion to dismiss based on the statute of limitations must be filed pre-trial, if "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."  Because McKelvy has adopted as credible all of his many references in this memo to the government's case, he argues that it follows that the factual basis for this motion to dismiss is "reasonably available," and that he was required to file this motion pre-trial.  Similarly, because this basis is "reasonably available," he argues that there is no "good cause to defer a ruling," under Rule 12(d).

[NEW ¶] As to this fourth requirement, McKelvy argues that, just because the factual basis for this motion is complicated does not mean that such complexity provides "good cause to defer a ruling" under Rule 12(d).  The factual basis for this motion is a highly boiled down version of the case as a whole, which the government's attorney has said would take two to three weeks to try.  If the case goes to trial, the arguments raised here would be a primary component of the defense and would, of course, have to be ruled on by the Court when the defendant makes a Rule 29 motion after the government rests.  Accordingly, there can be no "good cause to defer a ruling" until trial.

Fifth, as stated below, McKelvy agrees to stipulate that, for purposes of this motion, all the factual allegations in the indictment must be taken as true.[7]  The defendant, however, will

---

[7]  Although we are aware of no evidence that McKelvy participated, in any way, in owning or operating Mantria Financial, the defendant agrees, for purposes of this motion, that McKelvy also "controlled" Mantria Financial, as alleged in Count 1, ¶ 5.

not stipulate to the truth of any of the legal assertions in the indictment, including the allegations that Mantria Financial was a "financial institution" Count 1, ¶ 5, and that "the wire fraud affect[ed]" a "financial institution," Count 1, ¶ 8, which are the central legal issues in this motion.

McKelvy argues that the documents listed above can be properly considered pre-trial by this Court, just as the proffers were in Ghavami (or as the absence of proffers in Carollo) and just as was the defendant's (unopposed) affidavit in United States v. Jones, 542 F.2d 661, 664 (2d Cir. 1976).  Although we know of no case which so holds, we contend that there is no functional difference between a memo titled "proffer," on the one hand, and grand jury testimony, FBI 302s, and/or other documents which were provided as part of the discovery process, on the other.

[NEW ¶] As noted above at 13-14 & n.6, McKelvy asserts that the government must make a colorable showing that, at trial, it will be able to overcome, by proof beyond a reasonable doubt, the arguments on the "financial institution" and "affected" issues raised by the defendant.

IV.  FACTUAL BACKGROUND – THE DEFENDANT'S PROFFERS.

A.  The defendant's proffers are based on the grand jury and SEC testimony, FBI 302s, and other undisputed documents.

As argued above, McKelvy believes that "proffers" of evidence in this case – as long as they are undisputed – should be given the same consideration by this Court as if the government had made the proffers of its evidence, as the government did in the S.D.N.Y. cases discussed above and below, Ghavami and Carollo. As far as McKelvy can tell, this issue of the use of defense proffers in Rule 12 motions is a novel one in this circuit.

The types of proffers McKelvy uses in this memorandum are based on: (a) his representation that the motion can be determined as a matter of law; (b) his representation that any factual questions are resolved by also accepting the factual allegations in the indictment; (c) his submitting in this memo proffers, adopted directly from the government's case, which are, as far

as we know, undisputable;[8] (d) his representation that he will agree, in good faith, to any relevant stipulation proposed by the government; and (e) his representation that, in his view, the "motion can be determined without a trial on the merits." 12(d).

[AMD ¶] Because the grand jury testimony was entirely in the hands of the government's attorney, the FBI case agent (S/A Annette Murphy), and the witnesses such as Daniel Rink and Christopher Flannery, whom the government chose to call in support of the allegations in the indictment, McKelvy is submitting the proffers set out below as an expeditious means of providing the necessary factual background for his motion.  For some of the proffers, McKelvy will provide a citation; for others, he believes that no citation is necessary.[9]

B.  **The defendant's proffers.**

McKelvy submits, for purposes of the limitations motion and memo only, the following proffers ("Pr."):

1. The grand jury investigation focused on developing the facts about the involvement of co-defendants Troy Wragg, Amanda Knorr, and Wayde McKelvy with certain activities of Mantria Corporation ("Mantria"), Mantria Financial, and other entities related to Mantria.[10]  As S/A Annette Murphy testified on August 5, 2015 ("8/5/15 GJ"), the essential charge against Wragg, Knorr, and McKelvy was that they illegally participated in a so-called Ponzi scheme, which used "new" (investor) money to pay off "old" debts. 8/5/15 GJ at 37.  Troy Wragg "pretty much ran the show in Mantria." Id. at 6.  As supported by numerous documents, Wragg owned 51% of Mantria and Knorr owned 49%, and Mantria owned 100% of Mantria Financial.

---

[8]  The government did not explicitly attempt to explain its position on section 3293(2) in the grand jury transcripts.

[9]  If the government decides to dispute any of the defendant's proffers, McKelvy is prepared to file, depending on the issue, an appendix containing the documents referenced in this memo.

[10]  Unless otherwise noted, "Mantria" includes all of its related entities.  Any references to Mantria Financial will be explicit.

2. On 5/24/16, Knorr plead guilty to Counts 1, 2-8, 9, and 10.
On 3/2/17, Wragg plead guilty to the same counts.  By entering
these pleas, Wragg and Knorr admitted that they are guilty of
the crimes charged and that the allegations in the indictment as
to their conduct are accurate.  Among the allegations they admit
is the allegation in Count 1 that "Mantria Financial was
controlled by Mantria … and defendants Troy Wragg [and] Amanda
Knorr," Count 1, ¶5, and that they "claimed that Mantria made
millions of dollars selling real estate and 'green energy'
products, [when] they knew that Mantria had virtually no
earnings, no profits, and was merely using new investor money to
repay earlier investors." Count 1, ¶ 12.  Wragg and Knorr have
agreed to testify at trial against McKelvy.

3. [AMD ¶] As S/A Murphy testified, part of the approach taken
by McKelvy to potential investors in Mantria at a so-called
"seminar" on May 7, 2009, was to advise that their investments
would be in land sales at Mantria developments in Tennessee
("Mantria sales lots") and that their investments were "secured"
by "collateral" at a ratio of two (dollars of worth for the land
in these developments) to every one (dollar for the
investments), which McKelvy said could be realized by the
investors' foreclosing on the "collateral." Murphy 8/5/15 GJ at
43-45; see Murphy, 8/19/15 GJ at 11, 23-24.[11]

4. Wragg made (contingent) purchases of land in Tennessee,
possibly as early as 2005, from his sister's father-in-law, Dr.
George Dixson. (These purchases were "contingent" because Dr.
Dixson was obligated to buy them back at Wragg's option.)  Wragg
paid between $900 and $2,000 an acre. Murphy, 8/5/15 GJ at 6,
10-13.  As S/A Murphy testified, it initially was Wragg's plan
to develop and then sell these parcels for a profit. Murphy,
8/5/15 GJ at 13.

5. The SEC calculated that Mantria raised a total of
approximately $54 million from its investors, but received

---

[11]   In his sales pitch to prospective investors at the same
seminar, Wragg used a different approach: "We want people to
know that we're setting aside money to make sure that we can buy
[your investments] back out at the end of [December 2011.]"
Speed of Wealth seminar, 5/7/09, at 34; cf. Pr. 12.

monies of no more than about $300,000 from its real estate project.[12] Murphy, 8/5/15 GJ at 24.

6. The real estate communities envisioned by Wragg were never developed. Murphy, 8/5/15 GJ at 13-14.  There were many obstacles to development of this land, including the lack of potable water, the lack of access roads, and the presence, under some of the ground, of unexploded ordinance from "a U.S. Army World War II military artillery range." Id. at 14-20.

7. [AMD ¶] During the period August 11, 2007 through June 2008, Wragg hired appraiser Ray Bryant to value the land as if it had been fully developed, according to Wragg's plan of bringing water over a nearby mountain and constructing access roads; but none of these improvements was in place at the time of the appraisals. Murphy, 8/5/15 GJ at 14-17, 19.  As McKelvy learned from the discovery, the August 11, 2007 appraisals were attached to the Mantria Financial Private Placement Memo ("PPM").

8. Based on Wragg's representations and his sales figures on the lots, as set out in Pr. 7, above, Bryant calculated the appraised value of the land at approximately $80,000 per acre, based on future, rather than current, values of these undeveloped plots. Murphy, 8/5/15 GJ at 15-17.

9. As S/A Murphy (who is a licensed CPA) testified, mortgage loans began to dry up in or before January 2008, due to the looming national financial crisis, making it difficult for people to buy land. Murphy, 8/5/15 GJ at 5, 23.

10. As S/A Murphy testified, in approximately January 2008, defendants Wragg and Knorr formed Mantria Financial, which was initially supposed to function as "a bank in Tennessee" to lend "people money to buy this land" in Mantria's developments. Murphy, 8/5/15 GJ at 23; see also Pr. 34-36.  (Based on the Mantria Financial PPM, it appears that the actual date of Mantria Financial's formation was October 2007.)

11. Wragg solicited investors for Mantria Financial, with the assistance of McKelvy, to whom he (Wragg) had been introduced, sometime after Mantria Financial was formed in or about October 2007. Murphy, 8/5/15 GJ at 23.  At that time, McKelvy was in

---

[12]  Cf. Pr. 25, 41

Denver, while Mantria's offices, where Wragg and Knorr worked, were located in Bala Cynwyd, Pennsylvania. Id. at 23, 48.

12. McKelvy utilized his investment clubs, known at that time as "Speed of Wealth" investment clubs, to help market investments in Mantria and Mantria Financial. Murphy, 8/5/15 GJ at 24.

13. S/A Murphy did not mention, in any of her testimony, anything that McKelvy had allegedly done in the formation, control, or operation of Mantria Financial, but only that he had raised money from investors for that firm and that he frequently talked with Wragg over the phone.

14. Wragg had hired his aunt, Joan Bell, and his sister, Tisa Dixson, to help sell the lots in Tennessee. Murphy, 8/5/15 GJ at 22.

15. As S/A Murphy testified, despite Wragg's claim to potential investors that "we're developing Tennessee's largest master plan community," the development was "pretty much nonexistent." Murphy, 9/2/15 GJ at 57.

16. As S/A Murphy discussed, Marc Thalheimer, a former Mantria employee, arranged to purchase a lot in one of Mantria's planned developments in Tennessee, for the stated price of $134,999. Murphy, 9/2/15 GJ at 15, 18.

17. [AMD ¶] As S/A Murphy said, the Mantria Purchase Agreement – also referred to as the "Contract of Sale" or the "Sales Contract" - that Thalheimer utilized for this purchase, with the assistance of a mortgage through Mantria Financial, was not a typical real estate agreement. Murphy, 9/2/15 GJ at 21. According to the agent – whose testimony is consistent with a review of a typical Purchase Agreement – such an agreement provided that Thalheimer be given numerous "buyer incentives," including provisions that:

(a) the purchaser would receive a credit for two years of mortgage payments (which meant that he or she did not have to make any mortgage payments for two years);

(b) Mantria would pay the interest on the mortgage to Mantria Financial for two years;

(c) the purchaser was "free and clear of all debt associated with the home site or sites;"

(d) Mantria would pay all the real estate taxes "for up to two years;"

(e) after those two years "he [could] walk away" from the agreement of sale;

(f) Mantria would pay the closing costs of approximately $3,800 which would be paid to the title company;

(g) Mantria agreed to pay cash back - "buyer's bonuses" - (which are one of the "buyer incentives" discussed here) – of about three percent of the purchase price on the land, giving the purchaser an incentive to do the transaction;

(h) the purchaser did not have to put any money down to get the mortgage, Murphy, 9/2/15 GJ at 16;[13] and

(i) Mantria guaranteed that the purchaser would be able to re-sell after 36 months at the contracted sales price of the lot, plus a refund of any money paid by the purchaser plus 10% of that amount. Murphy, 9/2/15 GJ at 19-25, 78, 79.

18. As S/A Murphy said, "numerous" other sales agreements utilized by Mantria Financial were similar to Thalheimer's agreement. Murphy, 9/2/15 GJ at 19.

19. As S/A Murphy explained, Mantria's non-traditional arrangements with Thalheimer and others:

> induc[ed] employees and other … individuals to take possession of these properties on paper to establish a sales price and potentially drive up the associated "value" of the remaining properties.

Murphy, 9/2/15 GJ at 21-22.

---

[13]  The agent's testimony on this (and other) "buyer incentives" was consistent with a copy of the "Sales Contract" attached to the bankruptcy receiver's third quarterly report ("receiver's report"), which described the underlying mortgage loan as a "zero money down" loan. Receiver's report at 16.

20. Put differently, as S/A Murphy said, Mantria, by reaching purchase agreements with some of its employees such as Thalheimer, was attempting "to gin up purchases of the land in Tennessee to show the appearance that they had some revenue coming in." Murphy, 9/2/15 GJ at 21-22.  As the agent explained, Mantria was losing money on each transaction where Mantria appeared to sell a plot of land to a purchaser. Id. at 23.

21. As S/A Murphy said, in answering the question by the government's attorney, "Is it fair to say it would be nearly impossible for them to make money with that business plan?," she answered, "Yes." Murphy, 9/2/15 GJ at 80-81.

22. Also during S/A Murphy's testimony, the government's attorney asked the agent to confirm that "there's no allegation in the indictment … that the people who were buying the land were defrauded.  Is that fair to say?," to which question she answered, "Yes." Murphy, 9/2/15 GJ at 78-79.

23. Finally, S/A Murphy said that she agreed with the government's attorney that the investors in Mantria were "not being shown" those parts of the contracts which identified the "buyer incentives."  The agent also said that "if the investors in the Mantria securities really understood the … real estate contracts, they probably would not have invested in Mantria in the first place." Murphy, 9/2/15 GJ at 82.

24. As Daniel Rink testified in the grand jury, he (Rink) was the Chief Financial Officer ("CFO") of Mantria during the period 2007-09. Rink, 8/19/15 GJ at 7-8, 13.  Although Rink had responsibility for the overall functioning of the accounting systems at the company, it was Wragg and Knorr who "managed [Mantria's] cash very, very tightly." Id. at 14.

25. [AMD ¶] As Rink testified, almost all the money which came to Mantria was from the investors.  The only money which came to Mantria as a result of Mantria's sales or other business activities – including green energy products - was approximately $300,000, which was, he "believe[d]," in 2007 from the "cash sales" of Mantria's lots in Tennessee. Rink, 8/19/15 GJ at 16, 18-19. (According to SEC accountant Tracy Mongelli, as discussed below, the cash sales took place in 2008-09 and were by a Mantria entity other than Mantria Financial.)

26. Rink's testimony on the "buyer incentives" was consistent
with that of S/A Murphy.  As Rink testified, among Mantria's
arrangements with the "purchasers" were that they did not have
to pay any taxes for 24 months; that they would receive "buyer's
bonuses" of as much as $3,000; and that the buyers did not have
to put any money down. Rink, 8/19/15 GJ at 21-27.

27. As Rink stated, Mantria Financial was to be an in-house
mortgage company, similar in concept to General Motors
Acceptance Corp. ("GMAC"), that "would finance [the purchases
of] the Mantria home sites." Rink, 8/19/15 GJ at 19.

28. [AMD ¶] As Rink stated, it was his understanding that
Mantria Financial would wire transfer "the money down to
Tennessee to do the real estate closings" and from there the
funds would go to the Mantria entities which owned the land, as
had been mentioned by S/A Murphy (see Pr. 17, above). Rink,
8/19/15 GJ at 19-20.

29. [AMD ¶] As Rink said, Mantria "as a whole entity" was
"losing cash" on each of the sales of the lots, because it was,
among other things, paying commissions to inside salespeople,
paying the real estate taxes, and paying the closing costs, as
well as the "buyer incentives." Rink, 8/19/15 GJ at 21.  He
advised Wragg of this serious problem, but the practice of
"losing cash" on each transaction continued. Id. at 23.  Rink
also stated that Mantria Financial was losing cash on each
transaction, because of the high interest rates being paid to
the investors. Id. at 60.

30. As Rink testified, the development of the real estate in
Tennessee continued until sometime in early 2009, when Mantria
"had a change in focus" and turned to concentrating on green
energy, purchasing a large stake in Carbon Diversion, Inc. for
$2.1 million and paying $2.3 million for the construction of a
new plant at Dunlap, Tennessee. Rink, 8/19/15 GJ at 21-27.

31. As Rink stated, Mantria's "standard rate" for paying McKelvy
for raising money from investors was 12.5% "of what he was
raising." Rink, 8/19/15 GJ at 36.  Rink said that Wragg and
Knorr did not get any fees from fundraising, but that they did
get fees from the sales of the parcels in Tennessee, each at the
rate of 0.5% of the sales price. Id. at 42.  Because Mantria

Financial paid a high interest rate to investors, "it never made any money." Id. at 60.

32. Although a press release issued by Mantria Financial on March 26, 2008, stated that "Mantria Financial [was] a minority-owned business with 51% owned by President and Chief Operating Officer Amanda Knorr," it now appears that the ownership figures were incorrect.  Instead, a spreadsheet supplied to the SEC on behalf of Mantria, presumably by Wragg and/or Knorr, showed that Mantria Financial was 100% owned by Mantria and that 51% of Mantria was owned by Wragg and 49% by Knorr.

33. The spreadsheet described in Pr. 32 is inconsistent, in several respects, with the Mantria Financial LLC PPM.  McKelvy and the government agree that the representations in the spreadsheet as to Mantria Financial were correct.

34. The documents which corroborate S/A Murphy's testimony, as summarized in Pr. 20 and 21, as well as Rink's testimony, summarized in Pr. 25 and 29, are: (a) the testimony during a hearing on the SEC's motion for a preliminary injunction against Mantria, et al. ("12/2/09 SEC Tr."); (b) the cash disbursements spreadsheets which were supplied to the SEC, apparently by Wragg and/or Knorr on behalf of Mantria; and (c) the Mantria bankruptcy receiver's third quarterly report.

35. At the preliminary injunction hearing, Tracy Mongelli, an accountant with the SEC, testified, based on the cash disbursements spreadsheets, that there had been various expenditures for the years 2008 and 2009 by Mantria and Mantria entities.  Included in her testimony were references to the Mantria developments in Tennessee.  Specifically, Ms. Mongelli testified that the total amount of "buyer's bonuses" (one of the "buyer incentives" mentioned in S/A Murphy's testimony) paid to the "purchasers" of Mantria lots was $351,852 in 2008 and $429,205 in 2009. 12/2/09 SEC Tr. at 112, 115-16.  Ms. Mongelli also testified that the amount of sales "commissions" for 2008 was $952,631 and for 2009 was $410,651. Id. at 112, 116.

36. Moreover, although Ms. Mongelli did not mention that Mantria assumed what is traditionally the buyer's expense of closing costs in the form of title insurance fees, the spreadsheets show

that Mantria paid such fees in the amount of $239,346 for 2008 and $433,755 for 2009.

37. Neither Ms. Mongelli nor the spreadsheets provide any figures as to how much Mantria and Mantria entities may have made for any of the other "buyer incentives" identified by S/A Murphy in her testimony.

38. The spreadsheets referred to above did supply figures for Mantria Financial's total operating expenses of $3,296,643.87 in 2008 and $916,281 in 2009.  (It should be noted that these figures do not include any repayments to the investors.)

39. Regarding the sales of the lots which were financed through Mantria Financial during 2008 and 2009, Ms. Mongelli testified that Mantria/Mantria Financial "realized no cash up front" on these "loans." Id. at 120-21, 148.  She also testified that Mantria made three "cash sales" [14] of lots during 2008-09 sales for a total of $138,647 in 2008 and of $55,999 in 2009. Id. at 121.  The main inference to be drawn from her testimony is that Mantria and Mantria Financial were losing huge amounts of money in 2008-09.

40. Moreover, there is no indication in Ms. Mongelli's testimony, Rink's testimony, or the available documents that any of the money from these "cash sales" went to Mantria Financial; to the contrary, because Mantria Financial's claimed function was to provide mortgages, there would be no reason for that entity to be involved in a "cash sale," where the proceeds of the sale would presumably go to the Mantria entity which purportedly owned those lots.

41. Ms. Mongelli testified that, aside from the investor funds which were deposited into Mantria and its related entities, the only cash "income" which Mantria had on their books was "under $300,000" from the cash sales. 12/2/09 SEC Tr. at 115; Pr. 37.

C.  [NEW §] The defendant's supplemental proffers.

---

[14]  The term "cash sales" was used by Ms. Mongelli (and Rink) for lot sales which were not financed through Mantria Financial, all of which were 100% financed, with no down payments. Cf. 12/2/09 SEC Tr. at 120.

42. [NEW ¶] In 2005, Wragg obtained his undergraduate degree from Temple University, where he took courses in business. Murphy, 8/5/15 GJ at 9.  While in college, Wragg wrote a paper on "the emerging real estate market in Tennessee." Id.  After graduation, Wragg went to Tennessee and spoke with his sister's father-in-law, Dr. George Dixson about his (Wragg's) investing in real estate there. Cf. Pr. 4.  Dr. Dixson introduced Wragg to Larry Holder, for whom he did a real estate transaction, for a fee of approximately $70,000. Murphy, 8/5/15 GJ at 10-11.  As far as S/A Murphy knew, "the deal was on the up-and-up." Id. at 11.

43. [NEW ¶] According to Wragg's statements, during 2005-06, he invested the following monies in his venture of purchasing and re-selling land in Tennessee: (a) $70,000 he received from Holder in an apparently legitimate real estate transaction, see Murphy 8/5/15 GJ at 10-11; (b) $2,000 he had obtained from a student loan, id.; (c) $50,000 Dr. Dixson had lent to Wragg, Wragg, FBI 302 proffer 9/22/16 at 1-3; and (d) unspecified profits from sales of some of the lots to people from Florida. Id. Accordingly, the total of the amounts he specified for investment was $122,000.

44. [NEW ¶] Mantria Corporation was incorporated on November 2, 2006. Cf. Pr. 2.  It was on or about this date that Wragg started using "Mantria" as the name for developing real estate.

45. [NEW ¶] In his initial FBI interview, Wragg admitted that his initial plan was to buy land from Dr. Dixson at $4,000 per acre and then to sell the property at $15,000 to $20,000 per acre. Wragg, FBI 302 5/19/11, at 3.[15]  Moreover, as noted above, S/A Murphy confirmed that "there's no allegation in the indictment … that the people who were buying the land were defrauded." Pr. 22.

46. [NEW ¶] In or about December 2006, Wragg exchanged emails with Dr. Dixson, in which they discussed Wragg's having serious

---

[15]   [AMD] For purposes of this Amended Limitations Memo, McKelvy will not challenge the credibility of any government witness, other than Wragg and Knorr.  In this Memo, McKelvy will use selected passages from Wragg's 302s which specific passages he (McKelvy) submits are (arguably) credible.

financial difficulties, to the point that he (Wragg) said that he might have to go into bankruptcy, because he could not repay the $50,000 Dr. Dixson had lent him.  Murphy, 8/19/15 GJ at 12-14.  As Wragg later explained, as of the time of the Mantria 50[16] debt offering in September or October 2007, the purpose of that offering was to pay off a $3.2 million construction loan from Baringer Capital, for the construction work at the Mantria properties in Tennessee.  Wragg, FBI 302 proffer 9/22/16 at 1-2, 9.  As Wragg admitted during his proffer, Mantria did not then have the money to pay off this $3.2 million construction loan.

47. [NEW ¶] Sometime between August and October 2007, Wragg retained attorney Christopher Flannery, who was working for a private law firm in Philadelphia, to advise him (Wragg) regarding Mantria. Flannery, GJ 7/29/15 at 13-15.  Wragg told Flannery about Mantria's business venture of developing lots for re-sale in Tennessee. Id. at 18.  Shortly after Wragg told him about this venture, Flannery traveled to Tennessee to view the lots and saw what appeared to him to be an active "real estate development." Id. at 18-19.

48.  [NEW ¶]  Although McKelvy has not found anything in the discovery documents which establishes whether or not there were misrepresentations or omissions by Wragg and/or Knorr in connection with the issuance of the Mantria 50 debt offering in September or October of 2007 and although he has not found anything in those documents which establishes whether or not Flannery helped to draft the Mantria 50 debt offering documents, McKelvy concedes, for purposes of the Amended Limitations Memo, that Mantria 50 was the first fraudulent offering to investors.

49.  [NEW ¶]  As the government alleged in the indictment, "[o]n or about November 6, 2007, defendants Troy Wragg and Amanda Knorr sent a wire transfer in the amount of $240,000 in new investor funds to Alden View Funding."  Count 1, Overt Act 6. This is the indictment's only reference, of which McKelvy is aware, of evidence as to when the investor fraud aspect of the scheme was initiated.

50. [NEW ¶] Flannery testified that "Wragg explained … that the lots weren't selling because people couldn't get loans."

---

[16]  Mantria 50 is sometimes also known as "Trust Deed Group I."

Flannery GJ, 7/29/15 at 22.  Flannery stated that he wanted to do something to help Wragg because he (Flannery) was aware that "the financial crisis" in the real estate market made it "impossible to get a real estate loan." Id. at 22, 23.

51. [NEW ¶] After his trip to Tennessee, Flannery gave his two-fold "solution" to Wragg's problem of not being able to generate sales of the lots because the banks were not lending.  First, attorney Flannery advised Wragg regarding the requirements for seeking investors through such public offerings as PPMs. Flannery GJ, 7/29/15 at 13-15.  Second, Flannery told Wragg, "'If you can't get a loan for the money, let's make a bank,' and we did." Id. at 22.

52. [NEW ¶] Flannery advised Wragg how public offerings of investments, in the form of PPMs, could "help develop the lots." Flannery GJ, 7/29/15 at 21. Flannery was Mantria's attorney for all of its PPMs; he helped draft Mantria's first PPM, "Mantria Financial," which was issued on November 1, 2007.  After this first PPM, there was a "large" number of other Mantria PPMs for which Flannery provided his legal advice. Id. at 22.

53. [NEW ¶] Because of the decline in the real estate market in 2007-08,[17] Flannery also advised Wragg that he should utilize a Tennessee statue that "allows for special limited lenders that don't take deposits and [are] allowed to make loans based upon collateral." Flannery GJ, 7/29/15 at 23.  Attorney Flannery also advised Wragg regarding the creation of Mantria Financial, which was duly incorporated in Tennessee in October 2007, according to the Mantria Financial LLC PPM.

54. [NEW ¶] As stated in the Operating Agreement ("Operating Agreement") of Mantria Financial ("the Company"), the "purpose" of the company was:

> to engage in the business of acting as an Industrial Loan and Thrift Company, as defined in the laws and regulations of the State of Tennessee.… To further this purpose, the Company intends to offer and sell a … series of … Debt

---

[17]   Although Flannery testified that this downturn in the real estate market, as well as the date of his starting to work with Mantria, was in 2008, the documents suggest that these events took place sometime between August and October 2007.

> Securities to fund its [mortgage] loan operations. The
> Company will loan to qualified borrowers on adequate
> security, including, but not limited to, loans secured by
> deeds of trust on real property.…  [The purpose of the
> Company will be to] invest the proceeds of the Debt
> Securities … to fund [mortgage] loan[s].

Operating Agreement at 3, § 9.1 (Purpose).  Based on McKelvy's
review of the discovery documents, he is not aware of any
evidence, documentary or testimonial, that Mantria Financial
used any such debt securities to fund any "mortgage" loans, as
that term is defined by Dictionary.com, definition no. 1, as
quoted below at page 36.

55. [NEW ¶] Cary Widener testified that he is the CEO of High-
Temp Industries, a company which specializes in thermal
dynamics. Widener, GJ 8/5/15 at 4-5.  (Widener sometimes
referred to thermal dynamics as "high heat." Id.)  Widener
stated that he knew Michael Lurvey, who owned Carbon Diversion
Inc. (CDI) and that CDI was using a "woody biomass," high heat,
and pressure to convert the "biomass" into "biochar," which is a
highly-specialized form of carbon. Id. at 6-7.  Widener had
contacts with Wragg because of his (Wragg's) interest in going
into business to produce biochar, for which Widener's company
would make components for the production process. Id. at 8-10.
When asked by the government's attorney whether Wragg had had an
engineering background, Widener replied, "Oh, God, no." Id at
39.

56. [NEW ¶] Wragg told Widener that he (Wragg) was planning on
building a plant in Dunlap, Tennessee to produce biochar, using
technology from Lurvey/CDI. Widener, GJ 8/5/15 at 11.  In July
2009, Widener signed a contract to provide technical assistance
for producing biochar at Dunlap. Id. at 10. Biochar is referred
to in the indictment as a "green energy project." Count 1, ¶ 6.
Id.  Wragg initially looked to Widener for "nonstop" advice on
"programs to look at things" relating to the production of
biochar and later asked him to supervise construction of the
Dunlap plant. Widener. GJ 8/5/15 at 11-12.

57. [NEW ¶] Widener went to Dunlap in July, 2009, to survey the
situation. Widener, GJ 8/5/15 at 13.  As he studied the existing
plans for construction, Widener realized that "[t]hey [Mantria]

just did not have" the necessary high heat to manufacture
biochar. Id. at 12.  Before he went to Dunlap, he was told by
Wragg that construction of the plant was underway and that "the
reacting system was in the process of being assembled." Id.
When he arrived on the scene, however, he saw that

> They only had the footers of the building poured. They had
> no mechanical drawings.… So, you had basically an artist's
> rendering of what the building was supposed to look like
> and nothing else.

Id.  Widener said that it would not be possible to take this
rendering and "hand it to" a contractor and ask him to build it
on that basis. Id. at 14.

58. [NEW ¶] When Widener went to Dunlap, he met Wragg's sister,
Tisa Dixson, who was "in charge of" the construction project.
Widener, GJ 8/5/15 at 15.  She looked to be about 22 or 23 and
was a "stay-at-home mom" with absolutely no experience in
construction. Id. During the next three months, Widener hired
eight or nine engineers to work at the site to come up with
drawings for construction of the plant and to design the
operating system there. Id. at 16.  He and his crew were able to
design the building and get a contractor to do some of the
construction.  Id. at 16-17.  Later, they were able to get some
of the "autoclaves" – machinery which could manufacture biochar
– in place, but the machinery was not "up and running" and they
were not able to do even one "test batch." Id. at 17-18.
Without a test batch, "You don't know what you don't know."  Id.
At that point (September 2009), "it was not possible" to make
any biochar.  Id. at 19.

59. [NEW ¶] Widener testified that "[i]t's not possible … [or]
feasible" for biochar to be produced from consumer or hospital
waste, contrary to what Wragg and Knorr had told him they would
be able to do. Widener, GJ 8/5/15 at 21, 35.  Widener also
testified, again contrary to what Wragg and Knorr had
represented, that science did not support any claim that
biochar, when spread in a field, could "pull toxins out of the
atmosphere." Id. at 35.  Moreover, Widener testified that the
building he and his team helped to design was never "going to be
a full-production facility," because the equipment would never
keep the business "afloat." Id. at 24.

60. [NEW ¶] After he learned that the SEC had initiated its investigation of Mantria, Widener was provided information by Wragg about the Mantria building in Hohenwald, Tennessee. Widener, GJ 8/5/15 at 25.  In his opinion, as well as that of his business partner John Seaner (see below), this project was "not commercially ready" and they had no interest in it. Id. at 28.  Widener estimated that he lost "close to a million dollars" for work he and his team did for Mantria. Id. at 33.

61. [NEW ¶] In summary, Widener testified that, as to the green energy project at Dunlap, Tennessee (a) Wragg had represented to him that this plant would produce biochar, using proven technology from Lurvey/CDI and using hospital and other waste products for the source of carbon, and that construction of the plant was underway and that the reacting system was in the process of being assembled; and (b) although Wragg had represented that he already had 100,000 tons of biochar placed on "pre-order" by such stores as Walmart and Target, Widener stated that he found no support for this claim. As such, Widener stated that Wragg's plans for the Dunlap plant were simply not feasible.

62. [NEW ¶] John Seaner testified that he worked in software sales and marketing, including e-commerce software. Seaner, GJ 8/5/15 at 4-5.  He said that he was introduced to Wragg sometime in April or May of 2009 and that Wragg was interested in finding out what Seaner would advise on the "commercialization of a waste-to-energy initiative." Id. at 6.  As recounted by Seaner, Wragg told him in their initial meeting:

> He professed this waste-to-energy facility that was in Dunlap [utilized] very groundbreaking technology, [which would] change the world [and which] had a lot of science behind it[.] [Wragg said that] it had been proven to work and that he was going to use this technology as the cornerstone of his real estate developments.

Id. at 8.  Wragg advised Seaner that the biochar process, utilizing CDI technology, would make very high quality carbon in a very inexpensive and environmentally friendly manner. Id. at 8, 15.  Wragg told Seaner that he would pay him $300,000 a year for working to market Mantria's waste to energy technology,

obtained from CDI. Id. at 15, 17.  Wragg said he would pursue
marketing the biochar itself. Id. at 16.

63. [NEW ¶] When he got to the Dunlap plant in July, 2009,
Seaner realized that the plant "was not operational" and that
there had been no tests to determine if the biochar product
would be commercially viable. Seaner, GJ 8/5/15 at 18-20, 24.
Seaner said that his engineers said that "there was no market
here" and that the Dunlap facility would not be able to make
what Wragg said it could. Id. at 35-37.

64. [NEW ¶]  After Wragg asked Seaner, in September 2009, if he
would like to be the CEO of Mantria, one of Seaner's reactions
was to ask Wragg, several times, if he could see Mantria's books
and records, but Wragg always refused those requests. Seaner GJ,
8/5/15 at 45-46.  Seaner said that "[a]t that point [he and
Widener] … flipped and said there's something unsavory going on;
something doesn't add up." Id. at 46-47.

65. [NEW ¶] In summary, Seaner corroborated Widener's testimony
that Wragg's stated plans to produce biochar at the Dunlap plant
were simply not feasible.

66. [AMD ¶] There is no allegation by the government as to the
identity of any putative financial institution as to which the
second rationale might apply and no reference in the discovery
documents as to such a financial institution, as to the
"financial institution" element of section 3293(2).  Moreover,
there is no known documentary support for the government's
second rationale.

V.  THE GOVERNMENT'S FIRST RATIONALE – THE "FINANCIAL
INSTITUTION" REQUIREMENT.

A.  The factual and legal allegations in the indictment which
are relevant to the government's first rationale.

The indictment alleges that Mantria Financial was one of the "11
operating divisions" of Mantria Corporation ("Mantria") and that
Mantria Financial was a "wholly-owned or affiliated" division of
Mantria, but does not specify which. Count 1, ¶ 1.  Count 1 also
alleges that Mantria Financial "was a financial institution and
mortgage lending business which engaged in interstate commerce"

and that "Mantria Financial was licensed in Tennessee to finance real estate mortgages." Id. at ¶ 5.

B.  <u>Mantria Financial was not a "financial institution" within the meaning of sections 3293(2) and 20(10)</u>.

McKelvy argues that, as a matter of law, Mantria Financial – the only organization identified in the indictment as a "financial institution" – should not be considered to be such because it fails to meet several of the requirements in the applicable statutes.  The defendant will also argue, as an independent ground, that the government has not made a showing that, under section 3293(2), the scheme "affected" such an institution.

As set out above, the statutory definition of "financial institution" in section 3293(2) has, since May 20, 2009, also included "a mortgage lending business (as defined in section 27[18] of this title) or any person or entity that makes in whole or in part a federally related mortgage loan." 18 U.S.C. § 20(10).

C.  <u>The term "mortgage lending business" has not been developed by the courts in the context of section 3293(2)</u>.

There are only seven reported cases which McKelvy has found which consider the term "mortgage lending business" in sections 20(10) and 27 as this term applies to section 3293(2), but none of these cases included any development of this term by the courts. Cf. <u>United States v. Brown</u>, 2016 WL 4363135(3d Cir. 2016); <u>United States v. Bennett</u>, 621 F.3d 1131, 1137-38 (9th Cir. 2010); <u>United States v. Walker</u>, 2016 WL 1175134, *3 (M.D.Ga. 2016); <u>Cardillo</u>, 2015 WL 3409324, *3; <u>United States v. Leadbeater</u>, 2015 WL 567025 (D.N.J. 2015); <u>United States. v. Abakporo</u>, 959 F.Supp.2d 382, 387 (S.D.N.Y. 2013); <u>United States v. Brester</u>, 2013 WL 11325234, (M.D.Fl. 2013).  Accordingly, McKelvy needs to use other ways to define this term.

D.  [AMD ¶] <u>While the literal meaning of a "mortgage lending business" seems clear, legislative intent might be relevant</u>.

---

[18]  As also set out above, section 27 states, "In this title, the term 'mortgage lending business' means an organization which finances or refinances any debt secured by an interest in real estate, including private mortgage companies …, and whose activities affect interstate or foreign commerce."

As McKelvy analyzes section 20(10) and section 3293(2), we first
cite the law in this Circuit on the relationship between the
plain meaning rule and legislative intent.  As the Court said
in United States v. Fontaine, 697 F.3d 221 (3d Cir. 2012):

> "A court's primary purpose in statutory interpretation is
> to discern legislative intent.  In determining legislative
> intent, "[t]he plain meaning of legislation should be
> conclusive, except in … rare cases in which the literal
> application of a statute will produce a result demonstrably
> at odds with the intentions of its drafters." … In those
> rare cases, we are obligated "to construe statutes sensibly
> and avoid constructions which yield absurd or unjust
> results."

697 F.3d at 227 (citations omitted).

Although McKelvy believes that the "plain meaning" of section
3293(2) is clear, as set out above and below, he maintains, as
more fully explained in section V(F), page 37, that there is an
unstated premise underlying these sections which might be
clarified by a brief look at the statute's legislative history.

E.   **Dictionary definitions should provide the meanings of the
pertinent words in sections 3293(2) and 20(10).**

McKelvy will discuss the statutory definition of "a mortgage
lending business" provided by sections 3293(2) and 20(10), as
well the "plain meaning" of these two statutes.

The statutory definition of "a mortgage lending business" is: an
"organization which finances or refinances any debt secured by
an interest in real estate … and whose activities affect
interstate or foreign commerce." 18 U.S.C. § 27 (emphasis
added).  McKelvy argues that the five key words here are
"mortgage," "lending," "business," "finances," and "debt," and
that, after examining several definitions, it is apparent that
Mantria Financial was not "a mortgage lending business."

Recent decisions of the Supreme Court have used dictionary
definitions as central points in their analysis. See,
e.g., Board of Trustees of Leland Stanford Jr. University v.
Roche Molecular Systems, Inc, 563 U.S. 776, 788-89 (2011).  As
was stated in a recent article in the New York Times, "A new

study … found that the justices had used dictionaries to define 295 words or phrases in 225 opinions in the 10 years starting in October 2000. That is ... an explosion by historical standards." "Justices Turning More Frequently to Dictionary, and Not Just for Big Words," http://www.nytimes.com/2011/06/14/us/14bar.html

-- Definition of "mortgage."

The most pertinent dictionary definition of "mortgage" which McKelvy has found is: "a conveyance of an interest in property as security for the repayment of money borrowed," Dictionary.com, definition no. 1.

-- Definition of "lending."

The most pertinent dictionary definition of "to lend" or "lending" which McKelvy has found is: "the activity of lending money to people and organizations which they pay back with interest," Cambridge English Dictionary, definition no. 1.

-- Definition of "business."

The most pertinent dictionary definition of "business" which McKelvy has found is: that "which occupies the time, attention, and labor of men for the purpose of a livelihood or profit," Black's Law Dictionary.

-- Definition of "finances" (verb).

The most pertinent dictionary definition of "finances" (verb) which McKelvy has found is: "to buy (something) by borrowing money that will be paid back over a period of time," Merriam Webster, definition no. 2.

-- Definition of "debt."

The most pertinent dictionary definition of "debt" which McKelvy has found is: "something, typically money, that is owed or due," Oxford English Dictionary, definition no. 1.

F.   [AMD §] The facts of the government's case refute its allegation that Mantria Financial was a "mortgage lending" institution.

McKelvy argues that the "plain meaning" of section 20(10) shows that this section does not apply to Mantria Financial, under the defendant's factual proffers.  To construe this section "sensibly," as required by the Third Circuit in Fontaine, should mean, according to the dictionary definitions of the five key words listed above - "mortgage," "lending," "business," "finances," and "debt" - that a "mortgage lending business" would be defined as: an entity, intending to make a profit, which made loans secured by real estate, where the entity lent money to the prospective "purchaser(s)" on the condition of repayment of the loan, which would result in the creation of a debt.

[AMD ¶] Based on the defendant's proffers, McKelvy asserts that this Court should enter the Proposed Findings and Conclusions, which document has been filed separately.  In essence, the Proposed Conclusions, in light of the Proposed Findings, state the reasons why Mantria Financial is not, as a matter of law, a "financial institution."[19]  McKelvy adopts here the reasoning of the Conclusions as if that analysis were set out here in full. See Proposed Findings at 1-15 and the Proposed Conclusions at 15-26.

VI.  THE GOVERNMENT'S FIRST RATIONALE – THE "AFFECTED" REQUIREMENT.

A.  McKelvy cannot move to dismiss for insufficient allegations on how the fraud "affected" a financial institution.

As noted above, McKelvy recognizes, based on the law in this circuit and elsewhere, that the statute of limitations is not jurisdictional and can be waived. See, Karlin, supra, 785 F.2d at 92-93 (discussed above at 7-8).  McKelvy concedes that it follows, from this and from the Third Circuit and Supreme Court cases cited below, that he cannot argue that the indictment is defective due to the insufficiency of the factual allegations

---

[19]  [NEW] McKelvy has chosen to include these arguments only in his Proposed Findings and Conclusions because they are relatively uncomplicated.

there as to how the fraud affected the one financial institution
identified in the indictment, Mantria Financial.[20]

Although a defendant can move to dismiss an indictment under
Fed.R.Crim.P. 12(b)(3)(B) for failure to state an offense,
see  United States v. Kemp, 500 F.3d 257, 280 (3d Cir. 2007),
this authority concerns only situations where the indictment
fails to include elements of the crime charged – or their
functional equivalents -- which, of course, would not include
affirmative defenses such as the one here.

McKelvy's concession on this point is also driven by the well-
established principle that a defendant cannot challenge an
indictment for an alleged absence of probable cause on an
element on the offense.   The Supreme Court does not permit pre-
trial challenges to a grand jury's probable cause determination
or to the adequacy of the evidence supporting an indictment.
See Costello v. United States, 350 U.S. 359, 363 (1956)("An
indictment returned by a legally constituted and unbiased grand
jury, … if valid on its face, is enough to call for trial of the
charge on the merits."); see also United States v. Williams, 504
U.S. 36, 54-55 (1992)(relying on Costello).

B.  In Carollo, the government did not make sufficient
allegations for section 3293(2), but in Ghavami it did.

Even though McKelvy concedes here that the government need not
include any allegation in the indictment to explain how the
fraud "affected" a financial institution, he argues that the
government needs to give the defense sufficient notice of its
precise grounds for invoking section 3293(2), by means of
detailed allegations in a responsive memo and/or a formal
proffer.   In dealing with this issue, the district courts
in Carollo and Ghavami said, in effect, that the government had
(or had not) provided adequate notice of the manner in which the
fraud allegedly "affected" a financial institution.   We will
examine the Carollo and Ghavami cases, on the sufficiency of the
allegations there.

---

[20]  This concession only concerns the "affected" allegation as it
would relate to the statute of limitations.

-- "Affected" allegations - Carollo.  In the Carollo cases, the court stated that one of the reasons it initially granted the motion to dismiss as to Counts 4, 5, and 7 was that the government did not allege in the indictment or in any proffer that a financial institution had suffered "actual loss." Carollo I, at *2.  The court also ruled that the extended statute of limitations was not applicable because the government "merely argue[d] that the [fraud scheme] exposed [two financial institutions] to a risk of loss without providing much explanation as to what that risk [was] other than the expenses associated with litigation." Id. at *2.

In response to the government's motion for reconsideration of its dismissal order, the court denied this motion and amplified its initial ruling by stating that the government only argued, in response to the motion to dismiss, that an [unnamed] institution's "prospect of litigation expenses" was sufficient to carry the government's burden on the "affected" issue. Carollo II at *3.  The court noted that had the government "made the proffer of evidence at the motion to dismiss phase that it has made in this motion for reconsideration, the outcome may have been different." Id.

-- "Affected" proffer - Carollo. In response to government's motion for reconsideration, the court stated that the government argued, as noted above, that the court should wait until trial to decide the applicability of section 3293(2) issue "because an indictment need not negate an affirmative defense based on the statute of limitations," Carollo II at *3, citing, inter alia, the Supreme Court's decision in United States v. Cook, 17 Wall. 168, 84 U.S. 168 (1872).  In denying reconsideration, the district court distinguished Cook, on the grounds that the government could have "provide[d] evidence, or at least allege[d] facts [arguably] sufficient to withstand the statute of limitations defense," but did not do so. Carollo II, at *3.  As such, the court found that the government's failure to provide a proffer, or at least to have initially made an allegation as to what they expected to be able to prove, justified its granting the defendants' motion to dismiss Counts 4, 5, and 7.

McKelvy argues, following the ruling in the Carollo cases and
for the reasons explained more fully below, that the allegations
in the indictment, together with the government's claimed
explanation that section 3293(2) was satisfied because Mantria
Financial went bankrupt, did not provide a sufficient
"explanation" on the "affected" issue, by way of an allegation
or a proffer, "sufficient to withstand the statute of
limitations defense." Carollo II, at *3.

-- "Affected" allegations - Ghavami.  In contrast to the
insufficiency of the government's explanations in Carollo, the
government in Ghavami made allegations explaining how the fraud
affected one or more financial institutions.  Specifically, the
government alleged

> that the ten-year statute … applies … because the charged
> conduct "affect[ed]" certain financial institutions … by
> exposing them to the risk of financial loss and causing
> them to experience actual financial loss, in the form of
> civil monetary settlements with the [SEC] …, as well as
> attorneys' costs and fees associated with reaching
> resolutions of non-prosecution agreements with the
> Department of Justice Antitrust Division ("DOJ").

2012 WL 2878126, at *4.  The court found that these allegations
were sufficient, if supported by adequate proffers, to explain
how the "affected" element in section 3293(2) was satisfied -
because the alleged fraud had exposed four financial
institutions to "a new or increased risk of loss" and that its
position was supported by "persuasive" authority. Id. at *5-*6.

-- "Affected" proffer - Ghavami.  In its proffer of the evidence
it intended to introduce at trial, the government in Ghavami
stated that it would call a representative of each of four
financial institutions to testify about the actual losses
suffered by each entity and/or the associated susceptibility to
a substantial risk of loss, which were a direct result of the
fraud scheme. Dkt. #484 at 6, 9, 10.  In its four proffers - one
for each of the four financial institutions - the government
alleged that Financial Institutions A, C, and D, as well as
Provider B, entered into agreements to pay a total of hundreds
of millions of dollars to the IRS, the SEC, and various

municipalities "affected by the [fraudulent] conduct." 2012 WL
2878126, at *8.

In addition, one of the three victim banks was "not only exposed
to substantial risk but experienced actual losses," including
over $28 million in settlement costs and attorneys' fees. 2012
WL 2878126, at *6.  A memo filed by the government provided a
five-page summary of its proffer of evidence on the "affected"
issue. Dkt. #484 at 10-14.  Even a cursory reading of the
section in the court's opinion concerning the proffered evidence
on the "affected" element shows that the government went into
exhaustive detail to make its case. Id. at *7 - *9.

-- Summary.  In summary, in Carollo, the defendants' prevailed
on their motion to dismiss, in part because the government
failed to make sufficient allegations to support its invoking
section 3293(2). Contrastingly, in Ghavami, the government
prevailed, because it both made sufficient allegations in its
memoranda and provided the court with detailed proffers.

C.  An "institution" which was an "active participant in the
fraud" can be "affected" under section 3293(2).

As explained in Ghavami, even though a financial institution may
have been an "active participant in the fraud," that will not
automatically bar the application of section 3293(2).  For this
proposition, Ghavami relied on the following three cases:

> See United States v. Ohle, 678 F.Supp.2d 215, 228–29
> (S.D.N.Y. 2010) … (holding that financial institution was
> affected within meaning of § 3293 even where it was "active
> participant in the fraud"); United States v.. Daugerdas, …
> 2011 WL 6020113, at * 1 (S.D.N.Y. Apr. 5, 2011) …
> ("[N]othing in [§ 3293(2) ]'s language precludes  its
> application to a financial institution that  participated
> in the fraud."); see also United States v. Serpico, 320
> F.3d 691, 695 (7th Cir. 2003) ("[T]he mere fact that
> participation in a scheme is in a bank's best interest does
> not necessarily mean that it is not exposed  to additional
> risks and is not 'affected' [under § 3293(2)] …."}.

Ghavami, at *5; see, Agne, 214 F.3d at 51.  McKelvy agrees that
this is an accurate statement of the law.

**D.   [AMD §]   Even if Mantria Financial were an "active
participant in the fraud," the government has not shown that
this company was "affected."**

[AMD ¶] McKelvy argues that the rulings in such decisions
as <u>Ghavami</u>, <u>Ohle</u>, and the two other cases cited immediately
above on "active participant in the fraud" are not adverse
authority in his (McKelvy's) case for two reasons.  First,
McKelvy argues that all of the requirements for finding that a
"financial institution" was "affected," including the various
definitions of "affected" set out below in section VI (E), pages
42-45, are still fully applicable.  In other words, while we
agree that just because an institution is an "active
participant" in a fraud does not mean that the government is
automatically prohibited from invoking the ten-year statute, we
assert that it also does not mean that the government is
automatically entitled to utilize the extended statute – all the
usual requirements are still in effect – and, as argued below,
have not been met here.

[NEW ¶] Second, McKelvy argues that the Seventh Circuit's
statement in <u>Serpico</u> regarding the "whole purpose" of the
statute shows that there is an unstated premise in section
3293(2) – which the <u>Serpico</u> court said "protected" financial
institutions against "would-be criminals" – which supports
McKelvy's position.  See 320 F.3d at 694-95, quoted above at 8.
This unstated premise is that the "financial institutions" which
were "affected" must be legitimate ones.

[NEW ¶] In <u>Serpico</u>, the government charged the two defendants
with participation in hotel loan kickback schemes, where banks
made overly-favorable loans to the defendants. 320 F.3d at 693.
The defendants raised no argument that the banks were anything
but legitimate ones.  The question there was whether the banks
had been "affected" within the meaning of the statute.  The
district court found that the banks had suffered losses due to
the selection by corrupted bank employees of non-competitive
investments, to favor the defendants making the kickbacks. Id.
In its analysis of section 3293(2), the Seventh Circuit
separated "would-be criminals" from "financial institutions,"
id. at 694, but they are one and the same here.

Accordingly, in McKelvy's case, there was no difference between
the alleged financial institution, on the one hand, and the
criminal co-owners and the co-operators of the business, on the
other.  Section 3293(2) should not be read to protect an
institution from the total fraud that it was. Id. at 694.

### E.   To make a colorable case that Mantria Financial was "affected" by the fraud, the government must make three showings.

McKelvy will summarize here the requisite aspects of both the
necessary allegations and the necessary proffers for the
government to make a colorable case that it is entitled to the
ten-year statute of limitations.

[NEW ¶] As noted above at 13-14 & n.6, although McKelvy is
confident that the discovery provides ample support for each of
the Proposed Findings cited in this Amended Memo, it is not his
burden to establish these facts.  Rather, it is the government's
burden to make a colorable showing that it can prove at trial,
beyond a reasonable doubt, that the fraud was the direct cause
of Mantria's bankruptcy, despite the facts McKelvy offers
proving otherwise.

-- First, the government's allegations and proffers must be
sufficiently detailed to overcome the defense.  The government
must make sufficiently detailed allegations and proffers to
"allege[] facts [arguably] sufficient to withstand the statute
of limitations defense." Carollo II, at *3.  The government's
sufficiently detailed explanation must show what [the actual
loss or the] risk [was]." Id. at *2-*3.

This sufficiently detailed explanation is necessary, no matter
how complex the underlying fraud. Cf. Ghavami at *7-*10
(government provided sufficient explanation in proffers of
actual losses and/or substantial risks of loss in case involving
municipal bond trading, derivatives, competitive bidding
procedures, federal tax law, and IRS regulations), to give the
defendant(s) the information they need to respond to and probe
the validity of the government's assertion that an institution
was "affected." See Proposed Conclusion 35.

-- Second, the government must show that the fraud directly actual loss and/or a risk of loss.  The government must provide, in its allegations and/or proffers, an explanation of how the fraud "caused" the financial institution to suffer any such losses. Carollo I, at *2-*3.  Moreover, the government must demonstrate that the fraud was a "sufficiently direct" cause of such loss or risk of loss. Heinz, 790 F.3d at 367(citation omitted); Bouyea, 152 F.3d at 195.  A "mere use of a financial institution in a scheme to defraud is not enough to demonstrate that the financial institution was affected by the wire fraud." United States v. Mullins, 613 F.3d 1273, 1278 (10th Cir. 2010).

The Second Circuit has ruled that the term "affects" in section 3293(2) "expresses a broad and open-ended range of influences." Heinz, 790 F.3d at 367 (citation omitted). Accordingly, section 3293(2) "broadly applies to any act of wire fraud which affects a financial institution," provided the effect of the fraud is "sufficiently direct." Id. (citing United States v. Bouyea, 152 F.3d 192, 195 (2d Cir. 1998) (per curiam) (quotation marks omitted); cf. Anthony Allen, 160 F.Supp.3d at 705.

Moreover, the government does not have to show that the designated "financial institution" was a "victim" of the fraud charged in the indictment. See United States v. Pelullo, 964 F.2d 193, 215-16 (3d Cir. 2012) ("Pelullo's argument would have more force if [section 3293] provided for an extended limitations period where the financial institution is the object of fraud. Clearly, however, Congress chose to extend the statute of limitations to a broader class of crimes."); accord, Ghavami, 2012 WL 2878126 at *5. See Proposed Conclusion 37.

  -- Third, the government must specify the amount of any alleged actual loss, or that any risk of loss was "new or increased" and that it was "substantial" or "sufficient."  The government, if it is relying, as is apparently the case, on the theory that there was an actual loss, must articulate the extent of any such loss. Carollo I, at *2.  As of now, there is nothing in the case against McKelvy which even approaches what the indictment, the government's memoranda, and government's proffers in Ghavami

alleged as to the manner in which the fraud "affected" the
financial institutions there.

Alternatively, if the government's theory is not that Mantria
Financial suffered an actual loss, but that it was made
susceptible by the fraud to a risk of loss, then the government
has to make a colorable case, by way of allegations and/or
proffers, that any risk of loss was "new or increased" and that
it was "substantial." See Ghavami, 2012 WL 2878126 at *5,
citing Mullins, 613 F.3d at 1278; United States v.
Rubin/Chambers, Dunhill Ins. Services (CDR), 831 F.Supp.2d 779,
783-84 (S.D.N.Y. 2011); Carollo I, at *2, citing United States
v. Ohle, 678 F.Supp.2d 215, 228-29 2010), aff'd, 441 F.App'x 798
(2d Cir. 2011); see also Serpico, 320 F.3d at 694. The
government also has to show that the risk was
"substantial." Ghavami, at *6; CDR; Carollo I, at *2; Ohle, 678
F.Supp.2d at 229.

Using slightly different language, the First Circuit said
in United States v. Agne, 214 F.3d 47, 52 (1st Cir. 2000),
articulated a "sufficient risk" test:

> We conclude that this is a case in which the consequence to
> the bank, if any, is too remote to sustain the conviction.
> [A]ssuming … that being exposed to a risk of loss is
> sufficient to "affect" a bank, within the ordinary meaning
> of that term, we cannot agree with the district court that
> this defendant created such a risk.

Id. at 52 (citing in prior paragraph Pelullo, 964 F.2d at 216).

As a number of decisions recognize, there is a point beyond
which courts will not consider a financial institution to have
been at a risk of being "affected."  Terms used by the courts to
draw this line – which terms are functionally similar to the
"substantial risk" or "sufficient risk" tests -- are: "[not]
too remote," Agne, 214 F.3d at 52, Pelullo, 964 F.2d at
216, Bouyea, 152 F.3d at 195; not "too attenuated," Carollo I,
2011 WL 3875322 at *3, Agne, 214 F.3d at 52; and "[a] realistic
prospect of loss," citing Agne, 214 F.3d at 53; other such terms
are: the financial institution has been "prejudiced" by the
fraud charged, citing Agne, 214 F.3d at 52, Bouyea, 152 F.3d at
195, and Pelullo, 964 F.2d at 216; and the impact of the fraud

has been more than "de minimis," as used in Carollo I, 2011 WL
3875322 at *2, and Carollo II, 2011 WL 502 3241 at *1, *4.
McKelvy asserts that all of these terms are equally suitable and
interchangeable.  See Proposed Conclusion 39.

F. [AMD §] The government's allegations have not met the three
requirements set out in section VI (E).

By analogy to Ghavami, 2012 WL 2878126 at *7-*10, and Carollo I,
2011 WL 3875322 at *1-*2, where the government did (and did not)
submit sufficient allegations and/or proffers, McKelvy argues
that this Court can take into account proffers by the defendant,
as well as by the government.  Here, as noted above, McKelvy
asks this Court to consider his pre-trial proffers and Proposed
Findings and Conclusions, in support of his position that
Mantria Financial was not "affected" by the alleged fraud,
because it (the government), as of the date of this submission,
has not shown and will not be able to show the three
requirements set out in section VI (E), pages 42-45, above.

-- First, the government's allegations and proffers are not
sufficiently detailed to overcome the defense.  McKelvy asserts
that, as in Ghavami, this Court can determine, as a matter of
law, whether there is any likelihood that the government will be
able to show at trial a colorable basis to invoke section
3293(2), once the government has responded to the within motion.
The court in Ghavami found, in effect, that the government's
proffers made colorable showings that the four institutions in
question were substantially "affected." Id. at *7-*10.

[AMD ¶] As noted above, the charging paragraph in the indictment
"The Conspiracy" does not include any description whatsoever of
the specific manner in which Mantria Financial was "affected" by
the fraud scheme. Count 1, ¶ 5.  Rather, the only attempted
explanation of how the defendants' conduct in the alleged fraud
"caused" Mantria Financial to be "affected," under its informal
first rationale, see above at 6-7, is that Mantria Financial
suffered an actual loss because it went bankrupt.  Because the
informal first rationale took the issue for granted[21] and

---

[21]  The applicable passage reads, "[T]here is no question … that
the wire fraud affected Mantria Financial (i.e., it went
bankrupt.)" See above at 6.

consisted of only a single sentence, it cannot possibly be
considered as the requisite "sufficiently detailed" explanation
of the connection between the asserted loss and the fraud. See
Proposed Finding 36.

-- [AMD ¶] <u>Second, the government has not shown that the fraud
directly caused an actual loss and/or a risk of loss</u>.  One of
the reasons the government has not been able to show - and
cannot show - that the fraud "directly caused" an actual loss or
a risk of loss is that Mantria's bankruptcy or another form of
insolvency was apparently inevitable.  Based on Proposed
Findings 10-15, 26-28, and 31-42, McKelvy asks the Court to find
that, as of September and October 2007, Wragg and/or Mantria
were apparently insolvent for the following reasons:

(a) In December 2006, Wragg told Dr. Dixson that he (Wragg)
might have to go into bankruptcy, because he could not repay the
$50,000 Dr. Dixson had lent him, Proposed Finding 10, 12, 13,
pages 3-4;

(b) Wragg/Mantria's residential holdings in Tennessee could not
be developed as planned because of, among other things, multiple
fundamental problems with the sites, including the lack of
potable water, the presence of live ordnance, and the absence of
access roads, Proposed Finding 14, page 4;

(c) in addition, Wragg and Mantria could not sell these lots
because the financial crisis in 2007-08 made it impossible to
get a real estate loan, Proposed Finding 14, page 4;

(d) during the period August 11, 2007 through June 2008, Wragg
hired an appraiser to set values on the Mantria sales lots at
prices based on their future, developed value and on comparables
he (Wragg) provided, so that such lots would be accepted by
possible investors as collateral for Mantria investments,
Proposed Finding 15, pages 4-5;

(e) Wragg's actions in using the inflated appraisals of
approximately $80,000 per acre to make it (falsely) appear that
this land provided valuable "collateral" for the investments,
demonstrated that he had an urgent need for cash and that he had

abandoned his initial strategy of selling the land for $15,000 to $20,000 per acre, Proposed Finding 15, pages 4-5;

(f) Wragg's having taken out, at some point in 2006-07, a $3.2 million construction loan for the properties in Tennessee, see Proposed Finding 13, when compared with Wragg's statement that the total amount of money he had accumulated for investing in this land was approximately $122,000, Proposed Finding 12, showed that it was apparent that Wragg and Mantria were insolvent as of the time he initiated the Mantria 50 debt offering in September or October 2007, by which offering he was seeking to pay off this construction loan, demonstrated, as he admitted during a proffer, that he and Mantria did not then have the money to pay off this construction loan;

(g) other than the (at most) approximately $300,000 Mantria received for "cash sales" of parcels in 2008-09, Mantria did not intend to make any profit on such "sales," Proposed Finding 26; moreover, there is no evidence that Mantria Financial was in any way involved in such "cash sales" – by definition, Mantria Financial was involved with mortgages, not with such sales, id.;

(h) despite the expenditures of at least $4.4 million, Mantria never made any money from the green energy projects, Proposed Finding 27;

(i) Wragg and Knorr exercised consistently poor judgment in making their business plans as to the land sales in Tennessee and the green energy projects, as was fully set out in the grand jury testimony cited above, Pr. 10-15, 26, 27, and below, Pr. 31-42; and

(j) when the above nine instances are considered in totality, they constitute a presumption that Wragg and Mantria would have been insolvent, in 2007-08, had it not been for the illegal intrusion of investor funds taken by fraud, as established by the government's evidence.

Accordingly, as stated above, Wragg and/or Mantria were apparently insolvent as of September and October 2007 and would have been insolvent through 2008, for reasons independent of the

fraud, unless and until the government can prove - through
evidence not apparent from discovery - that the fraud was a
direct cause of Mantria's bankruptcy.

It is evident that an organization which does not make and does
not intend to make any money will, at some point, have to
declare bankruptcy or some other form of insolvency and,
accordingly, that the charged illegal activity could not
possibly be said to have "caused" the actual loss or a risk of
loss, as required by Carollo I, et al. See Proposed Conclusion
38.

-- Third, there was no effort to specify the amount of an actual
loss or the substantiality of a risk of loss.  There is nothing
in the indictment or in the government's statement of its first
rationale which sets out the amount of any actual or risk of
loss.  Because the government, in its first rationale, did not
identify the amount of an alleged actual loss or the amount as
to which there was a substantial risk of loss, there is no way
to know if that entity had been "affected" under the case law
cited above, which requires the government to show that the
actual loss or substantial risk of loss was, inter alia,
"sufficiently direct" and not remote or "de minimis."

As the defendant understands the relevant case law, there is no
case which found that a "financial institution" was affected,
without the government's providing at least an estimate of the
amount of money involved, which claim was then verified by the
court.  Otherwise, neither McKelvy nor the Court would have any
idea of the merits of the government's explanation as to how
McKelvy's fraudulent conduct may have affected Mantria
Financial. See Proposed Conclusion 40.

[NEW ¶] Alternatively, if the government's position is that
there was no actual loss but rather a risk of loss, McKelvy
recognizes, under the "new or increased risk of loss" test, used
in such cases as Ghavami, 2012 WL 2878126, at *4, and the
"substantial risk" of loss test, id. at *6, that if the
government could make a colorable showing that Mantria went
bankrupt substantially sooner than it would have otherwise, such
a showing would satisfy this test. In this case, however, the
defendant asserts that the discovery shows that the insolvency

did not occur sooner than it otherwise would have, but, to the
contrary, occurred long afterwards.  Put differently, while
Mantria was apparently insolvent by October 2007, Mantria and
Mantria Financial engaged in some business activity, in the form
of banking transactions, until on or about November 16, 2009,[22]
only because of their collection and use of investor funds.
McKelvy argues that the government has made no attempt to
explain why it is apparent that the corporate life of Mantria
Financial (which was dependent upon the corporate life of
Mantria) was extended - not shortened - by the fraud due to the
illegal infusion of investors' funds. See Proposed Conclusions
41, 42.

VII.  THE GOVERNMENT'S SECOND RATIONALE FOR APPLYING SECTION
3592(2) TO THIS CASE IS LIKEWISE UNSUPPORTABLE.

A.  <u>The government's second rationale is also unsupportable,</u>
<u>based on the discovery which McKelvy has reviewed.</u>

McKelvy argues that the government's second rationale is also
unsupportable.  McKelvy contends that, as to this rationale, the
indictment, together with the government's informal statement
and the discovery, do not supply the sufficiently detailed
explanation of the necessary three kinds of allegations and/or
proffers to make a colorable case that it can invoke section
3592(2), as set out in section VI (E), pages 42-45.

B.  <u>The government's second rationale regarding the</u>
<u>applicability of sections 3293(2) and 20(10) to Counts 1-8.</u>

-- <u>The indictment</u>.

The relevant part of the indictment alleges that:

---

[22]  The U.S. District Court for Colorado issued a temporary
restraining order on or about this date against Mantria, Wragg,
Knorr, Speed of Wealth, McKelvy, and Donna McKelvy, now Donna
Jarock, freezing the assets of all defendants.  This order
"prohibited the acceptance, deposit or disbursements of
additional funds from investors or potential investors,"
effectively shutting down Mantria.  Although this was not a
declaration of bankruptcy, it was its functional equivalent,
because it closed the business.

> During Speed of Wealth seminars, defendant McKelvey advised
> prospective investors to liquidate other investments,
> including retirement accounts, and to obtain the maximum
> amount of funds in <u>loans from financial institutions in the
> form of credit cards, insurance policies, home equity, and
> other loans</u>, and invest all these funds in Mantria and its
> related entities.

Count 1, ¶ 2 ("Background" section)(emphasis added).

<u>-- The "second rationale," summarized</u>.

The government's informal summary of its second rationale, set
out more fully above at II (C), pages 5-7, states that the
"affected" element is met in the following manner:

> When the Mantria Ponzi scheme collapsed, those [unnamed]
> financial institutions which lent money to investors were
> affected because many of the investors could not repay
> those loans or at least were delinquent on those loans.

Id.[23]

C.   <u>McKelvy's proffer on the second rationale</u>.

[AMD ¶]  McKelvey represents that he has made his best effort to
conduct a review of the discovery documents which are relevant
to this second rationale.  He makes the following proffer, set
out above at page 33, while recognizing that the government may
be able to locate documents which McKelvey has not found.

66. [AMD ¶] There is no allegation by the government as to the
identity of any putative financial institution as to which the
second rationale might apply and no reference in the discovery
documents as to such a financial institution, as to the
"financial institution" element of section 3293(2).  Moreover,

---

[23]  Once the government has supplied the necessary details, as
set out below, as to the identity of the financial
institution(s) which allegedly suffered a loss and a
representation that such financial institution(s) were federally
insured at the time, McKelvy may be in a position to stipulate
that such institutions would be qualified as such under sections
3293(2) and 20(10).

there is no known documentary support for the government's
second rationale.

D.  <u>The reasons why the second rationale fails</u>.

Based on the documents made available to the defense, this
second rationale is unsupportable for several reasons. The
defendant's arguments here are similar to his arguments made
above at section VI (E), pages 42-45, concerning the first
rationale.

-- <u>First, the government has not yet made any detailed
allegations or proffers as to how the particular financial
institution(s) were "affected."</u>  Under this second rationale,
the government needs first to make allegations similar to those
required for the first rationale, at sections III-VI, pages 8-
50.  Specifically, the government must meet all the requirements
of section VI (E), pages 42-45, of this memo, including the
requirement to make detailed factual allegations "sufficient to
withstand the statute of limitations defense." <u>Carollo II</u>, at
*3.  These allegations would need to include, among other
things, the identity of the financial institution(s) which
allegedly suffered a loss.

-- <u>Second, the government must make allegations and/or proffers
explaining how the fraud directly caused an actual loss and/or a
risk of loss</u>." As argued by McKelvy in his limitations memo at
section VI (E), pages 42-45, the second requirement, to overcome
a statute of limitations defense that there was no evidence of
the "affected" element, is for the government to provide an
"explanation as to how the fraud "caused" the financial
institution to suffer any such losses, id., and how the fraud
was a "sufficiently direct" cause of any such actual loss or
risk of loss. <u>Heinz</u>, 790 F.3d at 367 (citation omitted).  As
asserted above, these requirements apply no matter how
complicated the underlying fraud. Cf. <u>Ghavami</u>, at *1, *7-*10.

-- [AMD ¶]  <u>Third, the government must specify the amount of any
alleged actual loss, or that any risk of loss was "new or
increased" and that it was "substantial" or "sufficient."</u>  The
government, if it is relying, as is apparently the case, on the

theory that there was an actual loss, must articulate the extent of any such loss. Carollo I, at *2.  As of now, there is nothing in the second rationale which even approaches what the indictment, the government's memoranda, and government's proffers in Ghavami alleged as to the manner in which the fraud "affected" the financial institutions there.

[AMD ¶] Alternatively, if the government's theory is that a financial institution was made susceptible by the fraud to a substantial risk of loss, the government must provide allegations and/or proffers that (1) such exposure was "to a new or increased risk of loss," Ghavami, 2012 WL 2878126 at *5 (citations omitted); (2) the risk was "substantial," Ghavami, at *6; and, among other things, (3) the impact of the fraud has been more than "de minimis," as used in Carollo I, 2011 WL 3875322 at *2.

E.   For the government to adequately support the second rationale, it must supply the following information.

[AMD ¶] Moreover, because there is sparse information in the indictment which is relevant to the second rationale and because there is no explicit reference in the discovery to this rationale, as to any of the aspects of the detailed explanation required to show how a financial institution has been affected, McKelvy argues that the government needs to provide the following information to McKelvy and to the Court.

The defendant maintains that, to satisfy the three requirements for the government to establish that a financial institution was "affected," set out in this limitations memo at VI (E), pages 42-45, the government's explanation, allegations, and/or proffers or proposed stipulations would need to, at least:

(a) Identify the "financial institution(s)" which were allegedly affected by the fraud.

(b) State the dollar amount of any alleged loss.

(c) Identify the Mantria investor(s) who allegedly defaulted on or were otherwise unable to pay what was owed on a credit card,

line of credit, or other loan which the investors took out as a result of McKelvy's advice that they maximize such extensions of credit, in accordance with his recommended "arbitrage" technique.

(d) Describe and document the financial condition of the investor(s) before, during, and after the extensions of credit and after the extensions of credit, so as to permit the defendant and the Court to assess the alleged effect of the fraud, as opposed to other factors such as downturns in the economy or business practice errors, on the ability of the investor(s) to repay the loan(s).

(e) Explain and document how the loss to a financial institution was a "direct" effect of the fraud, i.e., "but for" the fraud, there would have been no such loss.

(f) If the government's theory is that financial institution(s) were made susceptible to a risk of loss, explain how that risk of loss was "substantial," direct, and not de minimis.

-- [AMD ¶] The government will not be able to make a colorable case of entitlement to the ten-year statute of limitations, unless it can produce documentation to support each of the elements of the tests established by the above cases.  Because the government must satisfy the reasonable doubt standard, to prove that it is entitled to the application of section 3293(2), see Pelullo, 964 F.2d at 208; Anthony Allen, 160 F.Supp.3d at 705, McKelvy argues that the government should be held to the same standard that it would be in its case-in-chief in a traditional criminal case where it had to prove details of an individual's financial dealings.  Specifically, because the requirements of the above-cited cases are so specific, McKelvy contends that any claim that a particular financial institution was "affected" due to the fraud should be rejected unless the government supplies sufficient documentary evidence to meet the reasonable doubt test.  This is especially true in a case where,

here, the operative facts concerning the second rationale took
place in 2008-09, all of which were more than six years ago.


Respectfully submitted,

/s/ Walter S. Batty, Jr.
Walter S. Batty, Jr., Esq.
101 Columbia Ave.
Swarthmore, PA  19081
(610) 544-6791
PA Bar No. 02530
tbatty4@verizon.net

/s/ William J. Murray, Jr.
William J. Murray, Jr., Esq.
Law Offices of
William J. Murray, Jr.
P.O. Box 22615
Philadelphia, PA 19110
(267) 670-1818
PA Bar No.73917
williamjmurrayjr.esq@gmail.com

Dated: June 14, 2017

## CERTIFICATE OF SERVICE

I hereby certify that I have served by electronic mail a true and correct copy of the foregoing Memorandum in support of the defendant's Motion to Dismiss Counts 1-8 of the Indictment, Based on the Statute of Limitations, upon Assistant U.S. Attorney Robert J. Livermore:

> Robert J. Livermore, Esq.
> U.S. Attorney's Office
> 615 Chestnut Street
> Philadelphia, Pa 19106
> 215-861-8505
> Fax: 215-861-8497
> Email:
> robert.j.livermore@usdoj.gov
>
>
> */s/ Walter S. Batty, Jr.*
> Walter S. Batty, Jr.

Dated: June 14, 2017