IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

                    v.            :          CRIMINAL No. 15-398-3

WAYDE MCKELVY,                    :

          Defendant              :

AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW IN SUPPORT OF DEFENDANT'S AMENDED
MOTION TO DISMISS COUNTS 1-8 OF THE INDICTMENT,
BASED ON THE STATUTE OF LIMITATIONS

Defendant Wayde McKelvy, by his attorneys, Walter S. Batty, Jr. and William J. Murray, Jr., submits these Amended Proposed Findings of Fact and Conclusions of Law in Support of his Amended Motion to Dismiss Counts 1-8 of the Indictment, in conjunction with his Amended Limitations Memorandum ("Amended Limitations Memo").

Based on his Amended Limitations Motion and Memo and pursuant to Fed.R.Crim.P. 12(d), which requires a court, which is ruling on a motion to dismiss, to "state its essential findings on the record," McKelvy requests this Court to enter the following Proposed Findings of Fact ("Proposed Finding(s)") and Proposed Conclusions of Law ("Proposed Conclusion(s)").[1]

I.   PROPOSED FINDINGS OF FACT RE: GOVERNMENT'S "FIRST RATIONALE."

A.   The defendant's proffers and stipulations for the Amended Limitations Motion and Memo.

1. As set out in the defendant's Amended Limitations Memo  , McKelvy stipulates that, for purposes of this motion, all the

---

[1]   Other than several new headings, McKelvy will signify any changes in the text by either [NEW §], for a new section, and [NEW ¶], for a new paragraph.  McKelvy will use the same format for amended language, [AMD §] or [AMD ¶].

factual allegations in the indictment must be taken as true. [2]

2. [AMD ¶] The Court accepts the proffers (Pr.) contained in Pr. 1-66, either as undisputed or as demonstrated by the discovery documents furnished to the Court by the defendant. See Amended Limitations Memo, pages 18-33.

B.  Background – Wragg, Knorr, Mantria, and Mantria Financial.

3. According to Count 1 of the indictment, to which defendant Troy Wragg plead guilty, he was the co-founder, chairman of the board of directors, and chief executive officer of Mantria Corp. ("Mantria"). According to Count 1 of the indictment, to which co-defendant Amanda Knorr plead guilty, she was the co-founder, president, vice-chairman of the board, and chief operating officer of Mantria.  As supported by numerous documents, Wragg owned 51% of Mantria and Amanda Knorr owned 49%. See generally, Pr. 1-2, 10-13, 17-18, 25, 27-28, 31-33, 39-40.

4. [AMD ¶] Mantria Financial, one of Mantria's related entities, was founded in October 2007. Mantria Financial was 100% owned by Mantria which, as noted above in Proposed Finding 3, was co-owned by Wragg and Knorr.  Wragg was the founder, CEO, and Chairman of Mantria Financial.  Knorr was the President and Chief Operating Officer of this company. Pr. 31-33.

5. [NEW ¶] Mantria Communities was, according to a spreadsheet provided to the bankruptcy trustee, owned by Wragg and Knorr. Mantria Communities was usually the Mantria party which was listed as the entity selling the lots in Tennessee, although the seller was sometimes Mantria Real Estate or Mantria Realty. Because Mantria owned all three entities which, on paper, owned

---

[2]  As noted in the Amended Limitations Memo at section III (D), the defendant will stipulate to the truth of the factual allegations in the indictment but will not stipulate to the truth of any of the legal assertions in the indictment, including the allegations that Mantria Financial was a "financial institution" Count 1, ¶ 5, and that "the wire fraud affect[ed]" a "financial institution," Count 1, ¶ 8, which are the central legal issues in the defendant's Amended Motion to Dismiss and Amended Limitations Memo.

the lots in the Mantria developments, the seller will usually be referred to as Mantria.

6. Both Wragg and Knorr plead guilty to Counts 1, 2-8, 9, and 10 of the indictment.  By entering these guilty pleas, Wragg and Knorr have admitted, among other things, the truth of the allegations in the indictment as to their conduct.  Among the allegations they admit are accurate, as to themselves, is the allegation that "Mantria Financial was controlled by Mantria … and defendants Troy Wragg [and] Amanda Knorr." Count 1, ¶ 5; Pr. 2.

7. By their guilty pleas, Wragg and Knorr have also admitted the truth of the allegation in Count 1 that as part of the manner and means of the conspiracy charged, they fraudulently "claimed that Mantria made millions of dollars selling real estate and 'green energy' products, [when] they knew that Mantria had virtually no earnings, no profits, and was merely using new investor money to repay earlier investors." Count 1, ¶ 12; Pr. 2.

8. [AMD ¶] The Court rules that a clear inference from the evidence summarized in this section is that Wragg had to have known that his actions concerning Mantria Financial in 2008-09, including "selling" the properties at a loss, were fraudulent as to the investors and that the "financing" through Mantria Financial was likewise fraudulent as to the investors. Pr. 1-41.

9. [AMD ¶] In summary, Wragg and Knorr formed, owned and operated Mantria; Wragg and Knorr formed and operated Mantria Financial, which was owned by Mantria. Pr. 1-2, 31-39.

C.   Whether Mantria Financial was a  "financial institution" and whether it was "affected" by the fraud charged.

10. [AMD ¶] Wragg obtained his undergraduate degree in 2005 from Temple University, where he took courses in business. Pr. 42. While in college, Wragg wrote a paper on "the emerging real estate market in Tennessee." Id.  Wragg made (contingent) purchases of land in Tennessee, possibly as early as 2005, from his sister's father-in-law, Dr. George Dixson. (These purchases

were "contingent" because Dr. Dixson was obligated to buy them back at Wragg's option.)  Wragg paid between $900 and $2,000 an acre and initially planned to sell these lots at $15,000 to $20,000 per acre. Pr. 4, 45.

11. [NEW ¶] Mantria Corporation was incorporated on November 2, 2006. Cf. Pr. 2.  It was on or about this date that Wragg started using "Mantria" as the name for developing real estate. Pr. 43.

12. [NEW ¶] Wragg has stated that, during 2005-06, he invested approximately $122,000 in his venture, whether as a sole proprietor or in the name of Mantria, of purchasing and re-selling land in Tennessee. Pr. 44.

13. In or about December 2006, Wragg exchanged emails with Dr. Dixson, in which they discussed Wragg's having serious financial difficulties, to the point that he (Wragg) said that he might have to go into bankruptcy, because he could not repay the $50,000 Dr. Dixson had lent him. Pr. 46.  At some point during the period 2006-07, Wragg entered into a $3.2 million construction loan from Baringer Capital, for the construction work at the Mantria properties in Tennessee. Id.

14. [AMD ¶] In 2006-07, Wragg/Mantria's[3] residential holdings in Tennessee could not be developed as planned because of, among other things, multiple fundamental problems with the sites - the lack of potable water; the presence of live military ordnance beneath some of the properties; and the absence of nearby access roads. Pr. 6-8, 15. In addition, Wragg/Mantria could not sell these lots because "the financial crisis" in 2007-08 in the real estate market made it "impossible to get a real estate loan." Flannery GJ, 7/29/15 at 22, 23.

15. [AMD ¶]  During the period August 11, 2007 through June 2008, Wragg hired Ray Bryant to appraise the Mantria sales lots at prices based on their future, developed value and on

---

[3]  As set out in the Amended Limitations Memo  , because Mantria owned the three entities which were sometimes the listed owners of the lots, each of those three entities will be referred to as Mantria, for purposes of clarity.

comparables he (Wragg) provided. Pr. 6-8.  Because these
inflated appraisals of approximately $80,000 per acre were used
by Wragg made it (falsely) appear that there was substantial
market value in the land, so that potential Mantria investors
would be persuaded that the land was valuable "collateral" for
the investments, Wragg's actions necessarily demonstrated that
he had abandoned his initial strategy of selling the land for
$15,000 to $20,000 per acre. Pr. 2, 14-15, 19-20; a copy of
Bryant's August 11, 2007 appraisal was attached to the Mantria
Financial PPM. Pr. 7; Mantria Financial PPM, Definition Section,
cf. Proposed Finding 19, below. Even though the indictment
charges the three defendants with ten counts of wire fraud and
other offenses for their involvement in a scheme to defraud
investors, as S/A Murphy testified, "there's no allegation in
the indictment … that the people who were buying the land were
defrauded." Pr. 22.

16. [NEW ¶] Sometime between August and October 2007, Wragg
retained attorney Christopher Flannery, who was working for a
private law firm in Philadelphia, to advise him (Wragg)
regarding Mantria. Flannery, GJ 7/29/15 at 13-15.  After his trip
to Tennessee to survey the Mantria developments there, Flannery
gave his two-fold "solution" to Wragg's problem of not being
able to generate sales of the lots because the banks were not
lending.  First, Flannery told Wragg, "'If you can't get a loan
for the money, let's make a bank,' and we did." Pr. 51. Second,
attorney Flannery advised Wragg regarding the requirements for
seeking investors through such public offerings as Private
Placement Memoranda ("PPMs"). Pr. 47, 51.

17. [NEW ¶] Because of the decline in the real estate market in
2007-08,[4] Flannery also advised Wragg that he should utilize a
Tennessee statue that "allows for special limited lenders that
don't take deposits and [are] allowed to make loans based upon
collateral." Pr. 53.  Attorney Flannery also advised Wragg
regarding the creation of Mantria Financial, which was duly

---

[4]  Although Flannery testified that this downturn in the real
estate market, as well as the date of his starting to work with
Mantria, was 2008, the documents suggest that these events took
place sometime between August and October 2007.

incorporated in Tennessee in October 2007, according to the
Mantria Financial LLC PPM. Id.

18. [NEW ¶] The first two investments offered on behalf of
Wragg, Knorr, and/or Mantria were the Mantria 50 debt offering,
in September or October 2007, and the Mantria Financial Private
Placement Memoranda ("PPM"), which was issued on November 1,
2007. Pr. 52.  It is unclear whether any attorney advised on the
Mantria 50 debt offering. Mantria Financial was Mantria's first
PPM and attorney Flannery had apparently given Wragg trustworthy
advice on the Mantria Financial PPM and, possibly, the Mantria
50 debt offering. Pr.47.

19. [NEW ¶] As stated in the Operating Agreement ("Operating
Agreement") of Mantria Financial ("the Company"), the "purpose"
of the Company was:

> to engage in the business of acting as an Industrial Loan
> and Thrift Company, as defined in the laws and regulations
> of the State of Tennessee.… To further this purpose, the
> Company intends to offer and sell a … series of … Debt
> Securities to fund its [mortgage] loan operations. The
> Company will loan to qualified borrowers on adequate
> security, including, but not limited to, loans secured by
> deeds of trust on real property.…  [The purpose of the
> Company will be to] invest the proceeds of the Debt
> Securities … to fund [mortgage] loan[s].

Operating Agreement at 3, § 9.1 (Purpose), as quoted in Pr. 54.
Because Mantria was insolvent as of September or October of
2007, and because Mantria Financial would have had no legitimate
funding except for any legitimate monies invested in Mantria,
Mantria Financial did not have the funds necessary for any
"mortgage loans" and was, accordingly, a sham.

20. [NEW ¶] Although there is no clear evidence that the Mantria
50 debt offering was a fraudulent one, McKelvy concedes, taking
the evidence in the light most favorable to the government,
that, for purposes of his Amended Limitations Motion and Memo,
both the Mantria 50 debt offering and the Mantria Financial PPM
were part of the fraudulent scheme charged in the indictment.
Pr. 48; Count 1, ¶ 3.  Accordingly, McKelvy concedes that the

government's evidence shows that the investor fraud scheme charged in the indictment started in September or October, 2007.

21. From S/A Murphy's testimony regarding proof of the investor fraud scheme, the government has substantial evidence that the Mantria sales lots agreements between Mantria and/or Mantria Financial, on the one hand, and "purchaser" Marc Thalheimer and other "purchasers," on the other, had the following provisions which were considered "buyer incentives," the first four of which are listed here: (a) the purchaser would receive a credit for two years of mortgage payments, which meant that the purchaser did not have to make any mortgage payments for two years; (b) Mantria Communities would pay the interest on the mortgage to Mantria Financial for two years (c) the purchaser "is free and clear of all debt associated with the home site or sites;" and (d) Mantria Communities would pay all the real estate taxes "for up to two years." Pr. 17-21.

22. The second group of five of the total of nine "buyer incentives," as described by S/A Murphy regarding the investor fraud scheme, are: (e) after those two years "[Thalheimer could] walk away" from the agreement of sale;" (f) Mantria Communities would pay the closing costs of approximately $3,800 to the title company; (g) Mantria Communities agreed to pay cash back (also referred to as a "buyer's bonus") of about three percent of the purchase price on the land – thereby giving the purchaser an incentive to do the transaction; (h) the purchaser did not have to put any money down on the mortgage; and (i) Mantria Communities guaranteed that the purchaser could re-sell for 36 months at the contracted sales price of the lot, plus a refund of ten percent of any money the purchaser(s) put down. Pr. 17-21, 35.

23. As S/A Murphy testified, the above-described groupings of "buyer incentives" did not encourage actual purchasers to borrow from Mantria Financial or for Mantria Financial to engage in actual "lending," but rather was designed "to gin up" the apparent price of so-called "purchases" of the land in Tennessee to give the appearance that Mantria had substantial revenue, for purposes of deceiving the investors. Pr. 17, 19-20.  From this, there is a clear inference that Wragg's desire to give the

appearance of substantial revenues for Mantria was evidence of his awareness that Mantria, in fact, had little, if any, income.

24. As S/A Murphy testified, Mantria and Mantria Financial were losing money on each sale of a parcel in Mantria's developments in Tennessee over a period of about two years. Pr. 20-21, 29; cf. Pr. 39. S/A Murphy also confirmed that it "would be nearly impossible for them to make money with [the] business plan" of giving the "buyer incentives" listed in Proposed Findings 23 and 24. See Pr. 21.

25. [AMD ¶] S/A Murphy stated that the so-called "mortgages" (or "deeds of trust") and/or sales agreements provided by Mantria Financial for the sales of the lots in Tennessee to "numerous" other "purchasers" included provisions which were the same as or similar to the "buyer incentives" in Thalheimer's "purchase," as listed in Proposed Findings 23 and 24.

26. [AMD ¶] Other than the (at most) approximately $300,000 Mantria received for sales of parcels in 2008-09, Mantria did not intend to make any profit on such "sales." Pr. 17, 25-29. Moreover, there is no evidence that Mantria Financial was in any way involved in such "cash sales" and no reason for it (Mantria Financial) to have been so involved, because by definition, such sales would not have involved mortgages. See Pr. 38.  As both S/A Murphy and former Mantria Chief Financial Officer ("CFO") Rink testified, there is no evidence that Mantria Financial intended to have any income during the period 2008-09. Pr. 29. See also Pr. 34-41 (corroborating testimony of Ms. Tracy Mongelli at the hearing on the SEC's motion for a preliminary injunction against Mantria, et al.)

27. [NEW ¶] The green energy projects started by Wragg and Knorr were also evidence of the inevitability of Mantria's insolvency due to the poor business judgment of Wragg and Knorr.  The development of the real estate in Tennessee continued until sometime in early 2009, when Mantria "had a change in focus" and turned to concentrating on green energy, purchasing a large stake in Carbon Diversion, Inc. for $2.1 million and paying $2.3 million for the construction of a new plant at Dunlap, Tennessee. Pr. 30.  Despite these expenditures of at least $4.4 million, Mantria never made any money from the green energy projects. Pr. 25. Moreover, Wragg's and Knorr's business plan

for the green energy project was simply not feasible. Pr. 61, 65.

28. [NEW ¶] Based on Proposed Findings 10-15, 27, as summarized below, the Court finds that, as of September and October 2007, Wragg and/or Mantria were apparently insolvent.

(a) In December 2006, Wragg told Dr. Dixson that he (Wragg) might have to go into bankruptcy, because he could not repay the $50,000 Dr. Dixson had lent him, Proposed Findings 10, 12, 13, pages 3-4;

(b) Wragg/Mantria's residential holdings in Tennessee could not be developed as planned because of, among other things, multiple fundamental problems with the sites, including the lack of potable water, the presence of live ordnance, and the absence of access roads, Proposed Finding 14, page 4;

(c) in addition, Wragg and Mantria could not sell these lots because the financial crisis in 2007-08 in the real estate market made it impossible to get a real estate loan, Proposed Finding 14, page 4;

(d) during the period August 11, 2007 through June 2008, Wragg hired an appraiser to set values on the Mantria sales lots at prices based on their future, developed value and on comparables he (Wragg) provided, so that such lots would be accepted by possible investors as collateral for Mantria investments, Proposed Finding 15, pages 4-5;

(e) Wragg's actions in using the inflated appraisals of approximately $80,000 per acre to make it (falsely) appear that this land provided valuable "collateral" for the investments, demonstrated that he had an urgent need for cash and that he had abandoned his initial strategy of selling the land for $15,000 to $20,000 per acre, Proposed Finding 15, pages 4-5;

(f) Wragg's having taken out, at some point in 2006-07, a $3.2 million construction loan for the properties in Tennessee, Proposed Finding 13, when compared with Wragg's statement that the total amount of money he had accumulated for investing in

this land was approximately $122,000, Proposed Finding 12,
showed that it was apparent that Wragg and Mantria were
insolvent as of the time he initiated the Mantria 50 debt
offering in September or October 2007, by which offering he was
seeking to pay off this construction loan, demonstrated, as he
admitted during a proffer, that he and Mantria did not then have
the money to pay off this construction loan;

(g) other than the (at most) approximately $300,000 Mantria
received for "cash sales" of parcels in 2008-09, Mantria did not
intend to make any profit on such "sales," Proposed Finding 26;
moreover, there is no evidence that Mantria Financial was in any
way involved in such "cash sales" – by definition, Mantria
Financial was involved with mortgages, not with such sales, id.;

(h) despite the expenditures of at least $4.4 million, Mantria
never made any money from the green energy projects, Proposed
Finding 27;

(i) Wragg and Knorr exercised consistently poor judgment in
making their business plans as to the land sales in Tennessee
and the green energy projects, as was fully set out in the grand
jury testimony cited above, Pr. 10-15, 26, 27, and below. Pr.
31-42; and

(j) when the above nine instances are considered in totality,
they constitute a presumption that Wragg and Mantria would have
been insolvent, in 2007-08, had it not been for the illegal
intrusion of investor funds taken by fraud, as established by
the government's evidence.

29. [NEW ¶] While Mantria was apparently insolvent by October
2007, the Court finds that it is a necessary inference that
Mantria and Mantria Financial staved off bankruptcy until some
point after November 2009, only because of the ill-gotten
investor funds. Cf. Proposed Finding 26-28.

30. [NEW ¶] Based on the evidence summarized above in Proposed
Findings 26-29, there is no evidence that Mantria (and
necessarily, Mantria Financial) became insolvent as a result of
the fraud; to the contrary, it is apparent that Mantria and

Mantria Financial would have become insolvent much sooner than the date they did, at some point after November 2009, because they received infusions of only money which was fraudulently obtained.

31. [NEW ¶] Because Wragg and Knorr were the only two owners of Mantria and because Mantria was the 100% owner of Mantria Financial; because Wragg and Knorr have pled guilty to all ten counts in the indictment, which includes the specific allegations noted above at Proposed Findings 6, 7; and because all the evidence gathered by the government in its investigation of the Ponzi scheme in this case showed that the activities and purpose of Mantria Financial were focused solely on fraudulently "ginning up" the perceived value of the Mantria investments, and had nothing at all to do with providing actual mortgages for actual purchasers of lots in Tennessee, the Court finds that Mantria Financial was not a legitimate "mortgage lending business" or a legitimate "financial institution."

32. [NEW ¶] Cary Widener testified that he is the CEO of High-Temp Industries, a company which specializes in thermal dynamics. Widener sometimes referred to thermal dynamics as "high heat." Pr. 55.  Widener stated that he knew Michael Lurvey, who owned Carbon Diversion Inc. (CDI) and that CDI was using a "woody biomass," high heat, and pressure to convert the "biomass" into "biochar," which is a highly-specialized form of carbon. Id. Widener had contacts with Wragg because of his (Wragg's) interest in going into business to produce biochar, for which Widener's company would make components for the production process. Id.  Wragg told Widener that he (Wragg) was planning on building a plant in Dunlap, Tennessee to produce biochar, using technology from Lurvey/CDI. Pr. 56.  In July 2009, Widener signed a contract to provide technical assistance for producing biochar at Dunlap. Id.  Biochar is referred to in the indictment as a "green energy project." Id.

33. [NEW ¶] Widener went to Dunlap in July, 2009, to survey the situation. Widener, GJ 8/5/15 at 13.  As he studied the existing plans for construction, Widener realized that "[t]hey [Mantria] just did not have" the necessary high heat to manufacture biochar. Pr. 57. Before he went to Dunlap, he was told by Wragg that construction of the plant was underway and that "the

reacting system was in the process of being assembled." Id.
When he arrived on the scene, however, he saw that

> They only had the footers of the building poured. They had
> no mechanical drawings.… So, you had basically an artist's
> rendering of what the building was supposed to look like
> and nothing else.

Id.  Widener said that it would not be possible to take this
rendering and "hand it to" a contractor and ask him to build it
on that basis. Id.

34. [NEW ¶] When Widener went to Dunlap, he met Wragg's sister,
Tisa Dixson, who was "in charge of" the construction project.
Pr. 58.  She looked to be about 22 or 23 and was a "stay-at-home
mom" with absolutely no experience in construction. Id. During
the next three months, he hired eight or nine engineers to work
at the site to come up with drawings for construction of the
plant and to design the operating system there. Id.  He and his
crew were able to design the building and get a contractor to do
some of the construction. Id.  Later, they were able to get some
of the "autoclaves" – machinery which could manufacture biochar
– in place, but the machinery was not "up and running" and they
were not able to do even one "test batch." Id.  Without a test
batch, "You don't know what you don't know." Id.  At that point
(September 2009), "it was not possible" to make any biochar. Id.

35. [NEW ¶] Widener testified that "[i]t's not possible … [or]
feasible" for biochar to be produced from consumer or hospital
waste, contrary to what Wragg and Knorr had told him they would
be able to do. Pr. 59.  Widener also testified, again contrary
to what Wragg and Knorr had represented, that science did not
support any claim that biochar, when spread in a field, could
"pull toxins out of the atmosphere." Id.  Moreover, although
Wragg had represented that he already had 100,000 tons of
biochar placed on "pre-order" by such stores as Walmart and
Target, Widener stated that he found no support for this claim
and that the building he and his team helped to design was never
"going to be a full-production facility," because the equipment
would never keep the business "afloat." Id.

36. [NEW ¶] After he learned that the SEC had initiated its
investigation of Mantria, Widener was provided information by

Wragg about the Mantria building in Hohenwald, Tennessee. Pr.
60. In his opinion, as well as that of his business partner John
Seaner (see below), this project was "not commercially ready"
and they had no interest in it. Id.  Widener estimated that he
lost "close to a million dollars" for work he and his team did
for Mantria. Id.

37. [NEW ¶] In summary, Widener testified that the green energy
project at Dunlap, Tennessee, which Wragg had represented to him
that (a) would produce biochar, using proven technology from
Lurvey/CDI and using hospital and other waste products for the
source of carbon; (b) construction of the plant was underway and
that the reacting system was in the process of being assembled;
(c) although Wragg had represented that he already had 100,000
tons of biochar placed on "pre-order" by such stores as Walmart
and Target, Widener testified that he found no support for this
claim; and (d) contrary to what Wragg and Knorr had represented,
that science did not support any claim that biochar, when spread
in a field, could "pull toxins out of the atmosphere."  As such,
Widener testified that Wragg's plans for the Dunlap plant were
simply not feasible.

38. [NEW ¶] John Seaner testified that he worked in software
sales and marketing, including e-commerce software. Pr. 62.  He
said that he was introduced to Wragg by Lurvey sometime in April
or May of 2009 and that Wragg was interested in finding out what
Seaner would advise on the "commercialization of a waste-to-
energy initiative." Id.  As recounted by Seaner, Wragg told him
in their initial meeting:

> He professed this waste-to-energy facility that was in
> Dunlap [utilized] very groundbreaking technology, [which
> would] change the world [and which] had a lot of science
> behind it[.] [Wragg said that] it had been proven to work
> and that he was going to use this technology as the
> cornerstone of his real estate developments.

Id.  Wragg advised Seaner that the biochar process, utilizing
CDI technology, would make very high quality carbon in a very
inexpensive and environmentally friendly manner. Id.  Wragg told
Seaner that he would pay him $300,000 a year for working to
market Mantria's waste to energy technology, obtained from CDI.
Id.

39. [NEW ¶] When he got to the Dunlap plant in July, 2009, Seaner realized that the plant "was not operational" and that there had been no tests to determine if the biochar product would be commercially viable. Pr. 63. Seaner said that his engineers said that "there was no market here" and that the Dunlap facility would not be able to make what Wragg said it could. Id.

40. [NEW ¶]  After Wragg asked Seaner, in September 2009, if he would like to be the CEO of Mantria, one of Seaner's reactions was to ask Wragg, several times, if he could see Mantria's books and records, but Wragg always refused those requests. Pr. 64. Seaner said that "[a]t that point [he and Widener] … flipped and said there's something unsavory going on; something doesn't add up." Id.

41. [NEW ¶] In summary, Seaner corroborated Widener's testimony that Wragg's stated plans to produce biochar at the Dunlap plant were simply not feasible. Pr. 65.

42. [NEW ¶] The development of the real estate in Tennessee continued until sometime in early 2009, when Mantria "had a change in focus" and turned to concentrating on green energy, purchasing a large stake in Carbon Diversion, Inc. for $2.1 million and paying $2.3 million for the construction of a new plant at Dunlap, Tennessee.

II.   PROPOSED FINDINGS OF FACT RE: GOVERNMENT'S "SECOND RATIONALE."

Based on his Amended Limitations Memo at section VII (A-E), pages 50-55, McKelvy requests this Court to enter the following Findings of Fact regarding the government's second rationale.

43. The government's informal summary of its second rationale, stated more fully in section II (C), at pages 5-7, of the Amended Limitations Memo, states that the "affected" element is met in the following manner:

> When the Mantria Ponzi scheme collapsed, those [unnamed]
> financial institutions which lent money to investors were

affected because many of the investors could not repay
those loans or at least were delinquent on those loans.

44. McKelvy asks the Court, pending a response by the government
to the defendant's limitations motion, to accept the defendant's
representations in his Amended Limitations Memo at section IV
(C), Pr. 66, at page 33, that there is no allegation by the
government as to the identity of any putative financial
institution as to which the second rationale might apply and no
reference in the discovery documents as to such a financial
institution, as to the "financial institution" element of
section 3293(2).

III.   PROPOSED CONCLUSIONS OF LAW RE: GOVERNMENT'S "FIRST
RATIONALE."

A.   The charges in the indictment and the positions of the
parties.

1. The parts of Counts 1-8 which are relevant to the defendant's
Limitations Motion are as follows:

Count 1 of the indictment charges Wayde McKelvy and co-
defendants Troy Wragg and Amanda Knorr with conspiracy to commit
wire fraud "affecting a financial institution," in violation of
18 U.S.C. § 1343 and 18 U.S.C. § 371. See Count 1, ¶ 8 ("The
Conspiracy" section).

Counts 2-8 charge McKelvy and his two co-defendants with
committing wire fraud, "in circumstances affecting a financial
institution," in violation of 18 U.S.C. §§ 1343, 2. See Counts
2-8, ¶ 2 ("The Scheme" section).

2. The indictment charges that defendants Wragg, Knorr, and
McKelvy participated in a Ponzi scheme to defraud over 300
investors in Mantria Corporation, which was then based in Bala
Cynwyd, Pennsylvania.  The indictment also charges that the
gross amount of the loss by the investors was $54.5 million and
that net amount of the loss was approximately $37.5 million. See
Amended Limitations Memo at 5-6.

3. The indictment charges that McKelvy persuaded the investors
to extend existing credit lines, whether in the form of credit
cards, second mortgages, and/or loans against life insurance,

and to use proceeds of these credit lines to invest in Mantria. See Amended Limitations Memo at 5-6.

4. The government's informal position is that the applicable statute of limitations is 18 U.S.C. § 3293(2), which states that a ten-year statute will apply in wire fraud prosecutions where the government can prove that a defendant willfully participated in an offense which "affect[ed] a financial institution." See Amended Limitations Memo at 6-7.  McKelvy argues that the traditional five-year statute of limitations is applicable in this case and that, accordingly, Counts 1-8 should be dismissed. See Amended Limitations Memo at 2, passim.

5. The government has offered a first and second rationale as to why section 3293(2) is applicable here. The government's first rationale is that Mantria Financial, which was initially set up to issue mortgages on land sold by Mantria in Tennessee, later went bankrupt as a result of the fraud scheme alleged in the indictment. See Amended Limitations Memo at 4-6.

6. McKelvy first argues that, under any common sense definition of "financial institution," Mantria Financial does not qualify as such.  McKelvy further argues that, even if Mantria Financial is a "financial institution," it was not "affected" – as that term is used in the case law – by the alleged fraud. See Amended Limitations Memo at 5, passim.

7. In its second rationale, the government argues that (unnamed) "financial institutions" – presumably federally-insured banks - were "affected" because they lost money when Mantria investors defaulted on their credit or loan obligations, which they had extended based on McKelvy's urging them to utilize his "arbitrage" technique. See Amended Limitations Memo at 6.

8. McKelvy's response to this second rationale that the government has not yet identified any evidence to support this claim.  McKelvy recognizes, however, that the statute of limitations is an affirmative defense and that the government has not yet had an opportunity to reply to the defendant's arguments on this point. See Amended Limitations Memo at 50-55.

B.   The two different statutes of limitations.

9. The central issue on the Limitations Motion is which of two different statutes of limitations is applicable here. See Amended Limitations Memo at 5-6.

10. For most federal crimes, the applicable (general) statute of limitations, as stated in 18 U.S.C. § 3282, is five years. See, United States v. Leadbeater, 2015 WL 567025 (D.N.J. 2015). See Amended Limitations Memo at 4.

11. Section 3293(2) provides a ten-year (extended) statute of limitations for the crimes charged in Count 1, the wire fraud conspiracy count, and Counts 2-8, the wire fraud substantive counts, only "if [each] offense affects a financial institution." Cf. United States v. Anthony Allen, 160 F.Supp.3d 698, 705 (S.D.N.Y. 2016). See Amended Limitations Memo at 4.

12. As to Count 1, absent a statutory extension under section 3293(2), "[f]or a conspiracy indictment to fall within the statute of limitations, it is 'incumbent on the Government to prove that … at least one overt act in furtherance of the conspiracy was performed' within five years of the date the Indictment was returned." United States v. Bornman, 559 F.3d 150, 153 (3d Cir. 2009)(citation omitted). See Amended Limitations Memo at 5.

13. As to Counts 2-8, they are traditional substantive counts, as to which the statute of limitations focuses on the dates of the substantive crimes alleged there. See Amended Limitations Memo at 2.

14. Unless section 3293(2) applies here, the statute of limitations on Count 1 would have run five years after November 20, 2009, the date of the last overt act (no. 55) alleged in Count 1; under this scenario, the statute would have run on November 20, 2014.  The indictment here was returned on September 2, 2015, more than nine months after the statute would have run, absent grounds for an extension. See Amended Limitations Memo at 4-5.

15. Similarly, unless section 3293(2) applies here, the statute of limitations on Counts 2-8 would have run five years after the dates of the substantive crimes of wire fraud alleged in those seven counts, the latest of which (Count 2) was on September 18,

2009; under this scenario, the statute would have run on
September 18, 2014, and earlier for the other seven counts.  The
indictment here was returned more than 11 months after the
statute for Count 2 would have run. See Amended Limitations Memo
at 5.

16. [NEW ¶] The Court concurs with the Seventh Circuit in United
States v. Serpico, 320 F.3d 691, 694-95 (7th Cir. 2003), in its
statement that:

> [T]he whole purpose of § 3293(2) is to protect financial
> institutions, a goal it tries to accomplish in large part
> by deterring would-be criminals from including financial
> institutions in their schemes.

320 F.3d at 694-95.  The Court further rules that section
3293(2)was not intended to protect Mantria Financial from the
actions of such criminals as Wragg and Knorr.

17. As to the government's first rationale, paragraph 5 of Count
1 alleged (in the Background section) that:

> Defendants Wragg, Knorr, and McKelvy used the funds raised
> by Mantria Financial to purchase or finance mortgages for
> undeveloped real estate in Tennessee owned by the Mantria
> or its subsidiaries in order to generate paper profits for
> Mantria and inflate the value of the undeveloped land.

Moreover, paragraph 8 of Count 1 (in the Conspiracy section)
charged all three defendants with conspiracy to commit wire
fraud "affecting a financial institution," without any further
elaboration. See Amended Limitations Memo at 6.

18. As to the government's second rationale, although the
indictment does not identify any financial institutions other
than Mantria Financial which were purportedly "affected" by the
fraud charged, it does allege that McKelvy advised potential
investors "to obtain the maximum amount of funds in loans from
[presumably non-Mantria-related] financial institutions in the
form of credit cards, insurance policies, home equity, and other
loans, and invest all these funds in Mantria and its related
entities." Count 1 at ¶ 2 (Background section).  This passage in
the indictment is apparently the basis for the second rationale.
See Amended Limitations Memo at 6.

**C.** **As to the government's first rationale, there is a statutory definition for a "financial institution" and a statutory definition for "mortgage lending business."**

19. As used in section 3293(2), the term "financial institution" is defined in 18 U.S.C. § 20(10) as follows:

> As used in this title, the term "financial institution" means --
>
> (1) an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act);
>
> … or
>
> (10) a mortgage lending business (as defined in section 27 of this title) ….

Section 20(10) was added, by an amendment to section 20, on May 20, 2009. See Amended Limitations Memo at 7.

20. As stated by the court in United States v. Cardillo, 2015 WL 3409324 (D.N.J. 2015), "In 2009, Congress amended the definition of 'financial institution,'" as set out above in section 20(10), to include "a mortgage lending business (as defined in 18 U.S.C. § 27)." Section 27, in turn, states, "In this title, the term 'mortgage lending business' means an organization which finances or refinances any debt secured by an interest in real estate, including private mortgage companies …, and whose activities affect interstate or foreign commerce." As such, the Court must determine whether Mantria Financial issued "mortgages," engaged in "lending" money, was a "business," and/or "financed" or "refinanced" any "debt." See Amended Limitations Memo at 35.

**D.** **The defendant's pre-trial motion to dismiss based on the statute of limitations, under Rule 12(b)(3)(A).**

21. McKelvy's motion to dismiss Counts 1-8 is cognizable under Fed.R.Crim.P.12(b)(3)(A), which rule states that a motion to dismiss for a "defect in instituting the prosecution" must be filed pre-trial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." The Court rules that McKelvy has satisfied these

requirements of Rule 12(b)(3)(A). See Amended Limitations Memo at 8-11.

22. Under rule 12(b)(3)(A), an alleged violation of the applicable statute of limitations is a claim of a "defect in instituting the prosecution," under Rule 12(b)(3)(A), which means that unless a limitations defense is raised pre-trial, it will be considered as having been waived. See United States v. Karlin, 785 F.2d 90 (3d Cir. 1986), cert. denied, 480 U.S. 907 (1987). See Amended Limitations Memo at 9.

23. For the reasons stated in the defendant's limitations memo at section III (A), the Court rules that it is appropriate to litigate this statute of limitations defense pre-trial because the (factual) basis for the within motion to dismiss is "reasonably available," under Rule 12(b)(3)(A), and because there is no "good cause to defer a ruling," under Rule 12(d). See United States v. Levin, 973 F.2d 463, 470 (6th Cir. 1992); United States v. Fitzgerald, 2017 WL 74074, *2 (W.D.Mich. 2017). See Amended Limitations Memo at 9-10.

24. There are five requirements which a defendant, who requests a court to rule pre-trial on a motion to dismiss, must meet regarding "the basis for the motion." Rule 12(b)(3).  First, any facts must be undisputed, Levin, supra; second, the issue must be able to be decided as a matter of law, without invading the province of the jury on the facts, Levin, supra; third, a trial of the disputed factual issues would not have "assisted the … court in deciding the legal issues," Levin, supra; fourth, the (factual) basis for the motion to dismiss must be "reasonably available," under Rule 12(b)(3)(A), and there must be no "good cause to defer a ruling," under Rule 12(d); and fifth, the defendant "must accept as true the factual allegations … in the indictment." United States v. Stock, 728 F.3d 287, 299(3d Cir. 2013). See also, Sewell v. United States, 406 F.2d 1289, 1292 (8th Cir. 1969). See Amended Limitations Memo at 10—11.

25. The Court rules that, as a matter of law, McKelvy has satisfied the five requirements set out immediately above from the Levin and Stock cases and, accordingly, the limitations motion is ripe for pre-trial determination by the Court. See sections III (B-D) of the limitations memo; see generally United States v. Carollo ("Carollo I"), 2011 WL 3875322 (S.D.N.Y. Aug.

25, 2011); <u>United States v. Carollo</u> ("Carollo II"), 2011 WL
5023241 (S.D.N.Y. Oct. 20, 2011); <u>United States v. Ghavami</u>, 2012
WL 2878126, *7-*10 (S.D.N.Y. 2012), <u>aff'd</u> <u>sub</u> <u>nom.</u>, <u>United
States v. Heinz</u>, 790 F.3d 365, 367 (2d Cir. 2015), <u>cert</u>. <u>denied</u>,
136 S.Ct. 801 (2016). See Amended Limitations Memo at 11-15.

26. If the government disputes any of the defendant's proffers
1-65, which are adopted from the government's case, McKelvy has
stated that he would, depending on the issue, submit an appendix
containing the referenced documents as to the disputed issue and
ask the Court to determine whether there is any merit to such
objection(s). Amended Limitations Memo at 18, n.9.

E.   <u>Mantria Financial and the definitions of the terms used in
18 U.S.C. §§ 3593(2), 20(10), and 27.</u>

27. The Court rules, based on the doctrine of judicial notice,
Fed R.Evid. 201(b), that no legitimate "mortgage" lending
business would have issued mortgage loans (or "deeds of trust")
on the properties described above, because no legitimate
mortgage lender would have taken the risk of having to foreclose
on land worth substantially less than the appraised value, in
which case an interest in property would not be a mortgage
(sometimes referred to as a "deed of trust"), one of the
definitions of which is "security for the repayment of money
borrowed" (Dictionary.com). See Amended Limitations Memo at 35-
36, Proposed Finding 15.

28. From the recitations above of S/A Murphy's testimony
concerning the "buyer incentives" offered by Mantria and/or
Mantria Financial, Mantria Financial did not engage in "lending"
money, in the sense that it (Mantria Financial) was not ready to
lend, or to have a customer "borrow" money or "pay [it] back
with interest" (Cambridge English Dictionary).  Instead, Mantria
Financial operated not to engage in traditional lender/borrower
relationships, but had undisclosed, fraudulent reasons for
giving out "buyer incentives" to the seeming "purchasers." See
Amended Limitations Memo at 35-36, Proposed Findings 21, 22.

29. [AMD ¶] From a consideration of Proposed Finding 26 and of
the dictionary definition of "business," this Court rules that
Mantria Financial was not a "business," in that it was not
designed to make a profit (Black's Law Dictionary).  It should

be noted that a definition of "profit" is "the excess of returns over expenditure in a transaction or series of transactions" (Merriam-Webster, definition no. 2). See Amended Limitations Memo at 35-36.

30. There is a second reason why Mantria Financial was not a "business," as that term is defined in Proposed Conclusions 19, 20, 29, above.  As Rink said in the grand jury, Mantria paid for the closing costs for each parcel, paid a sales commission to the inside salespeople, paid a high interest rate to investors (approximately two percent a month), often paid the real estate taxes, paid "bonuses" of as much as $3,000 to the "purchasers," and never made any profit - because it (Mantria Financial) was not designed to be profitable. See Amended Limitations Memo at 35-36, Pr. 29, 38, 39.

31. [AMD ¶] There is a third reason why Mantria Financial was not a "business," as that term is defined in Proposed Conclusion 19, 20, 29, above.  As Rink testified, despite his having advised Wragg on several occasions about the practice of losing money on each parcel, the practice continued. See Amended Limitations Memo at 35-36.

32. As compared with the dictionary definition of "debt" – "something, typically money, that is owed or due," Oxford English Dictionary, definition no. 1, the Court rules that Mantria Financial did not "finance[] or refinance[] any debt," as required by 18 U.S.C. § 27. From the government's evidence, it is clear that the "buyer incentives" did not impose any "debt" on the so-called "purchasers," but rather would result in a "buyer's bonus" of about three percent of the purchase price on the land. Proposed Findings 21, 22. See Amended Limitations Memo at 35-36.

33. The Court rules that the "mortgages" (or "deeds of trust") issued by Mantria Financial did not create any "debt," in the normal sense, because it was never intended to be repaid for what the purchasers had supposedly borrowed, but only served as a vehicle to permit co-defendants Wragg and Knorr to make it appear that the investments in Mantria were secured by collateral - the plots in the Mantria developments in Tennessee – which were purportedly worth twice the supposedly fairly-

appraised valuations of those plots. Proposed Finding 15, Pr. 3.
See Amended Limitations Memo at 35-36.

34. To the extent that the legislative intent of the drafters of
section 3293(2) may be relevant here, it supports the conclusion
that this statute was intended to protect legitimate financial
institutions. See United States v. Serpico, 320 F.3d 691, 694-95
(7th Cir. 2003).  Accordingly, the government's investigation
demonstrates that Mantria Financial was not a "financial
institution" which was intended to be protected from being
"affected," within the meaning of 18 U.S.C. § 3293(2). See
Amended Limitations Memo at 42-43.

35. There are four relevant requirements for the government to
be able to show that a financial institution was "affected." The
first of these four requirements is that the government must be
sufficiently detailed in "allege[ing] facts [arguably]
sufficient to withstand the statute of limitations
defense." Carollo II, at *3.  The government's sufficiently
detailed explanation must show, by way of proffer or otherwise,
what [the actual loss or the] risk [was]." Id. at *2-*3. This
sufficient explanation is necessary, no matter how complex the
underlying fraud. Cf. Ghavami at *7-*10. See Amended Limitations
Memo at 43.

36. [AMD ¶] The government's informal first rationale was not
sufficiently detailed to lay out a colorable explanation of the
alleged relationship between the fraud and the claimed actual
loss - bankruptcy.  As noted above, the charging paragraph in
the indictment does not include any description whatsoever of
the specific manner in which Mantria Financial was "affected" by
the fraud scheme. Count 1, ¶ 5.  Rather, the only attempted
explanation of how the defendants' conduct in the alleged fraud
"caused" Mantria Financial to be "affected," under its informal
first rationale, was that "[T]here is no question that … the
wire fraud affected Mantria Financial (i.e., it went bankrupt).
See above at 6-7. Because this statement not only is purely
conclusory, but also because it consisted of only one sentence,
it cannot possibly be considered to be the requisite
"sufficiently detailed" explanation of the connection between
the asserted loss and the fraud. See Amended Limitations Memo
at 46.

37. To meet the second of the four requirements for showing that a financial institution was "affected," the government must provide, in its allegations or proffers, an explanation of how the fraud "caused" the financial institution to suffer any such losses. Carollo I, at *2-*3.  Moreover, the government must demonstrate that the fraud was a "sufficiently direct" cause of such loss or risk of loss. Heinz, 790 F.3d at 367(citation omitted); Bouyea, 152 F.3d at 195.  A "mere use of a financial institution in a scheme to defraud is not enough to demonstrate that the financial institution was affected by the wire fraud." United States v. Mullins, 613 F.3d 1273, 1278 (10th Cir. 2010).  Likewise, a mere invocation of bankruptcy is not enough to show that a Mantria Financial was "affected" by the fraud. See Amended Limitations Memo at 43-44.

38. The Court rules that the government has not met the second requirement of showing that a financial institution was "affected," because the government has not made an allegation or submitted a proffer explaining in detail how the fraud "directly caused" the bankruptcy.  To the contrary, McKelvy's Proposed Findings 10-15, 26-28, 31-42, provide nine reasons why bankruptcy or another form of insolvency almost certainly have happened anyway, totally independent of the fraud. These nine reasons are also adopted in the Amended Limitations Memo  at 46-48. Again, the mere invocation of bankruptcy does not make for a colorable showing of a cause and effect relationship between the fraud and the alleged loss. See Amended Limitations Memo at 46-48.

39. To meet the third of the requirements to show that a financial institution was "affected," the government must specify, if it is relying on the theory that there was an actual loss, the extent of any such loss. Carollo I, at *2. Alternatively, if the government is relying on the theory that there was no actual loss, but rather a risk of loss, the government must allege that such risk of loss was "new or increased," see Ghavami, 2012 WL 2878126 at *5, citing Mullins, 613 F.3d at 1278, and that it was "substantial." Ghavami, at *6; United States v. Rubin/Chambers, Dunhill Ins. Services (CDR), 831 F.Supp.2d 779, 783-84 (S.D.N.Y. 2011); Carollo I, at *2; Ohle, 678 F.Supp.2d at 229. See Amended Limitations Memo at 45.  A slightly different formulation of this test is that any

such risk had to be a "sufficient" one. See United States v. Agne, 214 F.3d 47, 52 (1st Cir. 2000); United States v. Pelullo, 964 F.2d 193, 215-16 (3d Cir. 2012), and other cases collected there. See Amended Limitations Memo at 44-45.

40. The government has not met the third of the requirements to show that a financial institution was "affected," because, if it is relying on the theory that Mantria Financial experienced an actual loss, it has not specified, in the indictment or in any other manner, the extent of any such loss. Carollo I, at *2. See Amended Limitations Memo at 48, 49.

41. Alternatively, if the government's theory is not that Mantria Financial suffered an actual loss, but that it was made susceptible by the fraud to a risk of loss, then the government has not met the third requirement, because it had to have made a colorable case, by way of allegations and/or proffers, that any risk of loss was "new or increased" and that it was "substantial." See Ghavami, 2012 WL 2878126 at *5, citing Mullins, 613 F.3d at 1278, and the other cases cited in the Amended Limitations Memo at 46. The government also has to show that the risk was "substantial" or a "sufficient" one. Ghavami, at *6, and the other cases cited in the Amended Limitations Memo at 46-47. Again, the government has not yet attempted to overcome the evidence in the discovery showing that there are nine parts of the government's case which demonstrate that the bankruptcy was the result of causes independent of the fraud. See Amended Limitations Memo at 49.

42. The U.S. District Court for Colorado issued a temporary restraining order on or about this date against Mantria, Wragg, Knorr, Speed of Wealth, McKelvy, and Donna McKelvy, now Donna Jarock, freezing the assets of all defendants.  This order "prohibited the acceptance, deposit or disbursements of additional funds from investors or potential investors," effectively shutting down Mantria.  Although this was not a declaration of bankruptcy, it was its functional equivalent, because it closed the business. See Amended Limitations Memo at 49.

IV.  PROPOSED CONCLUSIONS OF LAW RE: GOVERNMENT'S "SECOND RATIONALE."

43. The Court adopts the proffers contained in Pr. 42, either as undisputed or as demonstrated by the defendant, based on the government's evidence.  As to the second rationale, the Court rules that the government has not, as of the date of the Order approving these proposed findings of fact and conclusions of law, provided references to any documents which would alter Pr. 42 or satisfied any of the four requirements set out in the defendant's Amended Limitations Memo at section VI (D).

44. The Court rules that there is insufficient specificity to the government's summary of its informal second rationale for invoking section 3592(2).  Accordingly, for the government to satisfy the four requirements set out in the defendant's Amended Limitations Memo at section VI (D), the government's explanation, allegations, and/or proffers or proposed stipulations would need to, at least:

(a) Identify the "financial institution(s)" which were allegedly affected by the fraud.

(b) State the dollar amount of any alleged loss.

(c) Identify the investor(s) who defaulted on or were otherwise unable to pay what was owed on a credit card, line of credit, or other loan which the investors took out as a result of McKelvy's advice that they maximize such extensions of credit.

(d) Describe and document the financial condition of the investor(s) before the extensions of credit and after the extensions of credit, so as to permit the defendant and the Court to assess the alleged effect of the fraud, as opposed to other factors such as downturns in the economy or business errors, on the ability of the investor(s) to repay the loan(s).

(e) Explain and document how the loss to a financial institution was a "direct" effect of the fraud, i.e., "but for" the fraud, there would have been no such loss.

(f) If the government's theory is that financial institution(s) were made susceptible to a risk of loss, explain how that risk of loss was both "substantial" and not de minimis.

Respectfully submitted,


/s/ Walter S. Batty, Jr.
Walter S. Batty, Jr., Esq.
101 Columbia Ave.
Swarthmore, PA  19081
(610) 544-6791
PA Bar No. 02530
tbatty4@verizon.net

/s/ William J. Murray, Jr.
William J. Murray, Jr., Esq.
Law Offices of
William J. Murray,  Jr.
P.O. Box 22615
Philadelphia, PA 19110
(267) 670-1818
PA Bar No. 73917
williamjmurrayjr.esq@gmail.com


Dated: June 14, 2017

## CERTIFICATE OF SERVICE

I hereby certify that I have served by electronic mail a true and correct copy of the foregoing Proposed Findings of Fact and Conclusions of Law in Support of his Motion to Dismiss Counts 1-8 of the Indictment, upon Assistant U.S. Attorney Robert J. Livermore:

Robert J. Livermore, Esq.
U.S. Attorney's Office
615 Chestnut Street
Philadelphia, Pa 19106
215-861-8505
Fax: 215-861-8497
Email: robert.j.livermore@usdoj.gov


/s/ Walter S. Batty, Jr.
Walter S. Batty, Jr.


Dated: June 14, 2017