**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIM. NO. 15-398** |
| **WAYDE MCKELVY** | **:** | |

**GOVERNMENT'S RESPONSE TO DEFENDANT WAYDE MCKELVY'S AMENDED MOTION TO DISMISS COUNTS ONE THROUGH EIGHT OF THE INDICTMENT BASED ON THE STATUTE OF LIMITATIONS**

The United States of America, by its attorneys LOUIS D. LAPPEN, Acting United States Attorney for the Eastern District of Pennsylvania, and ROBERT J. LIVERMORE, Assistant United States Attorney, respectfully represents as follows:

## I. Introduction

On September 2, 2015, a federal grand jury in the Eastern District of Pennsylvania returned a ten-count indictment charging TROY WRAGG, AMANDA KNORR, and WAYDE MCKELVY with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, seven counts of wire fraud, in violation of 18 U.S.C. § 1343, 1 count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5. The charges in the indictment stem from the defendants' participation in the Mantria Ponzi scheme which collapsed in November 2009 when the SEC filed a motion for a temporary restraining order with the United States District Court in Colorado.

The U.S. District Court in Colorado subsequently placed Mantria and all of its subsidiaries, including a bank in Tennessee called Mantria Financial, into receivership. In granting the SEC's motion for a permanent injunction, the Court found:

> [O]ver the course of approximately two years, Defendants raised more than $54 million from over 100 investors by egregiously, recklessly, knowingly, and shamelessly perpetrating a fraudulent scheme whereby they used misrepresentations, omissions, and blatant lies *to induce unsuspecting and unwitting victim investors to liquidate the equity in their homes and take out bank loans to invest in Defendants' scheme*, which was nothing more than smoke and mirrors. Thus, given the seriousness and extent of the violations and the degree of scienter required to establish and further the fraudulent scheme, the Court finds that entry of a permanent injunction is warranted [emphasis added].

In imposing a civil penalty on MCKELVY and his associates, the Court held: "Defendants repeatedly engaged in these acts for at least two years, during which time *they preyed on unsuspecting and unwitting investors who liquidated their retirement accounts and risked their home equity* only to have their life's savings washed away by Defendants' sociopathic greed. Thus, without question, Defendants' conduct is deserving of the most severe penalties available under 15 U.S.C. § 77t(d) [emphasis added]."

Both defendants WRAGG and KNORR have entered guilty pleas to all ten counts of the indictment. The remaining defendant, WAYDE MCKELVY, has moved to dismiss Counts One through Eight (the conspiracy to commit wire fraud and the substantive wire fraud charges) of the indictment. In his motion, defendant MCKELVY argued that those counts should be dismissed because the indictment failed to allege certain facts and the statute of limitations had expired by the time the indictment was returned. For the following reasons, the Court should deny the defendant's motion.

## II. Discussion

### A. Standard of Review on a Motion to Dismiss

Federal Rule of Criminal Procedure 7(c)(1) requires an indictment to "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." United States v. Bergrin, 650 F.3d 257, 264 (3rd Cir. 2011). It is well-established that "[a]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." Costello v. United States, 350 U.S. 359, 363 (1956). The Supreme Court has further explained that "the Federal Rules were designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure" and while "detailed allegations might well have been required under common-law pleading rules . . . they surely are not contemplated by Rule 7(c)(1)." United States v. Resendiz–Ponce, 549 U.S. 102, 110, (2007) (quoting United States v. Debrow, 346 U.S. 374, 376 (1953).

The United States Court of Appeals for the Third Circuit has held that an indictment is sufficient so long as it: "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." United States v. Vitillo, 490 F.3d 314, 320 (3rd Cir. 2007). Moreover, "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." United States v. Rankin, 870 F.2d 109, 112 (3rd Cir. 1989); accord United States v. Kemp, 500 F.3d 257, 280 (3rd Cir. 2007).

A ruling on a motion to dismiss is not, however, "a permissible vehicle for addressing the sufficiency of the government's evidence." United States v. DeLaurentis, 230 F.3d 659, 660–61 (3rd Cir. 2000). "Evidentiary questions" such as credibility determinations and the weighing of proof should not be determined at this stage. United States v. Gallagher, 602 F.2d 1139, 1142 (3rd Cir.1 979). Rather, in considering a defense motion to dismiss an indictment, the district court must accept as true the factual allegations set forth in the indictment. Bergrin, 650 F.3d at 265; United States v. Besmajian, 910 F.2d 1153, 1154 (3rd Cir.1990).[1]

**B. The Statute of Limitations**

The statute of limitations for securities fraud (Counts Nine and Ten of the indictment) is six years and there is no dispute that those counts were timely filed within the applicable period. As noted above, the Mantria Ponzi scheme was operating at least until November 2009 when it was shut down by the SEC and the District Court in Colorado.[2] Therefore, the September 2015 indictment undoubtedly fell within the six-year statute of limitations for Counts Nine and Ten.

The statute of limitations for wire fraud (Counts One through Eight which are the subject of the defendant's motion) is ordinarily five years. 18 U.S.C. § 3282. However, pursuant to 18 U.S.C. § 3293(2), the statute of limitations for wire fraud and conspiracy to commit wire fraud is extended to ten years "if the offense affects a financial institution." United States v. Heinz, 790

[1] In his amended motion, the defendant argues that a pretrial motion to dismiss is appropriate when the facts are not in dispute. The indictment alleges, and the government avers, that the defendant's fraudulent conduct affected a financial institution as defined by 18 U.S.C. § 3293(2). The defendant contests that point. Therefore, there are facts in dispute. The government will not concede any factual basis which falls short of that legal standard.

[2] Arguably, the fraud scheme continued into early 2010 when the defendants sent e-mails to victims in an attempt to lull them with false statements about the SEC action and the continued viability of Mantria.

F.3d 365, 367, (2d Cir. 2015). "[T]he verb 'to affect' expresses a broad and open-ended range of influences." Id. (citing United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 90 (2d Cir. 1999). The plain language of § 3293(2) makes clear that Congress chose to extend the statute of limitations for a broad class of crimes, including crimes in which the financial institution was not a victim of the fraud. United States v. Pellulo, 964 F.2d 193, 214-16 (3d Cir. 1992); see also United States v. Bouyea, 152 F.3d 192, 195 (2d Cir. 1998).

Whether the indictment was filed within the applicable statute of limitations time period is a finding of fact for the jury to decide. See Pelullo, 964 F.2d at 214-16; United States v. Bouyea, 152 F.3d 192, 195 (2nd Cir. 1998); United States v. Lowell, 649 F.2d 950 (3rd Cir. 1981).

**C. The Indictment**

In this case, the indictment alleged that the charged wire fraud scheme and conspiracy affected a financial institution in two separate and distinct ways. First, in Count One, paragraph 5, the indictment alleged that the defendants set up Mantria Financial as a "financial institution" and a "mortgage lending business." Those terms are defined in 18 U.S.C. §§ 20(10) and 27. Under 18 U.S.C. § 20, all "mortgage lending businesses" qualify as financial institutions. Under 18 U.S.C. § 27, a mortgage lending business is defined as any "organization which finances or refinances any debt secured by an interest in real estate . . . and whose activities affect interstate or foreign commerce."

The indictment alleged that through Mantria Financial:

> Defendants WRAGG, KNORR, and MCKELVY used the funds raised by Mantria Financial to purchase or finance mortgages for undeveloped real estate in Tennessee owned by the Mantria or its subsidiaries in order to generate paper profits for Mantria and inflate the value of the undeveloped land. Defendants

> WRAGG, KNORR, and MCKELVY then used the proceeds from the land "sales" for other Mantria-related business and for their own personal enrichment.

Indictment, Count One, paragraph 5. In so doing, the Mantria Ponzi scheme affected a financial institution, namely, Mantria Financial, as described in more detail below.

As a second and independent basis for extending the statute of limitations, the indictment alleged in Count One, paragraph 2 that the conspiracy to commit wire fraud and the wire fraud scheme affected financial institutions because defendant MCKELVY "advised prospective investors to liquidate other investments, including retirement accounts, and to obtain the maximum amount of funds in loans from financial institutions in the form of credit cards, insurance policies, home equity, and other loans, and invest all these funds in Mantria[3] and its related entities." In order to extend the statute of limitations under 18 U.S.C. § 3293(2) for fraud affecting a financial institution, the term "affects" includes a new or increased risk of loss to financial institutions even if the financial institution does not suffer a loss. United States v. Mullins, 613 F.3d 1273, 1278–79 (10th Cir. 2010) (holding that a new or increased risk of loss is sufficient to establish that wire fraud affects a financial institution); United States v. Serpico, 320 F.3d 691, 694 (7th Cir. 2003) (holding that fraud affects a bank if the bank is exposed to an increased risk of loss, even if the bank never suffers an actual loss). Thus, as alleged by the indictment, defendant MCKELVY's fraud affected the financial institutions from whom the victims of the fraud secured credit and funds to invest in Mantria.

As it pertained specifically to language extending the statute of limitations under both basis described above, in Count One, paragraph 8, the indictment alleged, "defendants TROY

---

[3] This allegation is consistent with the District Court's finding in the SEC action as described above.

WRAGG, AMANDA KNORR, and WAYDE MCKELVY conspired and agreed together to commit offenses against the United States, that is, wire fraud *affecting a financial institution*, in violation of 18 U.S.C. § 1343" [emphasis added]. Counts Two through Eight of the indictment, in paragraph 2, make a similar allegation that "defendants TROY WRAGG, AMANDA KNORR, and WAYDE MCKELVY *in circumstances affecting a financial institution*, devised and intended to devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises" [emphasis added].

In Count One, paragraph 15, which is also incorporated in Counts Two through Eight, the indictment sets forth the amount of loss from the fraud: "By their false statements, defendants TROY WRAGG, AMANDA KNORR, WAYDE MCKELVY raised approximately $54.5 million from investors and paid investors approximately $17.5 million in "earnings," resulting in a net loss of approximately $37 million. Defendants WRAGG and KNORR paid Defendant MCKELVY approximately $6.2 million in commissions for raising investor funds for Mantria."

The indictment, therefore, contained the elements of the offense intended to be charged, sufficiently apprised the defendant of what he must be prepared to meet, and allowed the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.

**D. Application**

As noted above, at this stage of the proceeding, the Court must accept the factual allegations set forth in the indictment as true. Bergrin, 650 F.3d at 265; United States v. Besmajian, 910 F.2d 1153, 1154 (3rd Cir.1990). The indictment sets forth precisely how the defendants' alleged conduct affected a financial institution, under two separate and distinct

theories, in order to extend the statute of limitations. The indictment also sets forth the losses incurred as a result of the fraud. Whether the government can prove these allegations is a question for the finder of fact at trial. See United States v. Pelullo, 964 F.2d 193, 214-16 (3rd Cir. 1992). Therefore, there is no basis to dismiss the indictment.

In his motion, the defendant engaged in exactly the type of factual disputes which are not appropriate in a motion to dismiss. See United States v. DeLaurentis, 230 F.3d 659, 660–61 (3rd Cir. 2000). The defendant, in considerable detail, explored the government's evidence, the testimony of certain witnesses before the grand jury, and other evidence provided in discovery. In so doing, the defendant highlighted certain helpful statements and ignored or discounted unhelpful statements, as if he were presenting a closing argument to the jury. In his amended motion, the defendant added some additional factual material, nonetheless, he is still quarreling with the allegations in the indictment.

Among the new factual material added to his amended motion is the putative testimony of Christopher Flannery, who was the attorney for Mantria. As provided in the discovery materials, Flannery is expected to testify at trial that, when he first became an attorney for Mantria, Mantria was engaged in the sale of real estate in Tennessee. As a result of the financial crisis of 2008, Mantria began to experience severe financial problems because banks and other financial institutions had restricted the ability of prospective real estate buyers to secure mortgages to buy Mantria real estate. Flannery, therefore, advised defendant TROY WRAGG to create his own bank or other financial institution in Tennessee to lend money to prospective real estate buyers. With Flannery's legal assistance, WRAGG created Mantria Financial, which was a financial institution licensed to lend money under Tennessee law. Mantria Financial

subsequently lent money to prospective real estate buyers for the land Mantria was selling in Tennessee. When the Mantria Ponzi scheme collapsed in November 2009, Mantria Financial and the remainder of the Mantria entities went bankrupt. All Mantria related-entities, including Mantria Financial, were ordered into receivership by the U.S. District Court in Colorado. Flannery will certainly not be the only witness to testify to these facts.

In this manner, the government will prove at trial, as the government alleged in the indictment, that the Mantria Ponzi scheme affected a financial institution, namely, Mantria Financial, by forcing it to go bankrupt and into receivership. The government cannot conceive of an affect greater than bankruptcy and receivership for a financial institution. As noted above, the collapse of the Mantria Ponzi scheme also affected other financial institutions, that is, the banks and other financial institutions who lent money to victims who then used that money to invest in Mantria (following the advice of defendant MCKELVY who urged investors to borrow money from banks and credit cards to invest in Mantria). Under the law, as described herein, this conduct also meets the standard for affecting a financial institution because it placed those loans in jeopardy. Nonetheless, the defendant, in his motion, challenges both ways the indictment alleges that the Mantria Ponzi scheme affected a financial institution.

**1. Mantria Financial**

In his motion, the defendant argued the extended statute of limitations is not applicable here because Mantria Financial was neither a financial institution nor a mortgage lending business. Under the law of the State of Tennessee, Mantria Financial was both. The defendant's argument twists and contorts the facts and the law beyond any recognition. First, he argued that Mantria Financial was not a mortgage lending business because it did not issue "mortgages."

That argument simply is not supported by the evidence because Mantria Financial kept very detailed mortgage records, records which have been turned over in discovery, showing which buyers received mortgages on which lots and the terms of those mortgages. All of the real estate transactions were properly filed by title companies in Tennessee pursuant to state law.

Second, the defendant argued that Mantria Financial was not a business because it did not expect to turn a profit. There is absolutely no requirement in the law that a business “make a profit or earn money” in order to qualify as a mortgage lending business under 18 U.S.C. §§ 20 and 27. In fact, the law states that all mortgage lending businesses qualify as financial institutions. Putting aside the fact that such an argument would means that many well-known banks and other financial institutions would not be considered “businesses” under the defendant’s definition because they are not currently profitable, Mantria Financial was an instrumental part of Mantria. Mantria was buying land in Tennessee for as little as $2000 an acre and attempting to sell it for more than $100,000 acre. Without Mantria Financial, these sales would have never taken place. The whole point of Mantria and Mantria Financial was to make money. The fact that Mantria was a Ponzi scheme does not change that intent. Moreover, Mantria Financial charged various fees just like any other lender. Most of the sales contracts contained: (1) a loan origination fee of $500, (2) a processing fee of $500, and (3) a servicing fee of $1000, among other fees all due to Mantria Financial at closing. To suggest that Mantria Financial was not a “business” is simply not supported by the evidence.

Third, the defendant argued that Mantria Financial was not a mortgage lending business because they never intended for the loans to be repaid. The government’s evidence will prove the contrary. As described above, Mantria intended to profit from the sale of the real estate in

Tennessee.  A Mantria Financial private placement memorandum ("PPM") circulated to investors seeking capital funding stated that the interest rate on the real estate mortgages ranged from 9% to 12% depending on the FICO scores, debt-to-income ratio, and amount of assets of the real estate purchasers.   The Mantria Financial PPM further stated that the mortgages would paid as "balloon" deferred payments for a term of 36 months.  Other loans were deferred for 24 months.  Simply because the Mantria Ponzi scheme collapsed before most of the loans came due is not evidence that Mantria Financial did not intend to be repaid.  Second, there is no requirement in the law that there must be an intent on either party to repay the loan.  There are many lawful business which operate without such intent.  Many lenders intend on reselling the loan before payment is due and many borrowers intend on refinancing the loan before payment is due.  These are common and lawful business practices which do not negate the fact that the former remains a mortgage lending business.

Fourth, the defendant argued that the fraud did not affect Mantria Financial because Mantria Financial was headed towards bankruptcy regardless of the fraud.  The defendant's argument on this point is entirely speculative and irrelevant.  As the defendant described in his motion, Mantria had been suffering from financial problems for several years at the time of Mantria's collapse.  However, despite these financial problems, Mantria Financial continued to survive and Mantria continued perpetuate the fraud.  What finally stopped the Mantria fraud was the SEC action.  The defendants' fraudulent conduct was the proximate cause of Mantria Financial's collapse.  The fact that Mantria Financial might have eventually declared bankruptcy at some indefinite point in the future is irrelevant.  The defendant is essentially arguing that he cannot be convicted of murder because his victim would have eventually died of natural causes

at some indefinite point in the future.  Many legitimate banks suffer financial problems, that does not mean they are not banks.  Here, there is no question that the defendant's fraud scheme "affected" Mantria Financial as defined by the statute.

Fifth, the defendant argues that Mantria Financial was not a financial institution because "there was no difference between the alleged financial institution, on the one hand, and the criminal co-owners and co-operators of the business, on the other."  However, as the defendant himself concedes in his motion, the law is clear that even if the financial institution was an "active participant" in the fraud, it still qualifies as a financial institution under the statute.  See e.g., United States v. Serpico, 320 F.3d 691, 695 (7th Cir. 2003).  Therefore, the defendant's argument on this point is without merit.

Finally, the defendant compares the facts of this case to two unpublished district court cases from the Southern District of New York – United States v. Carollo and United States v. Ghavami both of which related to a motion to dismiss on statute of limitations grounds.  Even if the defendant's interpretation of the holdings of both cases is correct, which the government suggests that it is not,[4] those holdings would be contrary to the precedential Third Circuit opinions in Bergrin, Vitello, Rankin, and Kemp described above which define the pleading requirements for an indictment.  Obviously, this Court is bound to follow the precedential Third Circuit opinions and not the unpublished district court opinions from New York.

---

[4] The government suggests that the defendant takes the finding and analysis of these cases out of context when applying them to the case at bar.  The Carollo opinion, for example, rested on a simple finding that the government could not establish any actual loss and the risk of loss to a financial institution was only *de minimus*.  The Mantria indictment certainly alleged actual loss and greater than *de minimus* risk of loss, therefore, Carollo is not analogous.  The Ghavami opinion denied the defendant's motion to dismiss the indictment.  The fact that the Ghavami opinion addressed and serially rejected the defendant's arguments does not add additional pleading requirements to an indictment to address those same issues in a different case.

**2. Other Financial Institutions**

The second manner in which the defendant's fraud affected a financial institution, as alleged in the indictment, is that defendant MCKELVY encouraged Mantria investors to borrow money from financial institutions in the form of credit cards, insurance policies, home equity loans, and other loans, and invest all these funds into Mantria. Obviously, when the Mantria Ponzi scheme collapsed, the ability of the victims to repay these loans was significantly jeopardized.

Nothing more than that allegation is required under the law. The law is clear that the government does not have to prove actual loss to a financial institution, merely the new or increased risk of loss. United States v. Mullins, 613 F.3d 1273, 1278–79 (10th Cir. 2010) (holding that a new or increased risk of loss is sufficient to establish that wire fraud affects a financial institution); United States v. Serpico, 320 F.3d 691, 694 (7th Cir. 2003) (holding that fraud affects a bank if the bank is exposed to an increased risk of loss, even if the bank never suffers an actual loss). Thus, as alleged by the indictment, defendant MCKELVY's fraud affected the financial institutions from whom the victims of the fraud secured credit and funds to invest in Mantria.

In his motion, the defendant claimed that he has reviewed the discovery material and cannot find any "apparent support" for the government's argument. Rather, the discovery materials contain many examples of support, primarily from the victim files disclosed on discovery disk #4. The victim files contain a victim questionnaire and other supporting documents describing the victim's experience with Mantria and the defendants. Thumbing

through the files of some victims and randomly picking the files of a few victims whose last name begins with the letter "B" revealed the following:

- Victims DB and his wife PB, stated that they first saw defendant MCKELVY on television advertising his investment club called "Speed of Wealth." Victims DB and PB then went to a seminar where defendant MCKELVY spoke. Defendant MCKELVY advised Victims DB and PB to borrow money from banks to invest in Mantria. Victims DB and PB subsequently invested $100,000 in Mantria. Of that investment, they used $25,000 withdrawn from a credit card and $25,000 withdrawn from a home equity line of credit.

- Victim MB stated that he first heard defendant MCKELVY advertising his investment club "Speed of Wealth" on the radio. Victim MB stated that he went to a seminar where MCKELVY advised him to borrow money from banks to invest in Mantria. Victim MB subsequently invested $59,000 in Mantria, a portion of which came from cash advances on his credit cards.

- In a similar manner, Victim GB stated that he invested he invested $134,000 in Mantria after listening to defendant MCKELVY speak at a seminar in Arizona. A portion of the funds which Victim GB invested came from a home equity line of credit. Victim GB stated that he was "financially devastated" when Mantria collapsed.

- Victims JB and FB stated that they also invested in Mantria after attending a seminar in which defendant MCKELVY spoke. Following defendant MCKELVY's advice, Victims JB and KB, invested $125,000 in Mantria, $50,000 of which came from a home equity line of credit.

Those are just four examples of victims whose last name ends in "B". All of these victims lost all or most of their investments in Mantria. There are dozens of other examples for victims whose last name ends in other letters of the alphabet. In total, there were more than 300 victims of this Ponzi scheme, many of whom were coached by MCKELVY to take loans from banks to invest in Mantria. That was part of defendant MCKELVY's standard sales pitch.[5] Once Mantria collapsed, the victims' ability to repay these loans to the financial institutions was seriously jeopardized. Many victims lost their homes, defaulted on their credit cards and other loans which they had used to invest in Mantria, and suffered extreme financial hardship. The financial institutions who had lent money to the Mantria victims who used that money to invest in Mantria were also obviously affected by Mantria's collapse and the inability of the victims to repay those loans.

Finally, the defendant repeats his arguments based upon the unpublished opinions in United States v. Carollo and United States v. Ghavami. For the same reasons, this Court should rely on the published Third Circuit decisions in Bergrin, Vitello, Rankin, and Kemp described above. Citing to Carollo and Ghavami, the defendant also argued that the government is required to supply certain information to the defendants, akin to a Bill of Particulars. Of course, full discovery obviates the need for a Bill of Particulars. United States v. Urban, 404 F.3d 754, 771 (3d Cir. 2005); United States v. Giese, 597 F.2d 1170, 1180 (9th Cir. 1979). In this case, all of the information which the defendant requested can be found in the indictment, in the

5 MCKELVY called his investing method "arbitrage." His theory was that the victims could take out loans from banks at 5% or 10% and invest the money in Mantria where they could earn returns of 50% or higher. The victims would then profit on the difference between the loan rate and the Mantria investment returns. MCKELVY told investors that this was how the "super-rich" had earned their money.

discovery materials, and, in particular, in the victim folders found on Disk 4 of the discovery materials.

**3. Notice**

Lastly, the defendant's motion is self-defeating by his own admission in filing this motion that he is aware that the government intends to argue that the 10-year statute of limitations applies. As noted above, the primary purpose of an indictment is to give the defendant notice of the charges against him. See Bergrin, 650 F.3d at 264. The indictment in this case clearly has met its intended purpose because the defendant is well aware of the government's theory of the case, especially as it pertains to the statute of limitations. Therefore, the defendant does not claim and cannot claim that he has suffered any prejudice from any alleged deficiency in the charging language of the indictment. By acknowledging and repeating the government's theory of the case in his motion to dismiss, the defendant admitted that he has received notice, negating any reason to dismiss the indictment.

## III. Conclusion

For the reasons described above, the defendant's amended motion to dismiss Counts One through Eight of the indictment based on the statute of limitations should be denied.

Respectfully submitted,

LOUIS D. LAPPEN
Acting United States Attorney

/s/
ROBERT J. LIVERMORE
Assistant United States Attorney


CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served upon the following:

Walter Batty, Esq.
William Murray, Esq.
Counsel for WAYDE MCKELVY

/s/
ROBERT LIVERMORE
Assistant United States Attorney